**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 12-CV-00292-RM-KMT

In re MOLYCORP, INC. SECURITIES LITIGATION.

---

**ORDER**

---

This uncertified securities fraud class action comes before the Court on Defendants'

motion to dismiss (ECF No. 109) Plaintiffs'[1] consolidated complaint[2] ("Complaint") (ECF No.

60).  The motion is fully briefed and ripe for adjudication.  (ECF Nos. 110; 121; 122; 123.)

Defendants also filed a motion for the Court to take judicial notice of certain documents filed in

support of their motion to dismiss.  (ECF No. 111.)  The Court, under a separate order, has

addressed that request and incorporates its rulings herein.

Plaintiffs allege securities fraud under Sections 10(b), 20(a), and 20A of the Securities

Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1 and United States

Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.  Plaintiffs

also allege violations of Sections 11, 12(a), and 15 of the Securities Act of 1933 ("1933 Act"), 15

U.S.C. §§ 77k, 77l, and 77o.

The Court has subject matter jurisdiction pursuant to Section 27 of the 1934 Act, 15

U.S.C. § 78aa(a), and Section 22 of the 1933 Act, 15 U.S.C. § 77v(a), as well as pursuant to 28

U.S.C. § 1331.

---

[1] On May 29, 2012, the Court appointed certain lead Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 *et seq*.  (ECF No. 49.)
[2] Subsequent to filing the Complaint, Plaintiffs voluntarily dismissed Defendant KMSMITH LLC.  (ECF No. 105.)

For the reasons discussed below, the Court GRANTS Defendants' motion to dismiss.

## I.   BACKGROUND

Because this matter is before the Court on Defendants' motion to dismiss, the Court accepts all well-pled facts, as distinguished from conclusory allegations, as true. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1088 (10th Cir. 2003) (citation omitted). The Court also incorporates those facts of which it takes judicial notice pursuant to Defendants' motion (ECF No. 111) and the parties' stipulation (ECF No. 116).

### A.   Overview

Plaintiffs, a group of individuals who purchased shares of Defendant Molycorp, Inc.'s ("Molycorp" or "Company") stock during the class period (February 11, 2011 through November 10, 2011) ("Class Period"), bring this action to recover damages sustained as a result of Defendants' allegedly misleading statements regarding "rare earth elements" ("REEs") at Molycorp's mine known as "Mountain Pass." (ECF No. 60 ¶¶ 1-3.) Plaintiffs allege that Defendants told investors that commercially significant amounts of "heavy" REEs ("HREEs") were located at Mountain Pass, that they would produce these HREEs during phases of developing Mountain Pass (a project known as "Project Phoenix"), and that no substitutes were available for these HREEs. (ECF No. 60 ¶ 3.)

Plaintiffs allege that there were no commercially significant volumes of HREEs at Mountain Pass and that Defendants knew of this fact. (ECF No. 60 ¶¶ 83-106; *see also* ECF No. 60 ¶¶ 267-68.) Plaintiffs rely upon an "industry expert" and a former Molycorp "analytical chemist" to form the basis for these allegations. (ECF No. 60 ¶ 4.) Plaintiffs allege that Defendants made these misleading statements to inflate Molycorp's stock prices to allow "insider selling" Defendants to sell large portions of their shares in Molycorp. (ECF No. 60 ¶ 5.)

Further, the alleged inflated stock price allowed Molycorp to raise additional funds through a follow on stock offering and acquire another company ("Aktsiaselts Silmet Grupp").  (ECF No. 60 ¶ 5.)

Plaintiffs allege that between November 8, 2011 and November 10, 2011, information regarding the true nature of Mountain Pass's HREE inventory became available to the market and, as a result, Molycorp's stock dropped and Plaintiffs were harmed.  (ECF No. 60 ¶¶ 149-151, 279.)

**B.      The Parties and the Claims**

Plaintiffs bring this action on behalf of all purchasers or acquirers of Molycorp securities from February 11, 2011 through November 10, 2011, including all persons who purchased or acquired Molycorp 5.50% Series A Mandatory Convertible Preferred Stock in the February 11, 2011 offering (hereinafter "February Offering") and all persons who purchased Molycorp common stock in the June 10, 2011 secondary offering (hereinafter "June Offering").  (ECF No. 60 ¶¶ 10-21.)

Molycorp is a Colorado-based company (ECF No. 60 ¶ 8) whose core business is the mining, production, and sale of rare earth elements (ECF No. 60 ¶ 22).

1934 Act Defendants include Molycorp (ECF No. 60 ¶ 22), certain Molycorp executive officers and/or directors[3] (ECF No. 60 ¶¶ 23, 28, 31, 34, 35, 39, 41, 43, 44) as well as certain Molycorp private equity investors[4] (ECF No. ¶¶ 37, 38, 40, 42).

---

[3] Mark A. Smith ("Smith") (Chief Executive Officer and Director); James S. Allen ("Allen") (Chief Financial Officer and Treasurer); John F. Ashburn, Jr. ("Ashburn") (Executive Vice President and General Counsel); Ross R. Bhappu ("Bhappu") (Chairman of the Board of Directors); John L. Burba ("Burba") (Executive Vice President and Chief Technology Officer); Brian T. Dolan ("Dolan") (Director); Mark Kristoff ("Kristoff") (Director); Charles R. Henry ("Henry") (Director); and Jack E. Thompson ("Thompson") (Director).

[4] Craig M. Cogut ("Cogut"); Pegasus Capital LLC ("Pegasus"); RCF Management, LLC ("RCF" or "Resource Capital Funds"); and T-II Holdings, LLC ("T-II Holdings").

1933 Act Defendants include Molycorp (ECF No. 60 ¶ 47), certain Molycorp executive officers and/or directors[5] (ECF No. 60 ¶¶ 48-52, 54-58), a Molycorp private equity investor[6] (ECF No. 60 ¶ 53), and various securities underwriters[7] (ECF No. 60 ¶¶ 59-68).

Plaintiffs' securities claims focus upon three broad categories of misrepresentations: statements related to Mountain Pass (ECF No. 60 ¶¶ 108, 115, 117, 121, 127, 129, 133); statements related to the demand and lack of available substitutes for REEs (ECF No. 60 ¶¶ 110, 115, 128); and statements in SEC certifications (ECF No. 60 ¶¶ 116, 122, 134).

Between February and June 2011, Insider Selling Defendants[8] collectively sold 31,419,972 shares of their holdings in Molycorp's stock—generating $1,584,366,300 in trading proceeds. (ECF No. 60 ¶ 87.) Insider Selling Defendants allegedly sold these shares at prices ranging from $50 to $51 per share (ECF No. 60 ¶ 88) despite the fact that the stock traded above $70 per share during the Class Period (ECF No. 60 ¶ 159).

C.    **Project Phoenix**

Beginning in 2010, Molycorp began the process of commencing mining operations at Mountain Pass as well as modernizing and expanding the facility. (ECF No. 60 ¶ 80.) Plaintiffs allege that Molycorp's goal was to become a "vertically integrated producer of high-performance permanent rare earth magnets that would incorporate the use of highly-valued HREEs. . . ." (ECF No. 60 ¶ 80.) Plaintiffs allege that Defendants assured investors that demand for these

---

[5] Smith; Allen; Ashburn; Russell D. Ball ("Ball") (Director); Bhappu; Dolan; Kristoff; Alec Machiels ("Machiels") (Director); Henry; and Thompson.
[6] Cogut.
[7] J.P. Morgan Securities LLC ("J.P. Morgan"); Morgan Stanley & Co. LLC ("Morgan Stanley"); Knight Capital Americas, L.P. ("Knight"); Dahlman Rose & Company, LLC ("Dahlman"); Stifel, Nicolaus & Company Inc. ("Stifel"); BNP Paribus Securities Corp. ("BNP"); CIBC World Markets Corp. ("CIBC"); Piper Jaffray & Co. ("Piper Jaffray"); and RBS Securities Inc. ("RBS").
[8] Defendants Smith, Allen, Ashburn, Bhappu, Dolan, RCF, Burba, Cogut, Pegasus, Kristoff, T-II Holdings, Henry, and Thompson are referred to herein, collectively, as the "Insider Selling Defendants."

products was expected to increase and that China (where most REEs were produced) was restricting its exports of the elements.  (ECF No. 60 ¶ 80.)

Project Phoenix was to be completed in phases.  (ECF No. 60 ¶ 81.)  Plaintiffs allege that during Project Phoenix Phase I, Molycorp "envision[ed] the production of 19,500 metric tons of REE oxides from Mountain Pass. . . ."  (ECF No. 60 ¶ 81.)  Plaintiffs allege that during Project Phoenix Phase II, Molycorp "envision[ed] the production of 40,000 metric tons of REE oxides. . . ."  (ECF No. 60 ¶ 81.)  Plaintiffs allege that according to Molycorp's SEC filings and various presentations, Molycorp would produce HREEs during Project Phoenix Phases I and II and would transport "dysprosium and terbium mined from Mountain Pass to off-site facilities to produce rare earth metals and alloys."  (ECF No. 60 ¶ 82.)

**D.  Alleged Material Misrepresentations and Omissions**

Plaintiffs generally allege that Smith, Allen, Ashburn, Ball, Bhappu, Burba, Dolan, Kristoff, Machiels, Henry, and Thompson were senior officers or directors of Molycorp; each of them had access to the materially adverse, undisclosed information; each of them directly participated in the management of Molycorp; each was directly involved in the day-to-day operations of Molycorp; and each was involved in signing and/or disseminating the information in the SEC forms and press releases.  (ECF No. 60 ¶¶ 23-26, 28-30, 31, 33, 34-37, 39, 41, 43-44, 45, 70-74.)

Plaintiffs allege that because Defendants Smith, Allen, Ashburn, and Burba's compensation was tied to specific Project Phoenix milestones, they had knowledge of Project Phoenix's status as well as knowledge of whether commercial volumes of HREEs existed at Mountain Pass.  (ECF No. 60 ¶ 82.)

1.    <u>February 2011 Statements Related to Molycorp's Initial Public Offering</u>

On January 24, 2011, Molycorp filed a registration statement for 5.50% Series A

Mandatory Convertible Preferred Stock for its initial public offering ("IPO").  (ECF No. 60 ¶

107.)  Defendants Smith, Allen, Ashburn, Ball, Bhappu, Cogut, Dolan, Kristoff, Machiels,

Henry, and Thompson signed the registration statement for the February Offering.  (ECF No. 60

¶ 107.)  The offering documents, including the Free Writing Prospectus, for the February

Offering allegedly contained materially false and misleading statements.  (ECF No. 60 ¶¶ 108-

112.)  Plaintiffs allege that the February Offering documents contain the following materially

false and misleading statement:

> If we are able to add an off-site facility to product [sic] rare earth metals and alloys instead of adding such facilities and equipment at Mountain Pass, we would transport cerium, lanthanum, neodymium praseodymium, dysprosium, terbium, and samarium oxide products from our Mountain Pass facility to that off-site location to produced [sic] rare earth metals and alloys. . . .
>
> *        *        *
>
> The oxides produced from processing REE's are collectively referred to as REOs. Light and heavy REE are contained in all rare earth deposits, including in our deposit at Mountain Pass.

(ECF No. 60 ¶ 108.)

Molycorp's February Offering document further states that

> IMCOA[9] estimates there is a [sic] currently a global deficit in REO supply, which anticipated [sic] to continue without the advent of production from new projects, such as Mountain Pass.  Limits on rare earth exports from China and the lack of available substitutes makes the development of new sources of REEs essential to meet the growing demand for existing and emerging technologies, such as hybrid and electric vehicles, wind power turbines, compact fluorescent light bulbs, hard disk drives and dual use electronics.

(ECF No. 60 ¶ 110.)

---

[9] Although not defined in Plaintiffs' Complaint, Defendants aver that "IMCOA" refers to the Industrial Minerals Company of Australia Pty Ltd.  (ECF No. 110 at 12.)  Plaintiffs do not contest this averment.  Plaintiffs do not allege that IMCOA has any corporate relationship to Molycorp.  (*See generally* ECF No. 60.)

On February 14, 2011, Molycorp filed a prospectus associated with the February Offering that contained the same statements distributed to the market in Molycorp's February 11, 2011 Free Writing Prospectus.  (ECF No. 60 ¶ 111.)

Plaintiffs allege that these statements are false and misleading and Defendants omitted material facts based on the following:

(a)     Goldman Sachs sold its private investment in the Company because Goldman Sachs had concluded that Mountain Pass' lack of commercial amounts of HREEs and the mine's relatively low percentage of the key LREE, as compared to the Company's non-Chinese high volume rivals, placed Molycorp at a competitive disadvantage (ECF No. 60 ¶ 112(a));

(b)     daily analysis of 20 to 30 samples of solvent extraction circuits of Mountain Pass ore stock piles showed no dysprosium or terbium in Mountain Pass ore and the elements could not be produced from Mountain Pass ore body in commercially significant quantities (ECF No. 60 ¶ 112(b));

(c)     investigations of float tests of Mountain Pass ore body revealed that commercially viable volumes of HREEs did not exist in Mountain Pass ore and the results of these tests were maintained in the Company's database which was widely accessible to Company management (ECF No. 60 ¶ 112(c));

(d)     Molycorp attempted to purchase companies with proven deposits of commercial volumes and recoverable levels of HREEs (ECF No. 60 ¶ 112(d));

(e)     Molycorp never attempted to extract traces of contaminated HREEs (ECF No. 60 ¶ 112(e));

(f)     analysis of Mountain Pass ore body, publicly available after the Class Period, revealed a weight to volume of 0.0% for key HREEs (ECF No. 60 ¶ 112(f));

(g)      an internal written report by a Vice President of Molycorp indicated that

Mountain Pass ore body did not have commercially viable amounts of HREEs (ECF No. 60 ¶

112(g)); and

(h)      Molycorp failed to disclose that the company could not produce commercially

viable amounts of highly-valued HREEs during Phase I or Phase II of Project Phoenix (ECF No.

60 ¶ 112(h)).

        2.      Molycorp's 2010 Form 10-K and Statements during a Conference Call

On March 9, 2011, Molycorp filed its 2010 Form 10-K with the SEC.  (ECF No. 60 ¶

115.)  Defendants Smith, Allen, Bhappu, Dolan, Henry, Kristoff, and Thompson signed the 2010

Form 10-K.  (ECF No. 60 ¶ 115.)  The 2010 Form 10-K allegedly contains the following

materially false and misleading statements:

> We expect to sell and transport a portion of the REOs we produce to customers
> for use in their particular applications.  The remainder of the REOs will be
> processed into rare earth metals.  A portion of these metals will be sold to end
> users and we expect to process the rest into rare earth alloys. . . . A portion of
> these rare earth alloys will be manufactured into NdFeB magnets as part of our
> alloy and magnet production joint ventures, described below, and we expect to
> sell the rest to end users. . . . If we are able to add an off-site facility to produce
> rare earth metals and alloys instead of adding such facilities and equipment at
> Mountain Pass, we would transport cerium, lanthanum, neodymium,
> praseodymium, dysprosium, terbium and samarium oxide products from our
> Mountain Pass facility to that off-side location to produce rare earth metals and
> alloys.

(ECF No. 60 ¶ 115.)

On March 9, 2011, Molycorp conducted its 2010 fourth quarter earnings conference call.

Defendants Smith and Allen participated in the call.  During the call, Defendant Smith made the

following statements in response to analyst inquiries:

> [Luisa Moreno-Analyst:]  All right.  So in the Phase 2, what other elements we
> should expect – we would likely see?  Can you comment on that?

[Mark Smith – Molycorp CEO:]  Yes.  We'll be producing 10 different rare earth elements as part of Phase 1 and as part of Phase 2 [of "Project Phoenix"], and that will be Cerium, Lanthanum, Neodymium, Praseodymium, Samarium, Gadolinium, Europium, Dysprosium, Terbium, and Yttrium.

[Luisa Moreno:]  And those are all coming from Mountain Pass, or are you getting concentrates from someone else?

[Mark Smith]:  No.  That's all from the Mountain Pass rare earth ore body.  And that's – just remember that everywhere the ore body has all of the rare earth elements in it.

\*        \*        \*

[Luisa Moreno:]  Yes.  Most of the cost will come from the separation part of separating these elements, and my understanding is the heaviest are harder to – require more processing.  So that's why I was asking.

[Mark Smith:] . . . So what that basically means is we look at these other rare earth elements that we'll be producing in commercial quantities as byproduct materials for the Company where we can really adjust our production costs on those elements, because we can move a lot of the fixed costs over to the higher-volume elements.  So we will end up with a very robust economic program by producing these materials and selling them on the open market.

\*        \*        \*

[Robert Crothers – Analyst:]  Yes, I have some questions.  First one is, I know you probably can't elaborate too much on any acquisitions, but being that you guys are considered to have light rare earth resources, would it be more – would we say it might be more of a possibility that you would look at a company with heavy rare earth deposits as opposed to one with more light rare earth deposits?"

[Mark Smith:]  Robert, I think that what you're really experiencing when you think about rare earths that way is a lot of promotional activities by a lot of junior exploration companies.  When you sit down and take a look at the rare earth deposits around the world, you have a bunch of different types of rare earth ore that could be out there, but the two primary types are bastnacite and monazite.  And there is a difference in monazite versus bastnacite in terms of the heavy rare earth concentration in it.  But what's very, very interesting is that when you look at any of these rare earth deposits that are being promoted around the world, what you find out is that Cerium is always the number-one element in the ore mix, Lanthanum is number two.  Neodymium is number three, Praseodymium is number four, and then everything else drops off substantially.
. . . And if you think about that calculation, what it does is it really makes it sound as if – the deposit like that Mountain Pass deposits is disadvantaged on that heavy

rare earth side, and, in fact, what it's really saying is, is that we have a very high ore grade. . . .

(ECF No. 60 ¶ 117.)

Plaintiffs allege that these statements are false and misleading and Defendants omitted material facts based on the following:

(a)     Goldman Sachs sold its private investment in the Company because Goldman Sachs had concluded that Mountain Pass' lack of commercial amounts of HREEs and the mine's relatively low percentage of the key LREE, as compared to the Company's non-Chinese high volume rivals, placed Molycorp at a competitive disadvantage (ECF No. 60 ¶ 118(a));

(b)     daily analysis of 20 to 30 samples of solvent extraction circuits of Mountain Pass ore stock piles showed no dysprosium or terbium in Mountain Pass ore and the elements could not be produced from Mountain Pass ore body in commercially significant quantities (ECF No. 60 ¶ 118(b));

(c)     investigations of float tests of Mountain Pass ore body revealed that commercially viable volumes of HREEs did not exist in Mountain Pass ore and the results of these tests were maintained in the Company's database which was widely accessible to Company management (ECF No. 60 ¶ 118(c));

(d)     Molycorp attempted to purchase companies with proven deposits of commercial volumes and recoverable levels of HREEs (ECF No. 60 ¶ 118(d));

(e)     Molycorp never attempted to extract traces of contaminated HREEs (ECF No. 60 ¶ 118(e));

(f)     analysis of Mountain Pass ore body, publicly available after the Class Period, revealed a weight to volume of 0.0% for key HREEs (ECF No. 60 ¶ 118(f));

(g)      an internal written report by a Vice President of Molycorp indicated that

Mountain Pass ore body did not have commercially viable amounts of HREEs (ECF No. 60 ¶

118(g)); and

(h)      Molycorp failed to disclose that the company could not produce commercially

viable amounts of highly-valued HREEs during Phase I or Phase II of Project Phoenix (ECF No.

60 ¶ 118(h)).

3.      Smith and Allen's Sarbanes-Oxley Act Certifications

Pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX"), *see* 15

U.S.C. § 7241(a) (ECF No. 60 ¶¶ 116, 118, 122, 123, 134, 135), Smith and Allen submitted

certifications to the SEC that Plaintiffs allege contain the following false and misleading

statements:

(a)      "[T]his report does not contain any untrue statement of material fact or omit to
state a material fact necessary to make the statements made, in light of the circumstances
under which such statements were made, not misleading with respect to the period
covered by this report"; and

(b)      "[I have] [d]esigned . . . disclosure controls and procedures, or caused such
disclosure controls and procedures to be designed under [my] supervision, to ensure that
material information relating to [Molycorp] is made known to us by others within
[Molycorp], particularly during the period in which this report is being prepared."

(ECF No. 60 ¶¶ 116, 122, 134.)

Plaintiffs allege that these statements are false and misleading and Defendants omitted

material facts based on the following:

(a)      Goldman Sachs sold its private investment in the Company because Goldman

Sachs had concluded that Mountain Pass' lack of commercial amounts of HREEs and the mine's

relatively low percentage of the key LREE, as compared to the Company's non-Chinese high

volume rivals, placed Molycorp at a competitive disadvantage (ECF No. 60 ¶¶ 118(a), 123(a), 135(a));

      (b)     daily analysis of 20 to 30 samples of solvent extraction circuits of Mountain Pass ore stock piles showed no dysprosium or terbium in Mountain Pass ore and the elements could not be produced from Mountain Pass ore body in commercially significant quantities (ECF No. 60 ¶¶ 118(b), 123(b), 135(b));

      (c)     investigations of float tests of Mountain Pass ore body revealed that commercially viable volumes of HREEs did not exist in Mountain Pass ore and the results of these tests were maintained in the Company's database which was widely accessible to Company management (ECF No. 60 ¶¶ 118(c), 123(c), 135(c));

      (d)     Molycorp attempted to purchase companies with proven deposits of commercial volumes and recoverable levels of HREEs (ECF No. 60 ¶¶ 118(d), 123(d), 135(d));

      (e)     Molycorp never attempted to extract traces of contaminated HREEs (ECF No. 60 ¶¶ 118(e), 123(e), 135(e));

      (f)     analysis of Mountain Pass ore body, publicly available after the Class Period, revealed a weight to volume of 0.0% for key HREEs (ECF No. 60 ¶¶ 118(f), 123(f), 135(f));

      (g)     an internal written report by a Vice President of Molycorp indicated that Mountain Pass ore body did not have commercially viable amounts of HREEs (ECF No. 60 ¶¶ 118(g), 123(g), 135(g)); and

      (h)     Molycorp failed to disclose that the company could not produce commercially viable amounts of highly-valued HREEs during Phase I or Phase II of Project Phoenix (ECF No. 60 ¶¶ 118(h), 123(h), 135(h)).

4.      Molycorp's 2011 Form 10-Qs

On May 10, 2011 and August 11, 2011, Molycorp filed its 2011 Form 10-Qs with the

SEC for the first and second quarters respectively.  (ECF No. 60 ¶¶ 121, 133.)  Defendants Smith

and Allen signed the Form 10-Qs.  (ECF No. 60 ¶¶ 121, 133.)  The Form 10-Qs, in pertinent

part, state:

> Our Mine Process and Development Plans
>
> . . . Prior to the expected completion of our initial modernization and expansion
> efforts, we expect to produce approximately 3,000 mt year in the aggregate of
> cerium products, lanthanum concentrate, didymium oxide and heavy rare earth
> concentrates from stockpiled feedstock.
>
> We currently produce rare earth metals outside of the United States through a
> third-party tolling arrangement.  Additionally, through our acquisitions of
> Molycorp Silmet AS and MMA in April 2011, we added facilities and equipment
> for metal conversion and alloy production within the Molycorp organization.  We
> intend to transport cerium, lanthanum, neodymium, praseodymium, dysprosium,
> terbium and samarium oxide products from our Mountain Pass facility to
> Molycorp Silmet AS and MMA to produce rare earth metals alloys.

(ECF No. 60 ¶¶ 121, 133.)

Plaintiffs allege that these statements are false and misleading and Defendants omitted

material facts based on the following:

(a)      Goldman Sachs sold its private investment in the Company because Goldman

Sachs had concluded that Mountain Pass' lack of commercial amounts of HREEs and the mine's

relatively low percentage of the key LREE, as compared to the Company's non-Chinese high

volume rivals, placed Molycorp at a competitive disadvantage (ECF No. 60 ¶ 123(a));

(b)      daily analysis of 20 to 30 samples of solvent extraction circuits of Mountain Pass

ore stock piles showed no dysprosium or terbium in Mountain Pass ore and the elements could

not be produced from Mountain Pass ore body in commercially significant quantities (ECF No.

60 ¶ 123(b));

(c)     investigations of float tests of Mountain Pass ore body revealed that commercially viable volumes of HREEs did not exist in Mountain Pass ore and the results of these tests were maintained in the Company's database which was widely accessible to Company management (ECF No. 60 ¶ 123(c));

(d)     Molycorp attempted to purchase companies with proven deposits of commercial volumes and recoverable levels of HREEs (ECF No. 60 ¶ 123(d));

(e)     Molycorp never attempted to extract traces of contaminated HREEs (ECF No. 60 ¶ 123(e));

(f)     analysis of Mountain Pass ore body, publicly available after the Class Period, revealed a weight to volume of 0.0% for key HREEs (ECF No. 60 ¶ 123(f));

(g)     an internal written report by a Vice President of Molycorp indicated that Mountain Pass ore body did not have commercially viable amounts of HREEs (ECF No. 60 ¶ 123(g)); and

(h)     Molycorp failed to disclose that the company could not produce commercially viable amounts of highly-valued HREEs during Phase I or Phase II of Project Phoenix (ECF No. 60 ¶ 123(h)).

5.     Molycorp's June 2011 Secondary Offering

On June 7, 2011, Molycorp filed a form S-1/A registration statement with the SEC for the June Offering of 13.7 million shares of common stock.  (ECF No. 60 ¶ 125.)  Defendants Smith, Allen, Ashburn, Ball, Bhappu, Cogut, Dolan, Kristoff, Machiels, Henry and Thompson signed the registration statement.  (ECF No. 60 ¶ 125.)  Molycorp also issued a prospectus associated with the June Offering.  (ECF No. 60 ¶ 126.)  The offering documents for the June Offering, in pertinent part, state:

Light and heavy REEs are contained in all rare earth deposits, including in our deposit at Mountain Pass.  Heavy REEs generally command higher sales prices on a per pound basis than light REEs because heavy REEs are not as prevalent.

*       *       *

REEs have unique properties that make them critical materials to many existing applications upon which society has become dependent as well as many emerging applications.

*       *       *

In addition, according to IMCOA, global demand for rare earths used in magnets [i.e., HREEs] is expected to grow at a CAGR of approximately 10-15% [between 2010 and 2015]. . . .

*       *       *

IMCOA estimates there is a [sic] currently a global deficit in REO supply which anticipated [sic] to continue without the advent of production from new projects, such as Mountain Pass.  Limits on rare earth exports from China and the lack of available substitutes make the development of new sources of REEs essential to meet the growing demand for existing and emerging technologies. . . .

We intend to transport . . . dysprosium [and] terbium . . . from our Mountain Pass facility to our Molycorp Silmet AS and MMA facilities where we will produce rare earth metals and alloys.

(ECF No. 60 ¶¶ 127, 128, 129.)

Plaintiffs allege that these statements are false and misleading and Defendants omitted material facts based on the following:

(a)      Goldman Sachs sold its private investment in the Company because Goldman Sachs had concluded that Mountain Pass' lack of commercial amounts of HREEs and the mine's relatively low percentage of the key LREE, as compared to the Company's non-Chinese high volume rivals, placed Molycorp at a competitive disadvantage (ECF No. 60 ¶ 130(a));

(b)      daily analysis of 20 to 30 samples of solvent extraction circuits of Mountain Pass ore stock piles showed no dysprosium or terbium in Mountain Pass ore and the elements could

not be produced from Mountain Pass ore body in commercially significant quantities (ECF No. 60 ¶ 130(b));

(c)      investigations of float tests of Mountain Pass ore body revealed that commercially viable volumes of HREEs did not exist in Mountain Pass ore and the results of these tests were maintained in the Company's database which was widely accessible to Company management (ECF No. 60 ¶ 130(c));

(d)      Molycorp attempted to purchase companies with proven deposits of commercial volumes and recoverable levels of HREEs (ECF No. 60 ¶ 130(d));

(e)      Molycorp never attempted to extract traces of contaminated HREEs (ECF No. 60 ¶ 130(e));

(f)      analysis of Mountain Pass ore body, publicly available after the Class Period, revealed a weight to volume of 0.0% for key HREEs (ECF No. 60 ¶ 130(f));

(g)      an internal written report by a Vice President of Molycorp indicated that Mountain Pass ore body did not have commercially viable amounts of HREEs (ECF No. 60 ¶ 130(g)); and

(h)      Molycorp failed to disclose that the company could not produce commercially viable amounts of highly-valued HREEs during Phase I or Phase II of Project Phoenix (ECF No. 60 ¶ 130(h)).

        6.      Molycorp's 2011 Second Quarter Earnings Conference Call

On August 11, 2011, Molycorp conducted its earnings conference call for the second quarter of 2011.  (ECF No. 60 ¶ 138.)  Defendants Smith and Allen participated in the call. (ECF No. 60 ¶ 138.)  During the call, Defendant Smith stated in response to analyst inquiries:

> [Michael Scarcello – Analyst]:  Hello, Mr. Smith.  My question is regarding
> Molycorp's long-term plans regarding heavy rare earths.  I know that you have an

impressive portfolio of light, neodymium and other critical materials, but what my concern is, as a shareholder, is a perceived lack of the heavies, particularly dysprosium, terbium, europium.  My question is, what are your long-term plans to secure a supply of those materials in particular?

[Mark Smith:]  First of all, let me reiterate from our prior calls that Molycorp will be producing 10 rare earth elements once Project Phoenix Phase 1 is up and operating, and we will be producing heavy rare earth metals as part of that production.  We will also be obtaining some heavy rare earth production as a result of our ownership of the Molycorp Silmet operation.  They'll be pulling those materials out, and we'll be processing those into final sellable products.

Molycorp has about 4 different tactics that is [sic] uses to handle what we call the dysprosium issue.  The dysprosium issue, which is linked to terbium as well, is really related to the rare earth magnet business, because without dysprosium, of course, these [NdFeb] magnets will not be able to operate at the higher temperature capacities without that dysprosium.  So in order to address that, our approach is, we will be producing materials from both Mountain Pass and Molycorp [Silmet].

(ECF No. 60 ¶ 138.)

Plaintiffs allege that these statements are false and misleading and Defendants omitted material facts based on the following:

(a)     Goldman Sachs sold its private investment in the Company because Goldman Sachs had concluded that Mountain Pass' lack of commercial amounts of HREEs and the mine's relatively low percentage of the key LREE, as compared to the Company's non-Chinese high volume rivals, placed Molycorp at a competitive disadvantage (ECF No. 60 ¶ 139(a));

(b)     daily analysis of 20 to 30 samples of solvent extraction circuits of Mountain Pass ore stock piles showed no dysprosium or terbium in Mountain Pass ore and the elements could not be produced from Mountain Pass ore body in commercially significant quantities (ECF No. 60 ¶ 139(b));

(c)     investigations of float tests of Mountain Pass ore body revealed that commercially viable volumes of HREEs did not exist in Mountain Pass ore and the results of these tests were

maintained in the Company's database which was widely accessible to Company management (ECF No. 60 ¶ 139(c));

(d)     Molycorp attempted to purchase companies with proven deposits of commercial volumes and recoverable levels of HREEs (ECF No. 60 ¶ 139(d));

(e)     Molycorp never attempted to extract traces of contaminated HREEs (ECF No. 60 ¶ 139(e));

(f)     analysis of Mountain Pass ore body, publicly available after the Class Period, revealed a weight to volume of 0.0% for key HREEs (ECF No. 60 ¶ 139(f));

(g)     an internal written report by a Vice President of Molycorp indicated that Mountain Pass ore body did not have commercially viable amounts of HREEs (ECF No. 60 ¶ 139(g)); and

(h)     Molycorp failed to disclose that the company could not produce commercially viable amounts of highly-valued HREEs during Phase I or Phase II of Project Phoenix (ECF No. 60 ¶ 139(h)).

7.     Molycorp's Mountain Pass Investor Day Comments[10]

On October 20, 2011, Molycorp held a 2011 Mountain Pass Investor Day during which "Defendants Smith and Burba, and *other Molycorp executives* participated in and spoke at the event." (ECF No. 60 ¶ 146 (emphasis added).)  Plaintiffs allege that Defendants presented a series of PowerPoint slides stating that Molycorp would produce dysprosium and terbium from Mountain Pass mine in commercial volumes.  (ECF No. 60 ¶ 146.)

---

[10] Although the parties do not provide any additional analysis with respect to these comments as to whether they are legally sufficient, the Court notes that Plaintiffs fail to identify who spoke the statements that Molycorp would produce dysprosium and terbium from Mountain Pass mine in commercial volumes.  (*See generally* ECF No. 60.) Because Plaintiffs fail to state the identity of the party making the false statements, any claims related to comments expressed at the Mountain Pass Investor Day are legally deficient.  *See Koch v. Koch Indus. Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (holding that an allegation under the more lenient pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure (in comparison to that of the PSLRA) is deficient when it "failed to identify any specific [d]efendant who made [the] alleged fraudulent misrepresentations or omissions").

Plaintiffs allege that Defendants' statements during Mountain Pass Investor Day were misleading based on the following:

(a)      Goldman Sachs sold its private investment in the Company because Goldman Sachs had concluded that Mountain Pass' lack of commercial amounts of HREEs and the mine's relatively low percentage of the key LREE, as compared to the Company's non-Chinese high volume rivals, placed Molycorp at a competitive disadvantage (ECF No. 60 ¶ 147(a));

(b)      daily analysis of 20 to 30 samples of solvent extraction circuits of Mountain Pass ore stock piles showed no dysprosium or terbium in Mountain Pass ore and the elements could not be produced from Mountain Pass ore body in commercially significant quantities (ECF No. 60 ¶ 147(b));

(c)      investigations of float tests of Mountain Pass ore body revealed that commercially viable volumes of HREEs did not exist in Mountain Pass ore and the results of these tests were maintained in the Company's database which was widely accessible to Company management (ECF No. 60 ¶ 147(c));

(d)      Molycorp attempted to purchase companies with proven deposits of commercial volumes and recoverable levels of HREEs (ECF No. 60 ¶ 147(d));

(e)      Molycorp never attempted to extract traces of contaminated HREEs (ECF No. 60 ¶ 147(e));

(f)      analysis of Mountain Pass ore body, publicly available after the Class Period, revealed a weight to volume of 0.0% for key HREEs (ECF No. 60 ¶ 147(f));

(g)      an internal written report by a Vice President of Molycorp indicated that Mountain Pass ore body did not have commercially viable amounts of HREEs (ECF No. 60 ¶ 147(g)); and

19

(h)     Molycorp failed to disclose that the company could not produce commercially viable amounts of highly-valued HREEs during Phase I or Phase II of Project Phoenix (ECF No. 60 ¶ 147(h)).

### E.     Loss Causation

Between November 8 and November 10, 2011, Plaintiffs allege that news began entering the market that "Molycorp had not determined whether any quantities of HREEs existed at the Mountain Pass mine and that Molycorp had no plans to actually produce HREEs from the Mountain Pass ore body. . . ." (ECF No. 60 ¶ 149.)  Plaintiffs allege that a "Molycorp senior executive" informed conference participants that Molycorp "had not found any quantities, let alone commercial quantities of HREEs in the Mountain Pass ore body and that HREEs would not be produced during Phase I or Phase II of Project Phoenix." (ECF No. 60 ¶ 149.)  The price of Molycorp's common stock dropped from a closing price of $42.29 per share on November 8, 2011 to a closing price of $33.45 per share on November 11, 2011.  (ECF No. 60 ¶ 151.)  The price of Molycorp's preferred stock dropped from a November 8, 2011 closing price of $80.04 per share to a closing price of $69.92 per share on November 11, 2011.  (ECF No. 60 ¶ 151.)

## II.     LEGAL STANDARDS

### A.     General Pleading Standards under Rule 8

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must be dismissed if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a

complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . ." *Id.* at 555 (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* A "plaintiff must 'nudge []

[his] claims across the line from conceivable to plausible' in order to survive a motion to dismiss. . . . Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original, internal citation and quotation omitted).

The Tenth Circuit Court of Appeals has held "that plausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (internal quotation and citation omitted). The Tenth Circuit has further noted "that the nature and specificity of the allegations required to state a plausible claim will vary based on context." *Id.* (Internal quotation and citation omitted.) Thus, the Tenth Circuit "concluded the *Twombly/Iqbal* standard is 'a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and

conclusions or a formulaic recitation of the elements of a cause of action, which the [Supreme C]ourt stated will not do.'"  *Id*. (Citation omitted.)

For purposes of a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-pled factual allegations in the complaint as true and resolve all reasonable inferences in a plaintiff's favor.  *Morse v. Regents of the Univ. of Colo.*, 154 F.3d 1124, 1126-27 (10th Cir. 1998) (citation omitted); *Seamons v. Snow*, 84 F.3d 1226, 1231-32 (10th Cir. 1996) (citations omitted).  However, "when legal conclusions are involved in the complaint 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to [those] conclusions. . . .'" *Khalik*, 671 F.3d at 1190 (quoting *Iqbal*, 556 U.S. at 678).  "Accordingly, in examining a complaint under Rule 12(b)(6), [the court] will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id*.

### B.      Pleading Standards under the Private Securities Litigation Reform Act

Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff to "state with particularity the circumstances constituting the fraud or mistake."  Fed. R. Civ. P. 9(b).  "Generally, the [Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 *et seq*.] is seen as imposing a standard of pleading which is more strict than that of Rule 9(b)." *In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1188 (D. Colo. 2004) (citing *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001)).

Under Section 10(b) of the 1934 Act, it is unlawful for any person "[t]o use or employ in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.  15

U.S.C. § 78j(b).  SEC Rule 10b-5 provides that it is unlawful for any person

    (a)    To employ any device, scheme, or artifice to defraud,

    (b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege that a defendant (1) in connection with the purchase or sale of a security; (2) made an untrue statement of material fact or failed to state a material fact; (3) with scienter; (4) that plaintiff relied on the misrepresentation; (5) that the plaintiff suffered an economic loss; and (6) that the material misrepresentation was the cause of that loss.  *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1136 (10th Cir. 2009) (citation omitted); *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1139 (D. Colo. 2011) (internal quotations omitted) (citing *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996)).

As the Tenth Circuit has held, the PSLRA is intended to stem abuses in private securities fraud suits.  *Fleming*, 264 F.3d at 1258-59 (citation omitted).  In addition, the PSLRA is meant to "protect[] outside directors, and others who may be sued for non-knowing securities law violations, from liability for damage actually caused by others."  H.R. Conf. Rep. No. 104-369, at 32, 1995 WL 709276, at *32 (Nov. 28, 1995).  The PSLRA, which amended the 1933 Act and the 1934 Act, "imposed specific and more stringent pleading requirements on complaints alleging securities fraud under Section 10(b)."  *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d at 1139 (citations omitted).  The PSLRA provides:

    (b)    Requirements for securities fraud actions

(1)     Misleading statements and omissions.  In any private action arising under this chapter in which the plaintiff alleges that the defendant –

(A)     made an untrue statement of a material fact; or

(B)     omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2)     Required state of mind.

(A)     In general . . . [i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C.A. § 78u-4(b)(1) and (2) (West 2014).  To satisfy the PSLRA's pleading requirement for a 1934 Act claim, plaintiffs must specify (1) each statement alleged to have been misleading; (2) why the statement is misleading; and (3) regarding each act or omission, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.  *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012); *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d at 1140 (citation omitted).

When a complaint contains allegations made on "information and belief," the PSLRA requires that "the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  Allegations based upon "investigation of counsel" are treated as if made on "information and belief."  *Adams*, 340 F.3d at 1098.  When a complaint contains allegations based on investigation of counsel, (*see* ECF No. 60 ¶ 1), the PSLRA "requires a plaintiff to identify in the complaint specific facts that support the allegations about the

misleading nature of the defendant's statements.  Generalized or conclusory allegations of fraud will not be sufficient." *Adams*, 340 F.3d at 1098.

The Tenth Circuit has held that this provision of the PSLRA does not require plaintiffs to include "all" facts on which their beliefs concerning false or misleading statements are based. *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d at 1140 (citations omitted).  Rather, the Tenth Circuit evaluates "the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Adams*, 340 F.3d at 1099 (citation omitted).  The Tenth Circuit's approach involves an evaluation of the following "*Adams*" factors:

(1)     the level of detail provided by the facts stated in a complaint;

(2)     the number of facts provided;

(3)     the coherence and plausibility of the facts when considered together;

(4)     whether the source of the plaintiff's knowledge about a stated fact is disclosed;

(5)     the reliability of the sources from which the facts were obtained; and

(6)     any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

*Adams*, 340 F.3d at 1099 (citation omitted).  "If an analysis of these factors leads to the conclusion that a reasonable person would find the defendant's statements to be false or misleading, 'the plaintiff has sufficiently pled with particularity facts support his belief in the misleading nature of the defendant's statements.'" *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d at 1140 (quoting *Adams*, 340 F.3d at 1099).  Whether the source of the plaintiff's knowledge is disclosed "can significantly strengthen the [] pleading," but a plaintiff's complaint need not "always identify the source, either personal or documentary of the facts alleged." *In re Crocs,*

*Inc. Sec. Litig.*, 774 F. Supp. 2d at 1140 (alteration in original) (quoting *Adams*, 340 F.3d at 1101, 1102).

## III.   ANALYSIS

Plaintiffs bring their principal claims pursuant to Section 10(b) of the 1934 Act and Section 11 of the 1933 Act.  With respect to the Section 10(b) claim, the parties dispute the sufficiency of Plaintiffs' pleading as to three of the elements required to state a claim:  (1) material misrepresentation or omission, including whether certain alleged misrepresentations are inactionable under the PSLRA's "safe harbor" provision and whether certain Defendants even made the statements alleged to be misrepresentations; (2) scienter; and (3) loss causation.  With respect to the Section 11 claim, the parties dispute the sufficiency of Plaintiffs' pleading as to whether:  (1) Plaintiffs adequately pled a misrepresentation; and (2) Plaintiffs' claim sounds in fraud or negligence.

With respect to Plaintiffs' other claims under Sections 20(a) and 20A of the 1934 Act as well as Sections 12 and 15 of the 1933 Act, the Court's resolution as to whether there has been a predicate violation of the respective securities laws under Section 10(b) of the 1934 Act and Section 11 of the 1933 Act—in this matter, is determinative for whether Plaintiffs have sufficiently pled each claim.

### A.   1934 Act Claims

1.   <u>Section 10(b) and Rule 10b-5 Claim</u>[11]

a.   *Alleged Material Misrepresentations or Omissions*

A representation or omission is only material "'if a reasonable investor would consider it important in determining whether to buy or sell stock,' and if it would have 'significantly altered

---

[11] Plaintiffs' Section 10(b) and Rule 10b-5 claim is against Defendants Molycorp, Smith, Allen, Ashburn, Bhappu, Burba, Cogut, Pegasus, Dolan, RCF, Kristoff, T-II Holdings, Henry, and Thompson.  (ECF No. 60 ¶¶ 173-83.)

the total mix of information available' to current and potential investors." *Fleming*, 264 F.3d at 1265 (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).  The Tenth Circuit has distinguished "between statements that are material and those that are 'mere [puffery] . . . [or] not capable of objective verification." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1339 (quoting *Grossman*, 120 F.3d at 1119).  "Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." *Id.* (internal quotation marks and citation omitted).  To be actionable, the statements must have "'a standard against which a reasonable investor could expect them to be pegged.'" *In re Harman Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d 26, 51 (D.D.C. 2014) (quoting *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005)).

For the reasons stated below, under *Adams*, the Court finds that Plaintiffs fail to plead with the requisite specificity a material misrepresentation or omission.  Thus, Plaintiffs fail to plead a Section 10(b) and Rule 10b-5 claim against the 1934 Act Defendants.

(1)     Statements Concerning Mountain Pass

Plaintiffs claim that the 1934 Act Defendants' statements concerning Molycorp's development of Mountain Pass and production from it were misleading because such statements depended upon the presence of commercially viable quantities of HREEs when, as the Complaint alleges, none existed.  (ECF No. 60 ¶¶ 108, 112, 117, 118, 121, 123, 127, 129, 130, 133, 135, 138, 139, 146, 147.)   Because Plaintiffs rely upon the same bases for their assertions as to each material misrepresentation, the Court proceeds by analyzing whether each such basis is sufficiently pled in accordance with *Adams*, 340 F.3d at 1099.  As the Court finds none of the supporting allegations well pled, the Court finds not well pled Plaintiffs' allegations concerning misrepresentations or omissions about Molycorp's Mountain Pass.

i. **The Goldman Sachs Investment**[12] (*See* ECF No. 60 ¶¶ 112(a), 118(a), 123(a), 130(a), 135(a), 139(a), 147(a)).

Plaintiffs allege that Goldman Sachs sold its investment in Molycorp because Goldman Sachs concluded that Mountain Pass lacked commercially viable amounts of HREEs. Plaintiffs, however, fail to allege facts showing how they acquired such knowledge. (*See generally* ECF No. 60.) The Court does not find sufficient Plaintiffs' reliance upon the industry expert to support such an allegation. (ECF No. 60 ¶ 98.) The Complaint does not contain an allegation as to *how* this industry expert would have knowledge of a third-party's investment decisions. (*See generally* ECF No. 60 ¶ 98.) Rather, the Complaint alleges that the industry expert "advises" the investment community. (ECF No. 60 ¶ 96.) The Complaint does not allege that the industry expert performed due diligence services for Goldman Sachs with respect to Mountain Pass. (*See generally* ECF No. 60.) Even if Goldman Sachs came to the conclusion Plaintiffs allege, Plaintiffs do not plead that 1934 Act Defendants knew the reason for Goldman Sachs's investment decision. Thus, the Court finds the Goldman Sachs investment allegation not well pled.

ii. **Ore Testing** (*See* ECF No. 60 ¶¶ 112(b), 112(c), 118(b), 118(c), 123(b), 123(c), 130(b), 130(c), 135(b), 135(c), 139(b), 139(c), 147(b), 147(c)).

Plaintiffs allege that daily analysis of solvent extract circuits of Mountain Pass ore "confirmed" there was no dysprosium or terbium in the ore. Plaintiffs further allege that "float tests of the Mountain Pass ore body revealed that commercially viable volumes of HREEs did not exist in the Mountain Pass ore" and Company management had access to these test results. Plaintiffs' basis for these allegations is a former Molycorp analytical chemist. (ECF No. 60 ¶¶

---

[12] Plaintiffs also allege that Hitachi Metals "concluded that there were not commercial volumes of HREEs at Mountain Pass." (ECF No. 60 ¶ 84; *accord* ECF No. 60 ¶ 137.) Plaintiffs' allegations regarding Hitachi Metals are deficient for many of the same reasons as is the Goldman Sachs allegation. Plaintiffs offer no support for their basis as to Hitachi Metal's conclusion (*see generally* ECF No. 60); thus the allegation is not well pled.

94-95.)  Plaintiffs fail to allege that Molycorp employed this analytical chemist during the testing periods.  (*See generally* ECF No. 60.)  Plaintiffs fail to allege that the purpose of these extractions and tests were to identify the presence of HREEs.  (*See generally* ECF No. 60.)  If these extractions and tests were not designed to identify the presence of HREEs, then the negative results from these tests are irrelevant to Plaintiffs' claims.  Plaintiffs fail to allege that Molycorp executives could understand these *scientific* test results.  (*See generally* ECF No. 60.)  Plaintiffs allege that these findings were "recorded in lab notebooks" and "that data was entered into Molycorp's computerized information system."  (ECF No. 60 ¶ 95.)  Plaintiffs allege in general and conclusory terms that certain Molycorp executives—Smith and Allen—had knowledge about the Company's operating and financial condition, including, specifically, the characteristics of the ore body at Mountain Pass (*see* ECF No. 60 ¶¶ 24, 29) and a "deep understanding of the operations [] Mountain Pass facility" (ECF No. 60 ¶ 25).  Plaintiffs, however, fail to plead a connection between Mountain Pass "operations" and the ore test or extraction results.  (*See generally* ECF No. 60.)  Plaintiffs fail to plead that Defendants could understand "data" entered into the information system.  (*See generally* ECF No. 60.)  The Court is left to guess as to whether a Molycorp executive would have to interpret the data or whether the "lab findings" were in such explicit terms, *i.e.*, no HREEs present, that a layman could understand the test results.  Thus, the Court finds the ore testing and extraction allegations not well pled.

**iii.     Molycorp's Efforts to Purchase Other Companies** (*See* ECF No. 60 ¶¶ 112(d), 118(d), 123(d), 130(d), 135(d), 139(d), 147(d)).

Plaintiffs allege that Molycorp "made several efforts to purchase companies with proven deposits of commercial volumes and recoverable levels of HREEs to perpetuate the illusion that the Mountain Pass contained significant volumes of HREEs."

This allegation confounds the Court.  It is not clear how the purchase of a company with no relation to Mountain Pass could perpetuate the illusion that *that mine* contained commercial and recoverable levels of HREEs.  Rather, to the Court, such an acquisition would only enhance Molycorp's overall possession of HREEs while not being specific to Mountain Pass.

Further, Plaintiffs' source of knowledge for this allegation is the "industry expert."  (ECF No. 60 ¶ 96.)  Plaintiffs' Complaint, however, fails to allege how the industry expert has knowledge of why Molycorp made such efforts.  (*See generally* ECF No. 60.)  Plaintiffs do not allege that Molycorp employed the industry expert.  (*See generally* ECF No. 60.)  Plaintiffs do not allege that Molycorp shared its acquisition strategy with the industry expert.  (*See generally* ECF No. 60.)  Plaintiffs do not allege that the "targets of interest" employed the industry expert. (*See generally* ECF No. 60.)  Rather, Plaintiffs only allege that the industry expert has confidentiality agreements with the targets of interest.  (ECF No. 60 ¶ 96.)  Plaintiffs do not allege that the targets of interest shared information with the industry expert as to why (and it would be their speculative assessments) Molycorp was interested in acquiring them.  (*See generally* ECF No. 60.)

Thus, the Court finds not well pled the allegations that Molycorp's efforts to purchase other companies were "to perpetuate the illusion that the Mountain Pass contained significant volumes of HREEs."

**iv.    The Presence of a Radioactive Element and Separation Technology** (*See* ECF No. 60 ¶¶ 112(e), 118(e), 123(e), 130(e), 135(e), 139(e), 147(e)).

Plaintiffs allege that "[t]he trace amounts of HREEs that do exist at Mountain Pass are associated with the dangerously radioactive element thorium and, therefore, Molycorp, prior to becoming a publicly-traded company, never attempted to extract traces of contaminated HREEs."  The Court agrees with 1934 Act Defendants' contention that this allegation is

irrelevant; even if the HREEs were associated with thorium, this allegation has no bearing on whether HREEs were to be mined during the Class Period.

Plaintiffs further allege that "Molycorp does not currently have sufficient separation technology in place to extract HREEs even if they existed at Mountain Pass." Plaintiffs fail to allege the basis for their knowledge as to Molycorp's lack of sufficient separation technology. (*See generally* ECF No. 60.) Thus, Plaintiffs' allegation is insufficient as it is simply conclusory because it is solely made on information and belief.

Thus, for these reasons, the Court finds the allegations regarding the presence of a radioactive element and the lack of separation technology not well pled.

**v.     The Post-Class Period Publically Available Analysis** (*See* ECF No. 60 ¶¶ 112(f), 118(f), 123(f), 130(f), 135(f), 139(f), 147(f)).

Plaintiffs allege that "analysis of the Mountain Pass ore body, which became publicly available after the Class Period, revealed a weight to volume of 0.0% for key HREEs such as dysprosium and terbium." Plaintiffs fail to allege, however, that such analysis was available to and known by Defendants during the Class Period so as to render misleading their Class Period statements and filings. (*See generally* ECF No. 60.) Thus, the Court finds the allegations regarding the post-class period publically available analysis not well pled.

**vi.    The Internal Report** (*See* ECF No. 60 ¶¶ 112(g), 118(g), 123(g), 130(g), 135(g), 139(g), 147(g)).

Plaintiffs allege that "[a]n internal written report in existence as of June 2009, written by a Vice President of Molycorp, indicated that the Mountain Pass ore body did not have commercially viable amounts of HREEs." Plaintiffs' allegation rests upon the industry expert's viewing this report "shortly before 2009." (ECF No. 60 ¶ 97.) Molycorp, however, according to the Complaint, was not formed until March 2010. (ECF No. 60 ¶ 78.) Thus, Plaintiffs'

allegation that the internal report was written by a Vice President of "Molycorp" is undermined by other allegations.  *See Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (holding that a plaintiff may plead himself out of a cause of action by alleging facts which undermine his claim) (citation omitted); *see also Blumhagen v. Sabes*, Case No. 94-8022, 78 F.3d 597 (10th Cir. Mar. 4, 1996) (unpublished).

Further, Plaintiffs allege that the Molycorp Vice President "drafted" the internal report. (ECF No. 60 ¶ 97.)  The Court does not infer that "draft" means that the report is a "final copy." Further, Plaintiffs fail to allege that the internal report was distributed to others within Molycorp. (*See generally* ECF No. 60.)  Under the PSLRA's heightened pleading standards, the Court cannot draw the inference that the internal report's findings were known by any 1934 Act Defendant.

Thus, the Court finds the allegations regarding the "internal report" not well pled.

**vii.   The Production of HREEs During Project Phoenix** (*See* ECF No. 60 ¶¶ 112(h), 118(h), 123(h), 130(h), 135(h), 139(h), 147(h)).

Plaintiffs allege "because there were no commercially viable amounts of HREEs at the Mountain Pass mine, the Company could not produce commercially viable amounts of highly-valued HREEs during Phase I or Phase II of Project Phoenix."  Again, Plaintiffs undermine this allegation because, according to the Complaint, Project Phoenix Phases I and II were not yet complete as of the time of the filing of the Complaint.  (*Compare* ECF No. 60 ¶ 81 ("Phase I of Project Phoenix envision[ed] the production [of REEs] . . . from Mountain Pass by no later than the end of 2012.  Phase II of Project Phoenix . . . envision[ed] the production of [REEs]. . . as early as mid-2013.") *with* ECF No. 60 (filed on July 31, 2012).)  Because the Complaint cannot show the lack of veracity as to a statement regarding events that had yet to occur, the Court finds the allegations regarding the production of HREEs during Project Phoenix not well pled.

(2)     Statements Concerning Demand and Lack of Available Substitutes
for REEs

Plaintiffs claim that the 1934 Act Defendants' statements concerning demand and lack of

available substitutes for REEs were misleading and omitted material information. (*See* ECF No.

60 ¶¶ 3, 109, 110, 115, 121, 127, 128.)  Specifically, Plaintiffs allege that certain Defendants

stated that:

> Limits on rare earth exports from China and the lack of available substitutes make
> the development of new sources of REEs essential to meet the growing demand
> for existing and emerging technologies. . . .  (ECF No. 60 ¶ 110) (Molycorp
> statement)

> The lack of available substitutes makes REEs essential for existing and emerging
> technologies. . . . (ECF No. 60 ¶ 115) (Molycorp statement signed by Smith,
> Allen, Bhappu, Dolan, Henry, Kristoff, and Thompson)

> China has announced a national stockpile program, as has South Korea.
> Additionally, Japan has increased its national stockpile program.  In December
> 2010, the U.S. Department of Energy released a study concluding that five rare
> earth metals . . . are critical to clean energy technologies in the short term due to
> their importance to the clean energy economy and risk of supply disruption. . . .
> (ECF No. 60 ¶ 121) (Molycorp statement signed by Smith and Allen)

> REEs have unique properties that make them critical materials to many existing
> applications upon which society has become dependent as well as many emerging
> applications. . . .  In addition, according to IMCOA, global demand for rare earths
> used in magnets [i.e., HREEs] is expected to grow at a CAGR of approximately
> 10-15% [between 2010 and 2015]. . . . (ECF No. 60 ¶ 128) (Molycorp statement
> in June Offering documents)

Plaintiffs allege that the February Offering documents positively highlight demand for

REEs and the lack of available substitutes.  (ECF No. 60 ¶ 110.)   Plaintiffs allege that statements

in the February Offering documents (ECF No. 60 ¶ 110) concerning demand and lack of

substitutes for REEs are misleading for the same reasons as Plaintiffs alleged regarding the

statements concerning Mountain Pass.  (ECF No. 60 ¶ 112.)  For the reasons articulated

previously (*see supra* Section III.A.1.a.(1)), the Court does not find such supporting allegations

well pled and thus, statements in the February Offering documents regarding demand and lack of available substitutes are not well pled as misrepresentations.

Plaintiffs do not allege why the March 9, 2011 statement in the 2010 Form 10-K (ECF No. 60 ¶ 115) concerning the lack of available substitutes is misleading. (*See generally* ECF No. 60 ¶ 118 (which explains why Defendants' March 9, 2011 statements are misleading only in reference to transportation, production, and ore grade in connection with Mountain Pass as well as certain Defendants' SOX certifications and not in reference to demand and/or lack of available substitutes).) Because Plaintiffs' allegation regarding the March 9, 2011 statement (ECF No. 60 ¶ 115) concerning the lack of available substitutes fails to explain the reason or reasons why the statement is misleading, it is not well pled. 15 U.S.C.A. § 78u-4(b)(1).

Plaintiffs do not allege why the May 10, 2011 statement in the Form 10-Q (ECF No. 60 ¶ 121) concerning demand for REEs is misleading. (*See generally* ECF No. 60 ¶ 123 (which explains why Defendants' May 10, 2011 statements are misleading only in reference to the transport of REEs from Mountain Pass as well as certain Defendants' SOX certifications and not in reference to demand and/or lack of available substitutes).) Because Plaintiffs' allegation regarding the May 10, 2011 statement (ECF No. 60 ¶ 121) concerning demand for REEs fails to explain the reason or reasons why the statement is misleading, it is not well pled. 15 U.S.C.A. § 78u-4(b)(1). Assuming *arguendo*, that the reason this statement is misleading is the same as Plaintiffs alleged regarding the statements concerning Mountain Pass (ECF No. 60 ¶ 123), for the reasons articulated previously (*see supra* Section III.A.1.a.(1)), the Court does not find such supporting allegations well pled. Thus, the May 10, 2011 statement in the Form 10-Q (ECF No. 60 ¶ 121) is not well pled as a misrepresentation.

Plaintiffs allege that the June Offering documents positively highlight demand for REEs and the lack of available substitutes.  (ECF No. 60 ¶ 128.)  Plaintiffs allege that statements in the June Offering document (ECF No. 60 ¶ 128) are misleading for the same reasons as Plaintiffs alleged regarding the statements concerning Mountain Pass.  (ECF No. 60 ¶ 130.)  For the reasons articulated previously (*see supra* Section III.A.1.a.(1)), the Court does not find such supporting allegations well pled and thus, the statements in the June Offering documents are not well pled as misrepresentations.

Plaintiffs allege that Defendants Smith and Allen's August 11, 2011 statements concerning the lack of available substitutes for REEs are misleading.  (ECF No. 60 ¶ 135.)  The Court does not discern either of Defendants Smith and Allen's August 11, 2011 statements (ECF No. 60 ¶¶ 133-34) to pertain to the lack of available substitutes for REEs.

Further, the complained of statements (ECF No. 60 ¶¶ 110, 115, 121, 127, 128) are too vague to constitute actionable falsehoods.  *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1339 (quoting *Grossman*, 120 F.3d at 1119), 1342.  These statements amount to mere puffery as Molycorp's statements do not categorically deny substitutes for REEs could be developed or that the demand for its product would not fall.  A reasonable investor would not have found the statements material.

(3)    SOX Certifications

Assuming that Plaintiffs' Complaint alleges that Defendants Smith and Allen filed SOX certifications knowing that they were false, *i.e.*, that the associated SEC filing contains no material misstatement of fact, the Complaint does not plead facts showing how the facts attested to in the certifications are false under the PSLRA's heightened pleading requirements (*see supra* Sections III.A.1.a.(1) and III.A.1.a.(2)).  Further, Plaintiffs' Complaint does not explain how the

statements regarding the design of internal controls were false.  Thus, the Complaint is not

sufficient with respect to the SOX certifications.  *See Andropolis v. Red Robin Gourmet Burgers,*

*Inc.*, 505 F. Supp. 2d 662, 683 (D. Colo. 2007).

b.  *Scienter*

For a 1934 Act claim, the PSLRA requires that plaintiffs "state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind."  15

U.S.C. § 78u-4(b)(2).  The Supreme Court has held that "courts must consider the complaint in

its entirety . . . [in order to determine] whether *all* of the facts alleged, taken collectively, give

rise to a strong inference of scienter."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

322-23 (2007) (emphasis in original).

"The term 'scienter' has been defined by the Supreme Court of the United States as 'a

mental state embracing intent to deceive, manipulate, or defraud.'"  *Fleming*, 264 F.3d at 1258

(quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  The Supreme Court has

held that "[t]he words 'manipulative or deceptive' used in conjunction with 'device or

contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional

misconduct."  *Ernst & Ernst*, 425 U.S. at 197 (citations omitted).  Section 10(b)'s scienter

requirement can also be satisfied by "[r]ecklesness, defined as 'conduct that is an extreme

departure from the standards of ordinary care, and which presents a danger of misleading buyers

or sellers that is either known to the defendant or is so obvious that the actor must have been

aware of it.'"  *Fleming*, 264 F.3d at 1258 (quoting *Anixter*, 77 F.3d at 1232).

In order "to establish scienter in a securities fraud case alleging non-disclosure of

potentially material facts, the plaintiff must demonstrate:  (1) the defendant knew of the

potentially material fact, and (2) the defendant knew that failure to reveal the potentially material

fact would likely mislead investors." *Fleming*, 264 F.3d at 1261. The Tenth Circuit emphasized that "it is the danger of misleading buyers that must be actually known or so obvious that any reasonable man would be legally bound as knowing." *Fleming*, 264 F.3d at 1260-61 (emphasis in original; internal quotation and citation omitted).

Further, to determine whether or not a complaint's scienter allegations are sufficient to state a claim, the Court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314.

In considering the Complaint in its entirety, the Court finds Plaintiffs fail to sufficiently allege any 1934 Act Defendants' scienter.

### (1)    Confidential Witnesses

Courts are to treat with caution confidential witness statements as "a court has no way of knowing whether even named witnesses have axes to grind, are lying, and/or exist." *In re Thornburg Mortg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1226 n.11 (D.N.M. 2011) (hereinafter "*Thornburg II*"). The Court evaluates the sufficiency of Plaintiffs' allegations by considering the details provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, and similar indicia. *Sorkin, LLC v. Fisher Imaging Corp.*, Case No. Civ.A. 03-CV-00631-R, 2005 WL 1459735, at *6 (D. Colo. June 21, 2005) (citation omitted).

### i.    Industry Expert

Plaintiffs' Complaint relies upon an "industry expert," in part, for its allegations to ascribe the 1934 Act Defendants' scienter. Specifically, the Complaint relies upon the "industry expert" with respect to Plaintiffs' allegations as to the Internal Report (ECF No. 60 ¶¶ 97-98),

Goldman Sachs's decision to sell its Molycorp investment (ECF No. 60 ¶ 98), and Molycorp's efforts to purchase other companies with proven reserves of HREEs (ECF No. 60 ¶ 96). Preliminarily, the Complaint fails to allege how the industry expert came to "view" the Internal Report or how he has knowledge as to Goldman Sachs's reasoning for its decision to sell its investment or how he has knowledge as to Molycorp's corporate strategies. (*See generally* ECF No. 60.)

With respect to the Internal Report, Plaintiffs allege that "[s]hortly before 2009, the industry expert personally viewed a Molycorp internal report drafted by a Company Vice President." (ECF No. 60 ¶ 97.) As stated previously, this allegation is undermined by Plaintiffs' allegation that Molycorp was not formed until 2010. (ECF No. 60 ¶ 78.) Therefore, the industry expert allegation with respect to the Internal Report lacks credibility as the source of his knowledge, *i.e.*, Molycorp, was not in existence at the time he allegedly viewed the Internal Report.

With respect to the Goldman Sachs investment, Plaintiffs allege that the industry expert "advises the investment community and performs due diligence services for institutional investors. . . ." (ECF No. 60 ¶ 96.) Plaintiffs, however, fail to allege that the industry expert performed these services for Goldman Sachs. (*See generally* ECF No. 60.) Rather, the Complaint only alleges in a conclusory fashion that the "industry expert [] has personal knowledge regarding why Goldman Sachs . . . sold its private investment in the Company." (ECF No. 60 ¶ 98.) Plaintiffs do not allege *how* the industry expert came into knowledge for a third-party's investment decisions. (*See generally* ECF No. 60.)

With respect to Molycorp's attempts to purchase other companies, Plaintiffs allege that the industry expert "has personal knowledge that Molycorp, prior to and during the Class Period,

engaged in desperate efforts to purchase third-party companies with proven deposits of commercial volumes of HREEs because Molycorp's Mountain Pass mine ore body does not have commercially viable amounts of HREEs." (ECF No. 60 ¶ 96.)  Plaintiffs' Complaint, however, fails to allege how the industry expert has knowledge of why Molycorp made such efforts. (*See generally* ECF No. 60.)  Plaintiffs do not allege that Molycorp employed the industry expert. (*See generally* ECF No. 60.)  Plaintiffs do not allege that Molycorp shared its acquisition strategy with the industry expert. (*See generally* ECF No. 60.)  Plaintiffs do not allege that the "targets of interest" employed the industry expert. (*See generally* ECF No. 60.)  Rather, Plaintiffs only allege that the industry expert has confidentiality agreements with the targets of interest. (ECF No. 60 ¶ 96.)  Plaintiffs do not allege that the targets of interest shared information with him as to why (and it would be their speculative assessments) Molycorp was interested in acquiring them. (*See generally* ECF No. 60.)

Plaintiffs fail to allege facts to corroborate the industry expert's statements about the Internal Report and Goldman Sachs's investment decision.

For these reasons, the Court finds the allegations based upon the industry expert not well pled and thus, insufficient—in consideration of the Complaint in its entirety—to ascribe the 1934 Act Defendants' scienter.

## ii.  Analytical Chemist

Plaintiffs' Complaint relies upon a former Molycorp "analytical chemist," in part, for its allegations to ascribe the 1934 Act Defendants' scienter.  Specifically, the Complaint relies upon the "analytical chemist" with respect to Plaintiffs' allegations as to the ore testing samples (ECF No. 60 ¶ 94) and "float tests of the Mountain Pass ore body" (ECF No. 60 ¶ 94).  Further, the Complaint relies upon the analytical chemist to allege that the lab findings (ECF No. 60 ¶ 94)

were recorded in Molycorp's information system which was accessible to Molycorp's management.  (ECF No. 60 ¶ 95.)

As a preliminary matter, the Complaint fails to allege when Molycorp employed the analytical chemist.  (*See generally* ECF No. 60.)  While this pleading deficiency is not fatal if Molycorp employed the analytical chemist either prior to or during the Class Period, such deficiency undermines Plaintiffs' Complaint.  *See Sorkin*, 2005 WL 1459735, at *6.

Further, as stated previously, Plaintiffs fail to allege that Molycorp executives could understand these *scientific* test results.  (*See generally* ECF No. 60.)  Plaintiffs allege that these findings were "recorded in lab notebooks" and "that data was entered into Molycorp's computerized information system."  (ECF No. 60 ¶ 95.)  Plaintiffs allege in general and conclusory terms that certain Molycorp executives—Smith and Allen—had knowledge about the Company's operating and financial condition, including, specifically, the characteristics of the ore body at Mountain Pass (*see* ECF No. 60 ¶¶ 24, 29) and a "deep understanding of the operations at our Mountain Pass facility" (ECF No. 60 ¶ 25).  Plaintiffs, however, fail to plead a connection between Mountain Pass "operations" and the ore test results.  (*See generally* ECF No. 60.)  Plaintiffs fail to plead that 1934 Act Defendants could understand "data" entered into the information system.  (*See generally* ECF No. 60.)  The Court is left to guess as to whether a Molycorp executive would have to interpret the data or whether the "lab findings" were in such explicit terms, *i.e.*, no HREEs present, that a layman could understand the test results.

With respect to the float tests, Plaintiffs allege that such tests are "a process that physically separates particles of different REEs based on the ability of air bubble to selectively adhere to mineral surfaces in a mineral/water slurry. . . ."  (ECF No. 60 ¶ 75.)  Plaintiffs fail to allege, however, that these tests' purpose was to identify the presence of HREEs.  (*See generally*

ECF No. 60.)  If these tests were not designed to identify the presence of HREEs, then these

negative test results are irrelevant to Plaintiffs' claim.

With respect to the ore testing samples (ECF No. 60 ¶ 94), Plaintiffs fail to allege that the

purpose of these tests were to identify the existence of HREEs (*see generally* ECF No. 60).

Again, if these tests were not designed to identify the presence of HREEs, then these negative

test results are irrelevant to Plaintiffs' claim.

For these reasons, the Court finds the allegations based upon the analytical chemist not

well pled and thus, insufficient—in consideration of the Complaint in its entirety—to ascribe the

1934 Act Defendants' scienter.

(2)     Stock Sales

"To establish scienter by pleading motive and opportunity, the plaintiff ha[s] to allege

that the defendant benefitted from the alleged fraud in some concrete and personal way, 'as when

the defendants made material misrepresentations to maintain a high stock price and then sold

their own shares at a profit.'"  *In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1194 (quoting

*Fleming*, 264 F.3d at 1261).  "In *Fleming*, [the Tenth Circuit] held that motive and opportunity

pleading, standing alone, is not sufficient to allege scienter under the PSLRA."  *In re Qwest

Commc'ns Int'l*, 396 F. Supp. 2d at 1194 (citing *Fleming*, 264 F.3d at 1263).  The *Fleming* court,

however, also held "that allegations concerning a defendant's motive and opportunity to commit

securities fraud may be considered in determining whether the 'plaintiffs' allegations taken as a

whole, give rise to a strong inference of scienter.'"  *In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d

at 1194 (citing *Fleming*, 264 F.3d at 1263).

"Courts should not infer fraudulent intent based only on the fact that some officers sold

stock.  Rather, plaintiffs must allege that the trades *were made at times and in quantities that are*

*suspicious* enough to support the necessary strong inference of scienter." *In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1195 (emphasis added and citations omitted).

> Among the factors relevant to this inquiry are (i) whether the alleged trades were "normal and routine" for the insider; (ii) whether profits reaped "were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud"; and (iii) whether, in light of the insider's total stock holdings, the sales are unusual or suspicious.

*In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1195 (citation omitted). "For individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a meaningful trading history for purposes of comparison to the stock sales within the class period." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (citation omitted). "Plaintiffs are 'not excused from pleading the relevant [trading] history,' regardless of whether such history is available. *Prissert v. EMCORE Corp.*, 894 F. Supp. 2d 1361, 1373-74 (D.N.M. 2012) (internal quotation marks and citation omitted). "A 'meaningful trading history' requires information on non-[c]lass [p]eriod sales, the amount of stock retained by the [d]efendants, or . . . whether the amount of stock owned by the [d]efendants actually increased during the [c]lass [p]eriod." *Prissert*, 894 F. Supp. 2d at 1374 (internal quotation and citation omitted).

Plaintiffs do not allege a trading history sufficient to establish the 1934 Act Defendants' scienter because the Court is unable to determine if the trades were "normal and routine." Both Plaintiffs and Defendants concede that, prior to the Class Period, Insider Selling Defendants were subject to a "lock out" during which they could not sell shares in Molycorp. (*See* ECF No. 60 ¶ 88.) Plaintiffs, however, fail to sufficiently plead that Insider Selling Defendants' Class Period sales were out of line with their trading history subsequent to the Class Period. Certain Insider Selling Defendants actually increased their Molycorp stock holdings subsequent to the Class Period. (ECF No. 60 ¶ 100.) Despite Plaintiffs' contention in their response brief to the

motion to dismiss (ECF No. 121 at 35), Plaintiffs do not allege that Insider Selling Defendants, subsequent to the Class Period, sold no shares. (*See generally* ECF No. 60 ¶ 100.) Thus, Plaintiffs insufficiently pled Insider Selling Defendants' trading history because the Court is unable to discern whether Insider Selling Defendants' Class Period actions were out of line with their trading practices.

Further, the Complaint alleges that Insider Selling Defendants sold their shares within a price range of $50 to $51 per share. (ECF No. 60 ¶ 99.) Plaintiffs allege that Defendants' misleading statements caused Molycorp's stock to trade "at artificially inflated levels up to and above $70 per share during the Class Period." (ECF No. 60 ¶ 159.) Because Insider Selling Defendants "missed the boat," *i.e.*, failed to maximize their gains from the alleged misrepresentations, their sales do not support a scienter inference. *See Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).

The Complaint only refers to Insider Selling Defendants' sales as "proceeds." (ECF No. 60 ¶ 87.) Plaintiffs allege that Defendants' costs basis for those shares was "no more than $14.00 per share." (ECF No. 60 ¶ 87.) The profits of sales[13] reaped in comparison to certain Insider Selling Defendants' 2010 compensation[14] (*see* ECF No. 112-14, Ex. 12 at 120) and other Insider Selling Defendants' 2011 incentive compensation[15] (*see* ECF No. 60 ¶¶ 26, 30, 33) could support an inference of scienter. *In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1195. The Court, however, is required to engage in a comparative analysis as to an equally plausible basis for Insider Selling Defendants' actions. *Tellabs*, 551 U.S. at 314. Because Insider Selling Defendants were subject to a lock out period which expired during the Class Period which

---

[13] Plaintiffs do not allege that Defendants Allen, Ball, Dolan, or Machiels sold shares during 2011 (*see generally* ECF No. 60), thus Plaintiffs' argument as to motive for 1934 Act Defendants Allen, Ball, Dolan, and Machiels is irrelevant.
[14] Defendants Bhappu, Dolan, Henry, Kristoff, and Thompson.
[15] Defendants Smith, Allen, and Ashburn.

prevented those individuals from prior trading activity, it is highly reasonable that such Insider

Selling Defendants would seek to recover initial investments, in part, at the earliest possible

moment. *See In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 224-25 (D.

Mass. 1999) (citation omitted).

Thus, although the profits and trading volume (in light of the Insider Selling Defendants'

total stock holdings) may appear suspicious under one prong of the *Qwest* analysis, the timing of

the Insider Selling Defendants' sales (subsequent to the "lock out period" and not when

Molycorp's stock was selling at its class period high) undermines the inference of scienter

Plaintiffs' seek to ascribe through such allegations. *See* 396 F. Supp. 2d at 1195. Insider Selling

Defendants have articulated a more plausible reason for their actions and thus, Plaintiffs'

allegations regarding stock sales—in consideration of the Complaint in its entirety—to ascribe

the 1934 Act Defendants' scienter are insufficient.

(3)     Position within the Company

"In *Fleming*, the Tenth Circuit found that allegations that a securities fraud defendant

must have known of certain information because of his position in the company, without more,

are not sufficient to support a strong inference of scienter under the PSLRA." *In re Qwest*

*Commc'ns Int'l*, 396 F. Supp. 2d at 1197 (citing *Fleming*, 264 F.3d at 1263-64 (allegations that

defendants held senior management positions, had access to inside information, and thus must

have known of fraudulent statements are insufficient to plead scienter under PSLRA)).

"Allegations that rely on the core-operations inference are among the allegations that may be

considered in the complete PSLRA analysis." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776,

784 (9th Cir. 2008). "[A]n allegation that an individual defendant knew certain information

based on that individual's position in a company, combined with other relevant allegations

concerning knowledge or motive, can be sufficient to support a strong inference of scienter under the PSLRA." *In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1197 (citations omitted). Core-operations refer to instances where the nature of the relevant facts allegedly known and not disclosed by defendants was "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *South Ferry LP*, 542 F.3d at 786. In such instances, plaintiffs may sufficiently plead core-operations allegations without accompanying particularized allegations. *Prissert*, 894 F. Supp. 2d at 1373 (citation omitted).

The scienter of senior controlling officers of a corporation may be attributed to a corporation itself to establish liability as a primary violator of Section 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority. *Adams*, 340 F.3d at 1106-07 (citations omitted).

Plaintiffs allege that certain Molycorp senior executives, including— Smith, Allen, Ashburn, Burba—had knowledge regarding Mountain Pass and the existence of HREEs due to their incentive compensation related to Project Phoenix. (ECF No. 60 ¶¶ 23, 26, 28, 30, 31, 33, 35-36.)

Plaintiffs, however, plead that neither Phase I nor Phase II of Project Phoenix were complete at the time they filed their Complaint. (*Compare* ECF No. 60 ¶ 81 ("Phase I of Project Phoenix envisions the production [of REEs]. . . from Mountain Pass by no later than the end of 2012. Phase II of Project Phoenix . . . envisions the production of [REEs]. . . as early as mid-2013.") *with* ECF No. 60 (filed on July 31, 2012).) Plaintiffs fail to allege that the above-identified executives' compensation was tied to production of HREEs from Mountain Pass. (*See generally* ECF No. 60.) Thus, Plaintiffs allegations regarding senior executives' scienter—in consideration of the Complaint in its entirety—to ascribe the 1934 Act Defendants' scienter are

insufficient.  While Mountain Pass may constitute Molycorp's core operation such that senior executive Defendants' lack of knowledge regarding the absence of HREEs is suspect, *see South Ferry LP*, 542 F.3d at 786, *in consideration of the Complaint in its entirety*, the Court does not find Plaintiffs' Complaint regarding Molycorp's senior executives' scienter sufficient.

In response to the fact that phases of Project Phoenix were yet to be completed, the Court understands Plaintiffs' irrelevancy argument to be that the 1934 Act Defendants' position ignores Plaintiffs' allegation that Mountain Pass never contained and will never contain REEs.  (ECF No. 121 at 20 ("Defendants' argument makes no sense because it relies on Defendants' unstated, and untested, belief that HREEs would magically appear in the Mountain Pass ore body despite years of testing indicating that HREEs simply do not exist.").)  Plaintiffs, however, fail to allege that the previously identified senior executive Defendants *had* knowledge of the tests which allegedly revealed no HREEs present in Mountain Pass.  (*See generally* ECF No. 60.)  Although Plaintiffs allege that ore tests results were accessible to Molycorp's senior management (ECF No. 60 ¶ 95), for reasons stated previously (*see supra* Section III.A.1.b.(1).ii), this allegation is not well-pled.

(4)     Motives Shared by All Companies

Plaintiffs allege that the 1934 Act Defendants were motivated to inflate Molycorp's stock price so they could use overpriced shares to acquire another company and complete a convertible note offering.  (ECF No. 60 ¶¶ 102-06.)  Allegations that corporate defendants were motivated "to present the company as successful, to facilitate corporate transactions, and to raise capital— are all 'generalized motives shared by all companies' and as such, are not helpful in establishing scienter." *Prissert*, 894 F. Supp. 2d at 1373 (citing *Fleming*, 264 F.3d at 1269).  Thus, Plaintiffs' allegations regarding 1934 Act Defendants' motives to acquire Aktsiaselts Silmet Grupp and

complete the note offering—in consideration of the Complaint in its entirety—to ascribe the 1934 Act Defendants' scienter are insufficient.

c.     *The PSLRA's Protection for Forward-Looking Statements*[16]

While in most contexts a court reviewing a Rule 12(b)(6) motion is limited to considering only the facts in the complaint, the PSLRA mandates that "the [C]ourt shall consider any statement cited in the complaint and any cautionary statement accompanying [a] forward-looking statement, which are not subject to material dispute, cited by the defendant." 15 U.S.C.A. § 78u-5(e) (West 2014).

For certain types of forward-looking statements, Congress created a "safe harbor" which shields securities fraud defendants from liability with respect to such statements to the extent that:

(A)     the forward-looking statement is--

    (i)     identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

    (ii)     immaterial; or

(B)     the plaintiff fails to prove that the forward-looking statement—

    (i)     if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

    (ii)     if made by a business entity; was –

        (1)     made by or with the approval of an executive officer of that entity; and

        (2)     made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

---

[16] Because the Court finds protection for certain statements under the PSLRA, the Court does not reach the issue as to whether the "bespeaks caution doctrine" similarly provides protection for these statements.

15 U.S.C.A. § 78u-5(c)(1).  As defined by the statute, "forward-looking statements" include, among other things, projections of revenues, expenditures, and income; *statements of management's plans and objectives for future operations*; statements of future economic performance; and *the assumptions underlying any of these types of statements.  See generally id*. § 78u-5(i)(1).

To qualify for protection under the subsection (A)(i) safe harbor, a forward-looking statement must be (1) "identified as a forward-looking statement," and (2) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id*. § 78u-5(c)(1)(A)(i).  "[A] forward-looking statement does not give rise to liability if it is accompanied by meaningful cautionary language, *see* 15 U.S.C. § 78u-5(c)(1)(A)(i), *or* it is immaterial, *see id*. § 78u-5(c)(1)(A)(ii), *or* the plaintiff fails to prove (or plead) that the issuer had actual knowledge that the statement was false or misleading when made, *see id*. § 78u-5(c)(1)(B)."  *In re Harman Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d at 41 (emphasis in original).  "The issuer's state of mind is irrelevant as to the subsection (A)(i) safe harbor."  *In re Harman Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d at 43.

"To determine whether a statement is adequately identified as forward-looking, courts look to the facts and circumstances of the language used." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d at 44 (citation omitted).  Courts also adhere to 'the common-sense proposition that words such as 'expect' identify forward-looking statements.'" *Id*. (citation omitted).

"If a statement is identified as forward-looking, it must also be accompanied by meaningful cautionary language in order to fall within the subsection (A)(i) safe harbor.  'To

suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the [publications] which the plaintiffs challenge." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d at 44-45 (citing *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993)). The subsection (A)(i) safe harbor "'does not require a listing of *all* factors' that may present a risk, nor 'must the cautionary language explicitly mention *the* factor that ultimately belies a forward-looking statement. . . .'" *In re Harman Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d at 45(alteration in original) (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999)). "Rather, 'when an investor has been warned of risks *of a significance similar to that actually realized*, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.'" *In re Harman Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d at 45(emphasis in original) (quoting *Harris*, 182 F.3d at 807).

The Court finds that certain complained of statements (ECF No. 60 ¶¶ 108, 115, 121, 129, 133) regarding REE production from Mountain Pass are subject to the PSLRA's safe-harbor provision.

(1)     Statements Regarding Production from Mountain Pass

**i.     Whether the Statements are Forward-Looking**

Because the statements regarding the production of REEs from Mountain Pass are couched in relation to Molycorp's (or its management's) future plans and rely upon certain assumptions, the Court agrees with 1934 Act Defendants' contention that the complained of statements are identified as forward-looking on their face. *See In re Harman Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d at 44. Specifically, the Court highlights how each such complained of statement is forward-looking.

49

"*If* we are able to add an off-site facility to produc[e] rare earth metals and alloys instead of adding such facilities and equipment at Mountain Pass, we *would* transport cerium, lanthanum, neodymium, praseodymium, dysprosium, terbium, and samarium oxide products from our Mountain Pass facility to that off-site location to produce[] rare earth metals and allows." (ECF No. 60 ¶¶ 108, 115 (emphasis added).)

"A portion of these rare earth alloys will be manufactured into NdFeB magnets as part of our alloy and magnet production joint ventures . . . and *we expect* to sell the rest to end users." (ECF No. 60 ¶ 115 (emphasis added).)

"*We'll be* producing 10 different rare earth elements as part of Phase 1 and as part of Phase 2 [of "Project Phoenix"], and that *will be* Cerium, Lanthanum, Neodymium, Praseodymium, Samarium, Gadolinium, Europium, Dysprosium, Terbium, and Yttrium." (ECF No. 60 ¶ 117 (emphasis added).)

"So what that basically means is we look at these other rare earth elements that *we'll be* producing in commercial quantities as byproduct materials. . . So *we will end up with* a very robust economic program by producing these materials and selling them on the open market." (ECF No. 60 ¶ 117 (emphasis added).)

"Prior to the expected completion of our initial modernization and expansion efforts, *we expect* to produce approximately 3,000 mt year in the aggregate of cerium products, lanthanum concentrate, didymium oxide and heavy rare earth concentrates from stockpiled feedstock . . . *We intend* to transport cerium, lanthanum, neodymium, praseodymium, dysprosium, terbium and samarium oxide products from our Mountain Pass facility to Molycorp Silmet AS and MMA to produce rare earth metals and alloys." (ECF No. 60 ¶¶ 121, 133 (emphasis added); *see also* ECF No. 60 ¶ 129.)

"First of all, let me reiterate from prior calls that Molycorp *will be* producing 10 rare earth elements once Project Phoenix Phase 1 is up and operating, and we *will be producing* heavy rare earth metals as part of that production." (ECF No. 60 ¶ 138 (emphasis added).)

Plaintiffs argue that these statements are not "forward looking" because they are predicated on the representation of the past and current fact that Mountain Pass contained commercially viable amounts of HREEs. (ECF No. 121 at 22.) Plaintiffs' argument that the statements do contain a representation of past or current fact is not dispositive. A document may contain both forward-looking statements as well as statements of current or past facts and the former may receive the PSLRA's safe-harbor protection while the latter may not. *See, e.g.,*

*Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009). These statements fall under the PSLRA's protection because they are statements of management's plans and objectives for future operations, notwithstanding the fact that there may be an underlying assumption of the presence of HREEs. *See* 15 U.S.C. § 78u-5(i)(1). Plaintiffs reliance on *Mishkin v. Zynex Inc.*, Case No. 09-CV-00780-REB-KLM, 2011 WL 1158715, at *5 (D. Colo. Mar. 30, 2011) and *West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, Case No. 05-CV-01265-WDM-MEH, 2008 WL 879023, at*17-18 (D. Colo. Mar. 28, 2008) is misplaced as neither commands the result Plaintiffs seek. *Mishkin* is distinguishable from the instant matter because, in *Mishkin*, the statement of present or historical facts stood apart from (rather than form) the underlying basis for a forward-looking statement. *Mishkin*, 2011 WL 1158715, at *5. *West Palm Beach Firefighters' Pension Fund* is distinguishable because in that matter, the statements of present or historical facts were objectively verifiable and known by the defendants. *West Palm Beach Firefighters' Pension Fund*, 2008 WL 879023, at *17. In contrast, in the instant matter, Plaintiffs have failed to plead facts that 1934 Act Defendants *knew* Mountain Pass did not contain HREEs (*see supra* Section III.A.1.b).

## ii.   Whether Molycorp Included Meaningful Cautionary Language

The question then becomes whether Molycorp included meaningful cautionary language with each of the challenged forward-looking statements. The Court relies upon documents submitted in support of Molycorp's motion to dismiss of which the Court takes judicial notice. In pertinent part, Molycorp cautioned investors that:

> Inaccuracies in our estimates of REO reserves and resource deposits could result in lower than expected revenues and higher than expected costs.
>
> We base our REO reserve and resource estimates on engineering, economic and geological data assembled and analyzed by outside firms, which are reviewed by our engineers and geologists. Ore reserve estimates, however, are necessarily

imprecise and depend to some extent on statistical inferences drawn from available drilling data, which may prove unreliable.  There are numerous uncertainties inherent in estimating quantities and qualities of REO reserves and non-reserve REO deposits and costs to mine recoverable reserves, including many factors beyond our control.  Estimates of economically recoverable REO reserves necessarily depend upon a number of variable factors and assumptions, all of which may vary considerably from actual results, such as:

- geological and mining conditions and/or effects from prior mining that may not be fully identified by available data or that may differ from experience;

- assumptions concerning future prices of rare earth products, operating costs, mining technology improvements, development costs and reclamation costs; and

- assumptions concerning future effects of regulation, including the issuance of required permits and taxes by governmental agencies.

Any inaccuracy in our estimates related to our REO reserves and non-reserve REO deposits could result in lower than expected revenues and higher than expected costs or a shortened estimated life for the mine at the Mountain Pass facility. . . .

(ECF No. 112-14 at 60-62, Ex. 12 [Feb. 7, 2011 S-1/A, at 28-29]; ECF No. 112-23 at 63, Ex. 21 [June 7, 2011 S-1/A, at 29]; *see also* ECF No. 112-17 at 31, Ex. 15 [Mar. 9, 2011 10-K, at 27]; *see also* ECF No. 112-20 at 33, Ex. 18 [May 10, 2011 10-Q, at 31] (referencing Dec. 31, 2010 Form 10-K listed risk factors- which were listed previously in ECF No. 112-17, Ex. 15); *see also* ECF No. 112-25 at 43, Ex. 23 [Aug. 11, 2011 10-Q, at 41] (referencing Dec. 31, 2010 Form 10-K listed risk factors- which were listed previously in ECF No. 112-17, Ex. 15).)

Based on the foregoing language presented in Molycorp regulatory filings, the Court finds that Molycorp sufficiently highlighted the uncertainties in estimating quantities and reserves of REE deposits and tailored their statements to future projects and estimates that Plaintiffs challenge. *See Grossman*, 120 F.3d at 1120.  Further, the Court finds that Molycorp sufficiently highlighted that its REE reserves might be inaccurately estimated. *See In re Harman*

52

*Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d at 45.  Thus, Molycorp included meaningful cautionary language with respect to the February 7, 2011 (ECF No. 60 ¶ 108), March 9, 2011 (ECF No. 60 ¶ 115), May 10, 2011 (ECF No. 60 ¶ 121) and June 7, 2011 (ECF No. 60 ¶ 129) statements.

### iii.   Whether Molycorp Had Actual Knowledge of the Statements' Falsity

Plaintiffs do not plead sufficiently that 1934 Act Defendants had "actual knowledge" of the statements regarding REE production from Mountain Pass.  (*See generally* ECF No. 60 ¶ 165.)  Plaintiffs rely upon their allegations regarding 1934 Act Defendants' scienter to establish that Molycorp had actual knowledge regarding the lack of REEs in Mountain Pass.  (*See* ECF No. 121 at 23, 27-36.)  For the reasons articulated previously (*see supra* Section III.A.1.b), the Court finds that Plaintiffs fail to plead 1934 Act Defendants' actual knowledge of the statements' falsity.

Thus, the challenged statements previously identified are immunized from liability under the PSLRA's safe-harbor provision.  *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010).

### d.   *SOX Certifications*

Plaintiffs plead that Defendants Smith and Allen submitted false SOX certifications to the SEC.  (ECF No. 60 ¶¶ 116, 122, 134.)  False SOX certifications are not independently actionable.  *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 417 (D. Del. 2009) (citation omitted); *see also In re Silicon Storage Tech., Inc., Sec. Litig.*, Case No. C-0-05-0295 PJH, 2007 WL 760535, at *17 (N.D. Cal. Mar. 9, 2007).

e.  *Group Pleading*

Within the Tenth Circuit, the PSLRA has not abrogated the group-pleading doctrine.  *In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1193-94.  Under the group-pleading doctrine, "[i]dentifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omission in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers."  *In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1193 (quoting *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir. 1997)).  "Prospectuses, registration statements, annual reports, press releases, and similar statements are subject to a presumption of collective action."  *Id.* (citing *Schwartz*, 124 F.3d at 1254).

Thus, for those 1934 Act Defendants whose names appear in the publicly filed documents (ECF No. 112-14 at 420, Ex. 12 [Feb. 7, 2011 S-1/A, at II-6]; ECF No. 112-23 at 359, Ex. 21 [June 7, 2011 S-1/A, at II-7]), the Court finds that Plaintiffs sufficiently pled their involvement in Molycorp's public statements.  That is, Plaintiffs properly pled with respect to Defendants Allen, Ashburn, Bhappu, Burba, Dolan, Kristoff, Henry, and Thompson.  (ECF No. 60 ¶¶ 28, 31, 34, 35, 39, 41, 43, 48, 50, 52, 54, 55, 57, 58.)  Plaintiffs failed to properly plead with respect to Defendants RCF, T-II Holdings, Pegasus, and Cogut.  (ECF No. 60 ¶¶ 37, 38, 40, 42); *see Winer Family Trust v. Queen*, 503 F.3d 319, 335-37 (3d Cir. 2007) (holding that the group pleading doctrine is not applicable to those that are not officers or directors of the at-issue company) (citation omitted); *see also In re Thornburg Mort., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1201-02 (D.N.M. 2010) (hereinafter "*Thornburg I*").  Plaintiffs allege that Cogut signed Molycorp's February Offering and June Offering documents.  (ECF No. 60 ¶ 53.)  This is plainly refuted by Defendants' documents submitted in support of their motion to dismiss of which the Court takes

54

judicial notice.  (ECF No. 112-14 at 420, Ex. 12 [Feb. 7, 2011 S-1/A, at II-6]; ECF No. 112-23 at

359, Ex. 21 [June 7, 2011 S-1/A, at II-7].)

    f. *Loss Causation*

   In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005), the Supreme Court

held that "an inflated purchase price will not itself constitute or proximately cause the relevant

economic loss."  The Tenth Circuit has held that "[a]lleging that [stock] price has been inflated

as a result of a misrepresentation is not enough—even if the plaintiff has suffered a loss—unless

the plaintiff can identify a 'causal connection' between the loss and the misrepresentation."  *In re*

*Williams Sec. Litig.*, 558 F.3d at 1136-37 (citing *Dura Pharm.*, 544 U.S. at 347).

   "Even if the truth has made its way into the marketplace, *Dura* requires that a plaintiff

show that it was this revelation that caused the loss and not one of the 'tangle of factors' that

affect price."  *In re Williams Sec. Litig.*, 558 F.3d at 1137 (citing *Dura Pharm.*, 544 U.S. at 343).

"When the purchaser subsequently resells such shares, even at a lower price, that lower price

may reflect not the earlier misrepresentation, but changed economic circumstances, changed

investor expectations, new industry-specific or firm-specific facts, conditions, or other events,

which taken separately or together account for some or all of that lower price."  *Dura Pharm.*,

544 U.S. at 342-43.  "The securities laws are not meant to 'provide investors with broad

insurance against market losses, but to protect them against those economic losses that

misrepresentations actually cause.'"  *In re Williams Sec. Litig.*, 558 F.3d at 1137 (quoting *Dura*

*Pharm.*, 544 U.S. at 345).  "The plaintiff bears the burden of showing that his losses were

attributable to the revelation of the fraud and not the myriad other factors that affect a company's

stock price.  Without showing a causal connection that specifically links losses to

misrepresentations, he cannot succeed."  *In re Williams Sec. Litig.*, 558 F.3d at 1137.  "[T]o

establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Prissert*, 894 F. Supp. 2d at 1375 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)). "[T]o sufficiently plead loss causation, a plaintiff must allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a drop in stock price." *Prissert*, 894 F. Supp. 2d at 1375 (citing *Dura Pharmaceuticals*, 544 U.S. at 346-47)).

"Any reliable theory of loss causation that uses corrective disclosures will have to show both that corrective information was revealed and that this revelation caused the resulting decline in price.  To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *In re Williams Sec. Litig.*, 558 F.3d at 1140.

Plaintiffs allege that "[a]s a direct result of disclosures between November 8 and November 10, 2011, the Company's securities prices suffered an abnormal decline in value.  By November 10, 2011, after information had entered the market that the Company did not have commercially viable quantities of HREEs and that Molycorp would not be producing such materials from the Mountain Pass during either Phase I or Phase II of Project Phoenix, the Company's stock price dropped $6.18 per share, or 22.0%, on high trading volume."  (ECF No. 60 ¶ 160.)  Specifically, Plaintiffs allege that during a Motor & Motion Association Technical Conference between November 8 and 10, 2011, "a Molycorp senior executive informed participants at the conference that the Company had not found any quantities, let alone commercial quantities of HREEs in the Mountain Pass ore body and that HREEs would not be

produced during Phase I or Phase II of Project Phoenix." (ECF No. 60 ¶ 149.) Further,

Plaintiffs allege that during a conference call, Defendant Smith stated "that the furthest the

Company had come along in actually identifying HREEs at Mountain Pass was only that the

Company was building a 'cracking facility'…." (ECF No. 60 ¶ 150.)

Because Plaintiffs have failed to adequately plead a misrepresentation (*see supra* Section

III.A.1.a), there can necessarily be no "corrective" statement. *See Lentell*, 396 F.3d at 175

(holding that "[t]o plead loss causation, the complaint[] must allege facts that support an

inference that [the defendant's] misstatements and omissions concealed the circumstances that

bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable

portion of that loss absent the fraud"). Thus, Plaintiffs have not adequately pled loss causation.

2.      Control Person Liability Claim[17]

Section 20(a) of the 1934 Act states

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person to any
> person to whom such controlled person is liable . . ., unless the controlling person
> acted in good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C.A. § 78t(a) (West 2014).

To state a *prima facie* case of control person liability under Section 20(a) of the 1934

Act, "the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control'

over the primary violator by the alleged controlling person." *Adams*, 340 F.3d at 1107 (citing

*Fleming*, 264 F.3d at 1270-71). To make a showing that individual defendants were control

persons, "the plaintiffs must point to facts which indicate that the defendants had 'possession,

direct or indirect, of the power to direct or cause the direction of the management and policies of

---

[17] Plaintiffs' Section 20(a) claim is against Defendants Molycorp, Smith, Allen, Ashburn, Bhappu, Burba, Cogut, Pegasus, Dolan, RCF, Kristoff, T-II Holdings, Henry, and Thompson. (ECF No. 60 ¶¶ 184-87.)

a person, whether through ownership of voting securities, by contract, or otherwise.'" *Adams*, 340 F.3d at 1108 (quoting *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998)).

Because the Court has found that Plaintiffs fail to adequately plead a Section 10(b) claim against any 1934 Act Defendant (*see supra* Section III.A.1), the Court necessarily finds that Plaintiffs have failed to adequately state a violation under Section 20(a) of the 1934 Act against any 1934 Act Defendant.

### 3.     Section 20A Claims[18]

A claim under Section 20A of the 1934 Act is an "insider trading claim" against those who have violated any provision of the 1934 Act, or its rules and regulations, "by purchasing or selling a security while in possession of material, nonpublic information. . . ." 15 U.S.C. § 78t-1(a). "A Section 20A claim must be predicated on a separate violation of the 1934 Act or its rules and regulations." *In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1200 (citation omitted).

Because the Court has found that Plaintiffs fail to adequately plead a predicate 1934 Act claim against any 1934 Act Defendant (*see supra* Sections III.A.1 and III.A.2), the Court necessarily finds that Plaintiffs have failed to adequately state a violation under any provision of Section 20A of the 1934 Act against any 1934 Act Defendant. *See In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d at 1156-57.

### B.     1933 Act Claims

Plaintiffs "incorporate by reference each non-fraud based allegation regarding false and misleading [statements], set forth at ¶¶ 107-111, 125, 127-129 [in the Complaint]." (ECF No. 60 ¶ 266.) Plaintiffs allege that the 1933 Act Defendants' negligent rather than fraudulent conduct

---

[18] Plaintiffs' Section 20A claims are against Defendants RCF, Bhappu, Dolan, Pegasus, Cogut, Kristoff, T-II Holdings, Smith, Ashburn, Burba, and Thompson. (ECF No. 60 ¶¶ 188-265.)

violated the 1933 Act.  (ECF No. 60 ¶¶ 266-67.)  Plaintiffs allege that in connection with the February and June Offering documents, certain Defendants materially misrepresented:  (1) that commercially viable amounts of HREEs exist at Mountain Pass Mine; (2) that the HREEs existing at Mountain Pass mine would be shipped for further processing; and (3) that Molycorp would produce HREEs in commercial quantities during Project Phoenix Phases I and II.  (ECF No. 60 ¶ 268.)  Plaintiffs allege that these statements were false because:

(a)     Goldman Sachs sold its investment in Molycorp prior to July 2010 because Mountain Pass lacked commercial amounts of HREEs;

(b)     during the Class Period, daily analysis of 20 to 30 samples of solvent extraction circuits of Mountain Pass were performed  and confirmed that Mountain Pass did not contain dysprosium or terbium in commercially significant quantities;

(c)     during the Class Period, float tests of Mountain Pass ore revealed that commercially viable volumes of HREEs did not exist in Mountain Pass;

(d)     subsequent to the Class Period, an analysis revealed a weight to volume of 0.0% for key HREEs;

(e)     an internal report in existence in June 2009, indicated that Mountain Pass ore body did not have commercially viable amounts of HREEs; and

(f)     because there were no HREEs at Mountain Pass mine, Molycorp could not produce HREEs during Project Phoenix Phases I or II.

(ECF No. 60 ¶ 276.)

1.    Section 11 Claim[19]

Section 11(a) of the 1933 Act provides "that when a securities registration statement contains material misstatements or omissions, persons who purchased securities sold in an offering covered by the registration statement may recover losses caused by the defect from the issuer, any person who signed the registration statement, directors of the issuer, and others." *In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1202 (citing *Joseph v. Wiles*, 223 F.3d 1155, 1159 (10th Cir. 2000)). "No scienter is required for liability under § 11." *In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1202. "A defendant may be liable under § 11 for negligent material misstatements or omissions." *In re Qwest Commc'ns Int'l*, 396 F. Supp. 2d at 1202 (citing *Ernst & Ernst*, 425 U.S. at 208). Under certain circumstances, the heightened-pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure may apply to a Section 11 claim. *See Schwartz*, 124 F.3d at 1251-52. When a plaintiff's 1933 Act claim is based on negligent rather than fraudulent conduct, however, a court applies the more lenient pleading standards of Rule 8(a) of the Federal Rules of Civil Procedure. *See Schwartz*, 124 F.3d at 1251-52.

A claim under Section 11 must be based on a registration statement filed with the SEC. *Thornburg I*, 695 F. Supp. 2d at 1191 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983)). "A Section 11 plaintiff must identify a material misrepresentation within the four corners of the challenged registration statement, or an omission of a material fact required to be stated therein, or necessary to make the statements therein not misleading." *Id*. (citations omitted).

---

[19] Plaintiffs' Section 11 claim is against Defendants Molycorp, Smith, Allen, Ashburn, Ball, Bhappu, Cogut, Dolan, Kristoff, Machiels, Henry, and Thompson.  (ECF No. 60 ¶¶ 281-90.)

a.      *Whether the Complaint Sounds in Fraud or Negligence*

Plaintiffs allege that the 1933 Act Defendants violated the 1933 Act through negligent—rather than fraudulent— conduct.  (ECF No. 60 ¶¶ 266-69.)  Defendants argue that Plaintiffs' nominal attempt to disclaim fraudulent allegations fails.  (ECF No. 110 at 39-40.)  In support of Plaintiffs' Section 11 claim, Plaintiffs rely upon the same 1934 Act alleged false and misleading statements with respect to the February and June Offering documents.  (ECF No. 60 ¶ 272 (referring to allegations at ECF No. 60 ¶¶ 108-11, 129); ECF No. 60 ¶ 275 (referring to allegations at ECF No. 60 ¶¶ 125-30).)  Defendants argue that Plaintiffs allege a unified course of fraudulent conduct to form the basis of their claims, *i.e.*, the cover up of the presence of REEs in Mountain Pass.  The Court, however, does not reach the issue as to whether the more stringent requirements under Rule 9(b) of the Federal Rules of Civil Procedure apply to Plaintiffs' Section 11 claim.

Even under the more lenient Rule 8(a) pleading standards, Plaintiffs fail to state a material misrepresentation or omission (*see infra* Section III.B.1.b).  Under Rule 8(a), Plaintiffs are still required to state non-conclusory facts from which it can plausibly be inferred that they state a valid claim.

b.      *Alleged Material Misrepresentations or Omissions*

As discussed previously, a representation or omission is only material "'if a reasonable investor would consider it important in determining whether to buy or sell stock,' and if it would have 'significantly altered the total mix of information available' to current and potential investors."  *Fleming*, 264 F.3d at 1265 (quoting *Grossman*, 120 F.3d at 1119).  The Tenth Circuit has distinguished "between statements that are material and those that are 'mere [puffery] . . . [or] not capable of objective verification."  *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at

1339 (quoting *Grossman*, 120 F.3d at 1119).  "Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions."  *Id.* (internal quotation marks and citation omitted).  To be actionable, the statements must have "'a standard against which a reasonable investor could expect them to be pegged.'"  *In re Harman Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d at 51 (quoting *Bridgestone*, 399 F.3d at 671).

For the reasons stated below, Plaintiffs fail to state a Section 11 claim because none of the complained of statements were materially false or misleading.  Further, Plaintiffs fail to state a Section 11 claim because certain of the complained of statements are protected under the PSLRA's safe-harbor provision.

(1)     February 2011 Offering Documents

Plaintiffs allege that the "February 2011 Preferred Stock IPO was made pursuant to registration statements dated February 7 and February 10, 2011 and a Form 424B4 final prospectus filed with the SEC on February 14, 2011."  (ECF No. 60 ¶ 271.)  Plaintiffs allege that "[t]he materially false and misleading statements made by the Company and 1933 Act Defendants in the February 2011 offerings and the reasons why they were false and/or misleading are pled at ¶¶ 108-111, 129[20] [in the Complaint] only."  (ECF No. 60 ¶ 272.)

Plaintiffs allege that the February Offering documents contain, in pertinent part[21,22], the following materially false and misleading statements:

---

[20] In Complaint Paragraph 129, Plaintiffs allege that "[t]he offering documents for the June 10, 2011 Secondary Offering also stated:  We intend to transport . . . dysprosium [and] terbium . . . from our Mountain Pass facility to our Molycorp Silmet AS and MMA facilities where we will produce rare earth metals and alloys."  (ECF No. 60 ¶ 129.)  Thus, Plaintiffs' allegation undermines its claim as the allegation in Complaint Paragraph 129 pertains to the June 2011 offering and not the February 2011 offering.  Therefore, the allegation in Complaint Paragraph 129 is not well pled as it does not pertain to Plaintiffs' February 2011 Section 11 claim.

[21] Plaintiffs' allegations in Complaint Paragraph 109 have no relation to production or transportation of REEs from Mountain Pass.  (*See generally* ECF No. 60 ¶ 109.)  Thus, the allegations in Complaint Paragraph 109 are irrelevant for purposes of determining whether the 1933 Act Defendants made materially false or misleading statements related to Mountain Pass to which Plaintiffs' Section 11 claim is directed (ECF No. 60 ¶ 268).

> If we are able to add an off-site facility to product [sic] rare earth metals and alloys instead of adding such facilities and equipment at Mountain Pass, we would transport cerium, lanthanum, neodymium, praseodymium, dysprosium, terbium and samarium oxide products from our Mountain Pass facility to that off-site location to produced [sic] rare earth metals and alloys…The oxides produced from processing REE's [sic] are collectively referred to as REOs.  Light and heavy REE are contained in all rare earth deposits, including in our deposit at Mountain Pass.  (ECF No. 60 ¶ 108.)

> IMCOA estimates there is a [sic] currently a global deficit in REO supply, which anticipated [sic] to continue without the advent of production from new projects, such as Mountain Pass.  Limits on rare earth exports from China and the lack of available substitutes make the development of new sources of REEs essential to meet the growing demand for existing and emerging technologies, such as hybrid and electric vehicles, wind power turbines, compact fluorescent light bulbs, hard disk drives and dual use electronics.  (ECF No. 60 ¶ 110.)

Plaintiffs' Section 11 claim related to the February 2011 offering is directed to the 1933 Act Defendants' allegedly misleading Plaintiffs with respect to the presence of "commercial" quantities of HREEs at Mountain Pass.  (*See* ECF No. 60 ¶ 268.)  Not one of the statements referenced by Plaintiffs in relation to the February Offering (ECF No. 60 ¶¶ 108-111, 129, 271-72) is one in which any Defendant asserted "commercial" quantities of HREEs exist at Mountain Pass.  Plaintiffs' Section 11 claim related to the February Offering is not directed to demand or lack of available substitutes for REEs.  (*See* ECF No. 60 ¶ 268.)  Thus, Molycorp's statement regarding "development of new sources of REEs . . . to meet the growing demand for existing and emerging technologies" (ECF No. 60 ¶ 110) is irrelevant to Plaintiffs' Section 11 claim.

Further, these statements' contexts make it clear that they are beliefs and estimates, and not assertions of fact.  For example, Defendant Molycorp asserted in subjunctive terms the following:  "if we are able . . . we would transport [REEs] . . . to produce[] rare earth metals and

---

[22] Plaintiffs' allegation in Complaint Paragraph 111 is that "[o]n February 14, 2011, Molycorp filed with the SEC pursuant to Rule 424(b)(4) a prospectus associated with the [February 2011] Preferred Stock IPO that contained false and misleading statements identical to those distributed to the market in the Company's February 11, 2011 FWP."  (ECF No. 60 ¶ 111.)  Thus, for the purpose of determining whether Complaint Paragraph 111 is sufficiently pled, the Court will rely on those allegations contained in Complaint Paragraphs 108, 110, and 129.

alloys." (ECF No. 60 ¶ 108.)  Regarding Plaintiffs' allegation on the "limits on rare earth exports from China and the lack of available substitutes . . .[,]" the Court finds that such statement does not have a standard against which to be judged.  The Court finds that these allegations are too vague to constitute a material misstatement or omission to which Section 11 liability might attach.  *See Thornburg I*, 695 F. Supp. 2d at 1223.  Additionally, for the reasons stated previously (*see supra* Section III.A.1.c), Complaint Paragraph 108 is protected under the PSLRA's safe-harbor provision.  *See* 15 U.S.C. § 77z-2(a) (the PSLRA's safe-harbor protection is available to claims under the 1933 Act).

The Court therefore finds that the complained of February 2011 statements (ECF No. 60 ¶¶ 108-11, 129, 271-72) are not materially false or misleading.  Further, certain of the complained of February 2011 statements (ECF No. 60 ¶¶ 108, 271-72) are protected under the PSLRA's safe-harbor provision.  Thus, Plaintiffs fail to adequately plead a Section 11 claim against the 1933 Act Defendants related to the February Offering.

(2)     June 2011 Offering Documents

Plaintiffs allege that "the June 10, 2011 Secondary Offering was made pursuant to a Form S-1/A filed [with] the SEC on June 7, 2007 and a Form 424B4 prospectus deemed effective by the SEC on June 9, 2011."  (ECF No. 60 ¶ 274.)  Plaintiffs allege that "[t]he materially false and misleading statements made by the Company and the 1933 Act Defendants in the February 2011 [sic] and June 2011 offerings and the reasons why they were false and/or misleading are pled at ¶¶ 125-130 [in the Complaint] only."  (ECF No. 60 ¶ 275.)

Plaintiffs allege that the June Offering documents contain, in pertinent part[23], the following materially false and misleading statements:

---

[23] Plaintiffs' allegations in Complaint Paragraphs 125, 126, 128 and 130 have no relation to production or transportation of REEs from Mountain Pass.  (*See generally* ECF No. 60 ¶¶ 125-26, 128, 130.)  Thus, the allegations

> Light and heavy REEs are contained in all rare earth deposits, including in our deposit at Mountain Pass.  Heavy REEs generally command higher sales prices on a per pound basis than light REEs because heavy REEs are not as prevalent. (ECF No. 60 ¶ 127.)

> We intend to transport . . . dysprosium [and] terbium . . . from our Mountain Pass facility to our Molycorp Silmet AS and MMA facilities where we will produce rare earth metals and alloys.  (ECF No. 60 ¶ 129.)

Plaintiffs' Section 11 claim related to the June Offering is directed to 1933 Act Defendants' allegedly misleading Plaintiffs with respect to the presence of "commercial" quantities of HREEs at Mountain Pass.  (*See* ECF No. 60 ¶ 268.)  Not one of the statements referenced by Plaintiffs in relation to the June Offering (ECF No. 60 ¶¶ 125-30, 274-75) is one in which any Defendant asserted "commercial" quantities of HREEs exist at Mountain Pass. Plaintiffs' Section 11 claim related to the June 2011 offering is not directed to demand or lack of available substitutes for REEs.  (*See* ECF No. 60 ¶ 268.)  Thus, the statements in Complaint Paragraph 128 (ECF No. 60 ¶ 128) related to production from Mountain Pass to meet demand are irrelevant to Plaintiffs' Section 11 claim.

Further, for the reasons discussed previously (*see supra* Section III.B.1.b.(1)), Plaintiffs fail to adequately plead a material misstatement or omission.  And these statements' (ECF No. 60 ¶¶ 127, 129) contexts make it clear that they are beliefs and estimates, and not assertions of fact.  (*See* ECF No. 112-23 at 63, Ex. 21 [June 7, 2011 S-1/A, at 29].)  Additionally, for the reasons stated previously (*see supra* Section III.A.1.c), Complaint Paragraph 129 is protected under the PSLRA's safe-harbor provision.  *See* 15 U.S.C. § 77z-2(a) (the PSLRA's safe-harbor protection is available to claims under the 1933 Act).

---

in Complaint Paragraphs 125, 126, 128, and 130 are irrelevant for purposes of determining whether the 1933 Act Defendants made materially false or misleading statements related to Mountain Pass to which Plaintiffs' Section 11 claim is directed (ECF No. 60 ¶ 268).

The Court therefore finds that the complained of June 2011 statements (ECF No. 60 ¶¶ 125-30, 274-75) are not materially false or misleading.  Further, certain of the complained of June 2011 statements (ECF No. 60 ¶¶ 129, 274-75) are protected under the PSLRA's safe-harbor provision.  Thus, Plaintiffs fail to adequately plead a Section 11 claim against the 1933 Act Defendants related to the June 2011 offering.

2.     <u>Section 12 Claim</u>[24]

Section 12(a)(2) provides that "any person who offers or sells a security . . ., by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him. . . ."  15 U.S.C.A. § 77l(a)(2) (West 2014).

a.     *Standing*

Section 12(a)(2) contains "*an express privity requirement*, giving a cause of action only to individuals who purchase securities *directly* from a person who sells the securities by means of a prospectus." *Joseph*, 223 F.3d at 1161 (emphasis added).  Thus, despite Plaintiffs' argument to the contrary (ECF No. 121 at 41-42, Pls.' Br. at 34 n. 20), the concept of "tracing" is unavailable in the Tenth Circuit.  Plaintiffs allege that they "purchased . . . Molycorp common and preferred stock issued *pursuant* to . . . the misleading *[February and June Offering] documents*." (ECF No. 60 ¶ 295 (emphasis added).)  Plaintiffs allege that Defendants Smith, Allen, Ashburn, Ball, Bhappu, Cogut, Dolan, Kristoff, Machiels, Henry, Thompson, Morgan

---

[24] Plaintiffs' Section 12(a)(2) claim is against Defendants Smith, Allen, Ashburn, Ball, Bhappu, Cogut, Dolan, Kristoff, Machiels, Henry, Thompson, Morgan Stanley, J.P. Morgan, Knight, Dahlman, Stifel, BNP, CIBC, Piper Jaffray, and RBS.  (ECF No. 60 ¶¶ 291-98.)

Stanley, J.P. Morgan, Knight, Dahlman, Stifel, BNP, CIBC, Piper Jaffray and RBS were sellers . . . in connection with the [February and June Offerings]."  (ECF No. 60 ¶ 293.)

While Plaintiffs may not be able to ultimately prove a Section 12(a)(2) claim against each Section 12(a)(2) Defendant with respect to the February and/or June Offerings, Plaintiffs have sufficiently pled a Section 12(a)(2) claim for purposes of establishing standing under Rule 8.[25] *See Genesee Cty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1211 (D.N.M. 2011).

> b.     *Material Misstatement or Omission*

As discussed previously (*see supra* Section III.B.1), however, Plaintiffs have failed to plead a false or misleading statement in the February or June Offering documents.  Thus, the Court concludes that Plaintiffs fail to state a Section 12(a)(2) claim.  *See In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1192 (D.N.M. 2012) (holding that Section 12(a)(2) of the [1933 Act] require[s] a showing that a defendant made a materially false or misleading statement or omission to trigger liability") (hereinafter "*Thornburg III*").

> 3.     Control Person Liability Claims[26]

Section 15(a) of the 1933 Act states

> Every person who . . . controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C.A. § 77o (West 2014).

---

[25] Of particular concern to the Court is that among the named Plaintiffs, Plaintiffs allege only that Eugene Salmon ("Salmon") purchased shares pursuant to the February Offering.  (ECF No. 60 ¶ 21.)  The certificate attached to Plaintiffs' Complaint shows that Salmon purchased preferred stock on February 25, 2011 at $97 per share, which is two weeks after the February Offering and $3 fewer than the offering price (ECF No. 60 ¶¶ 2, 270).  (ECF No. 60 at 136-37.)

[26] Plaintiffs' Section 15 claim is against all 1933 Act Defendants.

To state a prima facie case of control person liability under Section 15 of the 1933 Act, "the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Adams*, 340 F.3d at 1107 (citing *Fleming*, 264 F.3d at 1270-71). To make a showing that individual defendants were control persons, "the plaintiffs must point to facts which indicate that the defendants had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.'" *Adams*, 340 F.3d at 1108 (quoting *Maher*, 144 F.3d at 1305).

Here, because Plaintiffs have failed to establish a primary violation of the 1933 Act, (*see supra* Sections III.B.1 and III.B.2), Plaintiffs do not plead sufficiently a Section 15 claim.

## IV.   CONCLUSION

Based on the foregoing, the Court:

(1)   GRANTS Defendants' motion to dismiss (ECF No. 109);

(2)   DISMISSES WITHOUT PREJUDICE Plaintiffs' Complaint (ECF No. 60); and

(3)   GRANTS Plaintiffs leave to file an amended complaint within thirty-five (35) days of this Order's entry. If Plaintiffs fail to file an amended complaint within thirty-five (35) days of this Order's entry, the Clerk of the Court is to CLOSE this matter.

DATED this 31st day of March, 2015.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

68