**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:12-cv-00292-RM-KMT

In re MOLYCORP, INC. SECURITIES LITIGATION.

---

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

## I.    NATURE OF THE ACTION

1.    Lead Plaintiffs Randall Duck, Jerry W. Jewell, Philip Marner and Donald E. McAlpin, and representative Plaintiffs Iron Workers Mid-South Pension Fund ("Iron Workers"), Joseph Martiny, Jayne McCarthy, Robert Grabowski, Marjorine Dowd, Kyle Hare, Robert DeStefano and Eugene R. Salmon ("Salmon") (collectively, "Plaintiffs") bring this action on their own behalf and on behalf of all other persons similarly situated.  Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys.

2.    This is a class action for violations of the federal securities laws on behalf of all purchasers or acquirers of Molycorp, Inc. ("Molycorp" or the "Company") securities from February 7, 2011 through November 10, 2011 (the "Class Period"), including all persons who purchased or acquired Molycorp preferred and/or common stock in the Company's February 2011 Offering (defined herein) and all persons who purchased or acquired Molycorp common stock pursuant to the Company's June 2011 Offering (defined herein), and who were damaged thereby (the "Class").

3.    This action concerns Defendants' false and/or misleading statements and omissions regarding the capabilities of the Company's open-pit mine and processing facility located near Mountain Pass, San Bernardino County, California ("Mountain Pass").  Specifically, throughout the Class Period, Defendants falsely and misleadingly stated that:  (i) Molycorp's "***principal products***" included the heavy rare earth elements ("HREEs") dysprosium and terbium; and (ii) these elements were "***contained . . . in our deposit at Mountain Pass***."  When investors expressed any concern about whether dysprosium and terbium existed at Mountain Pass during the Class Period, Defendants also falsely assured them that those concerns were unfounded.  Between November 8

- 1 -

and 10, 2011, information began entering the market that contradicted Defendants' Class Period statements regarding HREEs at Mountain Pass – that is, there was no dysprosium or terbium at the mine.   As a consequence, the Company's security prices dropped significantly.   Indeed, as Defendant Mark A. Smith ("Smith") acknowledged on November 13, 2011, Molycorp's "**stock price went down**" after market participants concluded that Defendants were "**not being as forthright as we should be about the ability to produce heavies at Mountain Pass**."

4.      Defendants' statements that the Company's principal products included dysprosium and terbium, and that these HREEs came from the Mountain Pass ore body and were contained in the deposit at Mountain Pass were false, made without a reasonable basis, and made other than in good faith.  As described in detail at ¶¶76-80 below, the Company or its predecessor, which is now a subsidiary, generated records on a daily basis between 2008 and throughout the Class Period establishing that there were virtually no HREEs – particularly dysprosium and terbium – in the Mountain Pass ore body.  With regard to Plaintiffs' claims under the Securities Act of 1933 ("1933 Act"), Defendants failed in their duty to conduct a reasonable inquiry to uncover and disclose these facts.  With regard to Plaintiffs' claims under the Securities Exchange Act of 1934 ("1934 Act"), Defendants either knew or recklessly disregarded these facts when making their Class Period statements.

5.      Defendants' Class Period false and misleading statements and omissions artificially inflated Molycorp's security prices and allowed various Insider Defendants (defined herein) to sell **more than $1.5 billion** of their Company stock in less than four months between February and June 2011, from which they reaped **over $1.4 billion in profits**.  This insider selling was both unusual and suspicious in amount and timing.  Specifically, in January 2011, shortly before the Insider

Defendants initiated these sales, Defendant Ross R. Bhappu ("Bhappu") informed investors in an interview for *Forbes* that if the Company's insiders sold any of their shares in 2011, "it would be a relatively small stake."  Contrary to Bhappu's assurances, he and the other Insider Defendants sold as much as 52% of their holdings.  This massive insider selling that generated astronomical profits for the Insider Defendants was neither normal nor routine.  Since June 2011, the Insider Defendants have not sold an additional share of Molycorp stock.

6.      While the Insider Defendants earned over $1.4 billion in profits between February and June 2011, by contrast, unsuspecting Molycorp investors suffered hundreds of millions of dollars in damages, as the Company's common stock plummeted from $42.29 per share to $33.45 per share between November 8 and 11, 2011.  Similarly, the price of Molycorp's preferred stock dropped from $80.04 per share to $69.92 per share between November 8 and 11, 2011.

7.      Plaintiffs assert the first set of claims against the 1934 Act Defendants (defined herein) for violations of §§10(b) and 20(a) of the 1934 Act arising from the materially false and/or misleading statements and omissions alleged herein, which caused the price of Molycorp securities to be artificially inflated over the course of the Class Period.

8.      Plaintiffs assert the second set of non-fraud-based claims against the 1933 Act Defendants (defined herein) for violations of §§11, 12(a)(2) and 15 of the 1933 Act arising from the materially untrue statements and misleading omissions contained in the February and June 2011 Offering Documents.  Through the February 2011 Offering, Molycorp conducted an initial public offering ("IPO") of 2,070,000 shares of preferred stock at $100 per share for  $207 million in gross proceeds  and facilitated the sale of 15,025,000 shares of common stock at $50 per share for at least $776 million in gross proceeds.  Through the June 2011 Offering, Molycorp facilitated the sale of

- 3 -

11.5 million shares of common stock at $51 per share for gross proceeds of over $586.5 million. The 1933 Act Defendants are statutorily liable under a theory of strict liability and/or negligence.

9.      In conformity with the Tenth Circuit's decision in *Schwartz v. Celestial Seasonings*, 124 F.3d 1246, 1251-52 (10th Cir. 1997), and recent court decisions within the Tenth Circuit, Plaintiffs' non-fraud allegations in support of the 1933 Act claims are pled at ¶¶147-179 as separate, stand-alone claims under the notice pleading standards of Fed. R. Civ. P. 8(a). Plaintiffs specifically disclaim any allegations of fraud, scienter or recklessness under these non-fraud-based claims.

## II.      JURISDICTION AND VENUE

10.      The claims asserted herein arise under §§11, 12(a)(2) and 15 of the 1933 Act (15 U.S.C. §§77k, 77l and 77o) and under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and Rule 10-b5 (17 C.F.R. §240.10b-5) promulgated thereunder by the Securities and Exchange Commission ("SEC"). Jurisdiction is conferred by §22 of the 1933 Act (15 U.S.C. §77v) and §27 of the 1934 Act (15 U.S.C. §78aa). Venue is proper pursuant to §22 of the 1933 Act and §27 of the 1934 Act. Molycorp's headquarters are located in Greenwood Village, Colorado, and many of the acts and transactions constituting the violations of the securities laws alleged herein occurred in this District.

11.      In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

### III.   PARTIES

#### A.   Plaintiffs

12.     Lead Plaintiff Randall Duck purchased Molycorp common stock during the Class Period, as set forth in the certification accompanying the Motion to Appoint the Molycorp Shareholder Group as Lead Plaintiff ("Lead Plaintiff Motion") (Dkt. No. 29-2), and was damaged as a result of Defendants' conduct as alleged herein.

13.     Lead Plaintiff Jerry W. Jewell purchased Molycorp common stock during the Class Period, as set forth in the certification accompanying the Lead Plaintiff Motion, and was damaged as a result of Defendants' conduct as alleged herein.

14.     Lead Plaintiff Philip Marner purchased Molycorp common stock during the Class Period, as set forth in the certification accompanying the Lead Plaintiff Motion, and was damaged as a result of Defendants' conduct as alleged herein.

15.     Lead Plaintiff Donald E. McAlpin purchased Molycorp common stock during the Class Period, as set forth in the certification accompanying the Lead Plaintiff Motion, and was damaged as a result of Defendants' conduct as alleged herein.

16.     Representative Plaintiff Iron Workers purchased Molycorp common stock during the Class Period, including shares issued in connection with the February and June 2011 Offerings, as set forth in the certification attached to Plaintiffs' Consolidated Class Action Complaint for Violations of Federal Securities Laws  ("Consolidated Complaint") (Dkt. No. 60), and was damaged as a result of Defendants' conduct as alleged herein.

17.     Representative Plaintiff Joseph Martiny purchased Molycorp common stock during the Class Period, as set forth in the certification attached to the Consolidated Complaint, and was damaged as a result of Defendants' conduct as alleged herein.

18.     Representative Plaintiff Jayne McCarthy purchased Molycorp common stock during the Class Period, as set forth in the certification attached to the Consolidated Complaint, and was damaged as a result of Defendants' conduct as alleged herein.

19.     Representative Plaintiff Robert Grabowski purchased Molycorp common stock during the Class Period, as set forth in the certification attached to the Consolidated Complaint, and was damaged as a result of Defendants' conduct as alleged herein.

20.     Representative Plaintiff Marjorine Dowd purchased Molycorp common stock during the Class Period, as set forth in the certification attached to the Consolidated Complaint, and was damaged as a result of Defendants' conduct as alleged herein.

21.     Representative Plaintiff Kyle Hare purchased Molycorp common stock during the Class Period, as set forth in the certification attached to the Consolidated Complaint, and was damaged as a result of Defendants' conduct as alleged herein.

22.     Representative Plaintiff Robert DeStefano purchased Molycorp common stock during the Class Period, as set forth in the certification attached to the Consolidated Complaint, and was damaged as a result of Defendants' conduct as alleged herein.

23.     Representative Plaintiff Salmon purchased Molycorp preferred stock during the Class Period, including shares issued in connection with the February 2011 Offering, as set forth in the certification attached to the Consolidated Complaint, and was damaged as a result of Defendants' conduct as alleged herein.

**B.      The 1934 Act Defendants**

24.      Defendant Molycorp is a rare earth element ("REE") mining business engaged in the production and sale of rare earth products, including rare earth oxides ("REOs"), metals, alloys, and magnets for various inputs in existing and emerging applications, such as clean energy technologies, high-tech uses, and advanced water treatment technology.   The Company owns and operates Mountain Pass, an open-pit mine and processing facility located in San Bernardino County, California and maintains its corporate headquarters at 5619 Denver Tech Center Parkway, Suite 1000, Greenwood Village, Colorado.   Prior to Molycorp's 2010 formation, the Company's predecessor and current subsidiary, Molycorp Minerals, LLC ("Molycorp Minerals"), owned and operated Mountain Pass.[1]

25.      Defendant Smith was, at all relevant times, Chief Executive Officer ("CEO"), President, and a Director of Molycorp.   Defendant Smith served as the President and CEO of Molycorp Minerals between October 2008 and December 2012.   During the Class Period, Defendant Smith participated in the issuance of false and/or materially misleading statements and omissions that misrepresented and/or failed to disclose the true facts about the absence of dysprosium and terbium at Mountain Pass by virtue of his positions as CEO, President and a Director of Molycorp.

---

[1]      According to the Company's "Corporate History and Structure" set forth in its public SEC filings, Molycorp Minerals is a Delaware limited liability company (formerly known as Rare Earth Acquisitions LLC) formed on June 12, 2008 to acquire Mountain Pass from Chevron Mining, Inc. ("Chevron").   On September 9, 2009, Molycorp, LLC was formed and became the parent of Molycorp Minerals.   Molycorp was formed on March 4, 2010 as a Delaware corporation.   Shortly before the Company's August 2010 IPO, the founders of Molycorp Minerals and Molycorp, LLC, who include Defendants Bhappu, Craig M. Cogut ("Cogut"), RCF Management, LLC ("RCF"), and Pegasus Capital Advisors, L.P. ("Pegasus"), exchanged all of their ownership interests in Molycorp, LLC and Molycorp Minerals for Molycorp common stock.   As such, Molycorp, LLC and Molycorp Minerals became subsidiaries of Molycorp.   Thereafter, in June 2010, Molycorp, LLC was merged into Molycorp Minerals, which remains a subsidiary of Molycorp.

- 7 -

In particular, Defendant Smith signed the following false and/or materially misleading public filings: (i) Molycorp's registration statements on Form S-1/A (Registration No. 333-171827), filed with the SEC on February 7, 2011 (the "February 2011 Form S-1/A"), and on Form S-1MEF, dated February 10, 2011 and filed with the SEC on February 11, 2011 (the "February 2011 Forms S-1MEF") (together, the "February 2011 Registration Statements"); (ii) Molycorp's annual report on Form 10-K for the fiscal year ended December 31, 2010, filed with the SEC on March 9, 2011 (the "2010 Form 10-K"); (iii) Molycorp's quarterly report on Form 10-Q for the quarter ended March 31, 2011 ("1Q11"), filed with the SEC on May 10, 2011 (the "1Q11 Form 10-Q"); (iv) Molycorp's registration statement on Form S-1/A (Registration No. 333-174458), filed with the SEC on June 7, 2011 (the "June 2011 Registration Statement"); and (v) Molycorp's quarterly report on Form 10-Q for the second quarter ended June 30, 2011 ("2Q11"), filed with the SEC on May 10, 2011 (the "2Q11 Form 10-Q").  Throughout the Class Period, Defendant Smith also had the opportunity to correct misstatements and omissions made by and on behalf of Molycorp, but failed to do so.  As CEO of both Molycorp and Molycorp Minerals, Defendant Smith had access to the Company's computerized Laboratory Information Management System ( "LIMS"), which stored the results of daily ore tests conducted between 2008 and 2012 as part of the Company's core mining and processing operations for the purpose of identifying the presence of HREEs in the Mountain Pass ore body that could then be produced through mining.  During the Class Period, Defendant Smith reported indirect and direct sales of 259,260 shares of Molycorp common stock for proceeds of $13.1 million and profits of more than $8.3 million.  These insider sales amounted to more than 21% of Defendant Smith's total Class Period holdings of Molycorp common stock.  Between the end of

- 8 -

the Class Period and the termination of Defendant Smith's employment in December 2012, he did not sell a single share of Molycorp common stock.

26.     As CEO, President and a Director, Defendant Smith was responsible for directing Molycorp's financial and business affairs.  During conference calls and meetings with analysts and investors, Defendant Smith repeatedly held himself out as knowledgeable about the Company's operating and financial condition, including, specifically, the characteristics of the ore body at Mountain Pass.  At no time during the Class Period did Defendant Smith ever indicate that he was not aware of all material aspects of Molycorp's mining operations.  According to the Company's Proxy Statement, filed with the SEC on April 18, 2011, Defendant "***Smith[] [has]*** broad experience in the rare earths mining industry and ***[a] deep understanding of the operations at our Mountain Pass facility***."  Defendant Smith had been intimately involved with the operation and development of Mountain Pass over the course of 24 years while the mine operated under the ownership of Unocal Corporation ("Unocal"), Chevron, Molycorp Minerals, and finally, Molycorp.  As Defendant Smith admitted in testimony to Congress on March 16, 2010 regarding his "observations, experiences, and insights on the subject of rare earths," Defendant Smith has "worked with Molycorp and its former parent companies, Unocal and Chevron, for over 25 years, and [has] watched closely the evolution of this industry over the past decade."

27.     Defendant James S. Allen ("Allen") was, at all relevant times, Chief Financial Officer ("CFO") and Treasurer of Molycorp.  Defendant Allen began serving as the CFO of Molycorp Minerals beginning in 2009.  During the Class Period, Defendant Allen participated in the issuance of false and/or materially misleading statements and omissions that misrepresented and/or failed to disclose the true facts about the absence of dysprosium and terbium at Mountain Pass by virtue of his

- 9 -

positions as CFO and Treasurer of Molycorp.  In particular, Defendant Allen signed the following false and/or materially misleading public filings:  (i) the February 2011 Registration Statements; (ii) the 2010 Form 10-K; (iii) the 1Q11 Form 10-Q; (iv) the June 2011 Registration Statement; and (v) the 2Q11 Form 10-Q.  Throughout the Class Period, Defendant Allen also had the opportunity to correct misstatements and omissions made by and on behalf of Molycorp, but failed to do so.  As CFO of both Molycorp and Molycorp Minerals, Defendant Allen had access to the Company's LIMS system, which stored the results of daily ore tests conducted between 2008 and 2012 as part of the Company's core mining and processing operations for the purpose of identifying the presence of HREEs in the Mountain Pass ore body that could then be produced through mining.  As CFO and Treasurer, Defendant Allen was responsible for directing Molycorp's financial and business affairs. During conference calls and meetings with analysts and investors, Defendant Allen repeatedly held himself out as knowledgeable about the Company's operating and financial condition, including the capabilities of Mountain Pass.  At no time during the Class Period did Defendant Allen indicate that he was not aware of material aspects of Molycorp's mining operations.

28.     Defendant John F. Ashburn, Jr. ("Ashburn") was, at all relevant times, Executive Vice President and General Counsel of Molycorp.  Defendant Ashburn also served as Vice President of Molycorp Minerals between 2009 and 2013.  During the Class Period, Defendant Ashburn participated in the issuance of false and/or materially misleading statements and omissions that misrepresented and/or failed to disclose the true facts about the absence of dysprosium and terbium at Mountain Pass by virtue of his positions as Executive Vice President and General Counsel of Molycorp.  Throughout the Class Period, Defendant Ashburn also had the opportunity to correct misstatements and omissions by and on behalf of Molycorp, but failed to do so.  As Executive

1019208_1

President and General Counsel of both Molycorp and Molycorp Minerals, Defendant Ashburn had access to the Company's LIMS system, which stored the results of daily ore tests conducted between 2008 and 2012 as part of the Company's core mining and processing operations for the purpose of identifying the presence of HREEs in the Mountain Pass ore body that could then be produced through mining. During the Class Period, Defendant Ashburn reported direct sales of 95,184 shares of Molycorp common stock for proceeds of $4.8 million and profits of approximately $4.5 million. These insider sales amounted to 34% of Defendant Ashburn's total Class Period holdings of Molycorp common stock. Between the end of the Class Period and March 2013 when Defendant Ashburn's employment with Molycorp was terminated, he did not sell a single share of Molycorp common stock.

29.     Prior to joining Molycorp, Defendant Ashburn was Senior Counsel of Chevron. Prior to joining Chevron, Defendant Ashburn was Senior Counsel of Unocal. Defendant Ashburn was involved in various aspects of Mountain Pass in his capacity as Senior Counsel with Chevron and Unocal since the mid-1990s. All told, Defendant Ashburn has nearly 20 years combined service with various companies that owned and/or operated Mountain Pass, including, Chevron, Unocal, Molycorp Minerals, and finally, Molycorp.

30.     Defendant Bhappu was, at all relevant times, the Chairman of Molycorp's Board of Directors (the "Board"). During the Class Period, Defendant Bhappu participated in the issuance of false and/or materially misleading statements and omissions that failed to disclose the true facts about the absence of dysprosium and terbium at Mountain Pass by virtue of his position as Chairman of Molycorp's Board. In particular, Defendant Bhappu signed the following false and/or materially misleading public filings: (i) the February 2011 Registration Statements; (ii) the 2010 Form 10-K;

- 11 -

and (iii) the June 2011 Registration Statement.  Throughout the Class Period, Defendant Bhappu also had the opportunity to correct misstatements and omissions by and on behalf of Molycorp, but failed to do so.  According to the Company's SEC filings, Defendant Bhappu "is a key member of [the Company's] Board of Directors" with "comprehensive knowledge of the mining industry"  based upon his over 25 years of experience therein, as well as his background in metallurgical engineering and mining project finance.  Defendant Bhappu was previously employed by Newmont Mining Corporation, GTN Copper Corporation, and Cyprus Minerals Company.  Since 2005, Defendant Bhappu has been a partner of Defendant RCF (discussed below).  Defendant RCF, along with the Traxys Group and Defendant Pegasus (discussed below), was a principal investor in connection with the acquisition of Mountain Pass from Chevron in 2008.  During the Class Period, Defendant Bhappu, through Defendant RCF, reported indirect sales of 13,769,269 shares of Molycorp common stock for proceeds of $694.2 million and profits of more than $597 million.  These insider sales amounted to 49.8% of Defendant Bhappu's total Class Period holdings of Molycorp common stock.  Defendant Bhappu has not sold a single share of Molycorp stock since June 2011.

31.    Defendant John L. Burba ("Burba") was, at all relevant times, Executive Vice President and Chief Technology Officer ("CTO") of Molycorp.  Defendant Burba also served as the CTO of Molycorp Minerals beginning in December 2009.  During the Class Period, Defendant Burba participated in the issuance of false and/or materially misleading statements and omissions that misrepresented and/or failed to disclose the true facts about absence of dysprosium and terbium at Mountain Pass by virtue of his position as CTO of Molycorp.  As CTO of both Molycorp and Molycorp Minerals, Defendant Burba had access to the Company's LIMS system, which stored the results of daily ore tests conducted between 2008 and 2012 as part of the Company's core mining

- 12 -

and processing operations for the purpose of identifying the presence of HREEs in the Mountain Pass ore body that could then be produced through mining. According to the Company's 2010 Form 10-K, Defendant Burba received his Ph.D. in physical chemistry from Baylor University in 1979. Throughout the Class Period, Defendant Burba also had the opportunity to correct misstatements and omissions by and on behalf of Molycorp, but failed to do so. During the Class Period, Defendant Burba reported sales of 118,982 shares of Molycorp common stock for proceeds of $6.0 million and profits of more than $5.7 million. These insider sales amounted to 34.7% of Defendant Burba's total Class Period holdings of Molycorp common stock. Between the end of the Class Period and March 2013 when Defendant Burba's employment with Molycorp was terminated, he did not sell a single share of Molycorp common stock.

32.    Defendant Cogut, at all relevant times, exercised control over Defendants Pegasus and T-II Holdings LLC ("T-II Holdings") (discussed below). In particular, Defendant Cogut was a managing director at Defendant Pegasus, which controlled Molycorp LLC, the entity that was formed to acquire Mountain Pass from Chevron. Additionally, Defendant Cogut's Class Period Form 4 filings with the SEC represented that he controlled Defendants Pegasus and T-II Holdings. The Company's public filings further acknowledged that through his control of Defendants Pegasus and T-II Holdings, Defendant Cogut "may be deemed to share voting and investment power of the shares of our common stock" owned by these entities. At the times specified herein, Defendant Cogut, through his control of Defendants Pegasus and T-II Holdings, engaged in insider trading in violation of §10(b) of the 1934 Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) based on material, adverse, non-public information regarding the capabilities of Mountain Pass. In addition, Defendant Cogut is liable under §20(a) of the 1934 Act

- 13 -

for the conduct alleged herein in violation of §10(b) of the 1934 Act that is attributable to the entities that he controlled – *i.e.*, the failure of Defendants Pegasus and T-II Holdings to disclose material information regarding the lack of HREEs at Mountain Pass when each of these Defendants sold Molycorp common stock during the Class Period, as alleged below.  During the Class Period, Defendant Cogut reported total indirect sales from the February and June 2011 Offerings of 12,270,073 shares of Molycorp common stock through Defendants Pegusus and T-II Holdings for proceeds of $618.7 million and profits of more than $588 million.  These insider sales amounted to 50.1% of Defendant Cogut's total Class Period holdings of Molycorp common stock.

33.     Defendant Pegasus was, at all relevant times, a Delaware limited partnership with offices at 505 Park Avenue, 21st Floor, New York, New York.  At the times specified herein, Defendant Pegasus, through its owners, employees or agents, or the owners, employees or agents of its general partners, limited partners and/or affiliates Pegasus Capital Advisors IV GP, LLC; Pegasus Capital Advisors IV, L.P.; MP IH Holdings 1, LLC; MP IH Holdings 2, LLC; Pegasus Capital LLC; Pegasus Investors IV GP, LLC; Pegasus Investors IV, L.P.; Pegasus Partners IV, L.P.; PP IV Mountain Pass II, LLC; Pegasus Partners IV (AIV), L.P.; PP IV MP AIV 1, LLC; PP IV MP AIV 2, LLC; PP IV MP AIV 3, LLC; and/or Defendant T-II Holdings engaged in insider trading in violation of §10(b) of the 1934 Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) at the direction of, and/or based on material, adverse, non-public information provided by, Defendant Cogut, who is the founder and managing partner of Defendant Pegasus and/or Defendant Mark Kristoff ("Kristoff"), who is the CEO of Defendant T-II Holdings (both discussed below).  During the Class Period, Defendant Pegasus reported total sales from the February and June 2011 Offerings of 12,270,073 shares of Molycorp common stock for proceeds of

- 14 -

$618.7 million and profits of more than $588 million.  These insider sales amounted to 50.1% of Defendant Pegasus' total Class Period holdings of Molycorp common stock.

34.     Defendant Brian T. Dolan ("Dolan") was, at all relevant times, a Director of Molycorp.  During the Class Period, Defendant Dolan participated in the issuance of false and/or materially misleading statements and omissions that misrepresented and/or failed to disclose the true facts about the absence of dysprosium and terbium at Mountain Pass by virtue of his position as a Director of Molycorp.  In particular, Defendant Dolan signed the following false and/or materially misleading public filings:  (i) the February 2011 Registration Statements; (ii) the 2010 Form 10-K; and (iii) the June 2011 Registration Statement.  Throughout the Class Period, Defendant Dolan also had the opportunity to correct misstatements and omissions by and on behalf of Molycorp, but failed to do so.  From 2002 until December 13, 2011, Defendant Dolan was a partner of Defendant RCF (discussed below).  Defendant RCF, along with the Traxys Group and Defendant Pegasus, was a principal investor in connection with the acquisition of Mountain Pass from Chevron in 2008.  During the Class Period, Defendant Dolan, through Defendant RCF, indirectly executed sales of 13,769,269 shares of Molycorp common stock for proceeds of $694.2 million and profits of more than $597 million.  These insider sales amounted to 49.8% of Defendant Dolan's total indirect Class Period holdings of Molycorp common stock.  Defendant Dolan has not sold a single share of Molycorp common stock since June 2011.

35.     Defendant RCF was, at all relevant times, a Delaware limited liability corporation doing business as Resource Capital Funds, with offices in this District at 1400 Sixteenth Street, Suite 200, Denver, Colorado.  At the times specified herein, Defendant RCF, through its owners, employees or agents, or the owners, employees or agents of its general partners, limited partners

and/or affiliates Resource Capital Associates IV, LP; Resource Capital Fund IV, LP; RCA IV GP, LLC; Resource Capital Associates V, LP; Resource Capital Fund V, LP; RCA V GP, Ltd.; and/or RCF US Holdings, L.P. engaged in inside trading in violation of §10(b) of the 1934 Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) at the direction of, and/or based on material, adverse, non-public information provided by, Defendant Bhappu, who is a partner at Defendant RCF and serves on Defendant RCF's investment committee, and Defendant Dolan, who served as a partner of RCF from its inception until December 31, 2011. During the Class Period, Defendant RCF reported total sales from the February and June 2011 Offerings of 13,769,269 shares of Molycorp common stock for proceeds of $694.2 million and profits of more than $597 million. These insider sales amounted to 49.8% of Defendant RCF's total Class Period holdings of Molycorp common stock. Defendant RCF has not sold a single share of Molycorp common stock since June 2011.

36. Defendant Kristoff was, at all relevant times, a Director of Molycorp. Since April 2005, Defendant Kristoff has been the CEO of the Traxys Group, which is a global trading, marketing, and distribution company. The Traxys Group, along with Defendants Pegasus and RCF, was a principal investor in connection with the acquisition of Mountain Pass from Chevron in 2008. During the Class Period, Defendant Kristoff participated in the issuance of false and/or materially misleading statements and omissions that misrepresented and/or failed to disclose the true facts about the absence of dysprosium and terbium at Mountain Pass by virtue of his position as a Director of Molycorp. In particular, Defendant Kristoff signed the following false and materially misleading public filings: (i) the February 2011 Registration Statements; (ii) the 2010 Form 10-K; and (iii) the June 2011 Registration Statement. Throughout the Class Period, Defendant Kristoff also had the

- 16 -

opportunity to correct misstatements and omissions by and on behalf of Molycorp, but failed to do so.  During the Class Period, Kristoff directly and indirectly, through Defendant T-II Holdings, sold 4,774,448 shares of Molycorp common stock for proceeds of $240.7 million and profits of more than $214 million.  These insider sales amounted to 52% of Defendant Kristoff's total direct and indirect Class Period holdings of Molycorp common stock.  According to the Company's SEC filings, Defendant "Kristoff's experience in global trading, financing, supply chain management, and distribution of metals and REE's provides valuable insight to [Molycorp's] [B]oard of [D]irectors regarding existing and potential opportunities in the rare earths markets."  Defendant Kristoff has not sold a single share of Molycorp common stock since June 2011.

37.     Defendant T-II Holdings was, at all relevant times, an Anguillan limited liability corporation with offices at 825 Third Avenue, 9th Floor, New York, New York.  At the times specified herein, Defendant T-II Holdings, through its owners, employees or agents, or the owners, employees or agents of its wholly owned companies, subsidiaries and/or affiliates Defendant Pegasus; TNA Moly Group LLC ("TNA Moly"); Traxys S.a.r.l. ("Traxys S"); and Traxys North America, LLC ("Traxys") engaged in insider trading in violation of §10(b) of the 1934 Act (15 U.S.C. §78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) at the direction of, and/or based on material, adverse, non-public information provided by Defendant Kristoff who is the CEO of Defendant T-II Holdings, TNA Moly, Traxys S, and Traxys and/or Defendant Cogut who is the founder and managing partner of Defendant Pegasus.  During the Class Period, Defendant T-II Holdings reported total sales from the February and June 2011 Offerings of 4,584,710 shares of Molycorp common stock for proceeds of over $230 million.  These insider sales amounted to 52% of Defendant T-II Holdings' total Class Period holdings of Molycorp common

- 17 -

stock. Defendant T-II Holdings has not sold a single share of Molycorp common stock since June 2011.

38. Defendant Charles R. Henry ("Henry") was, at all relevant times, a Director of Molycorp. During the Class Period, Defendant Henry participated in the issuance of false and/or materially misleading statements and omissions that misrepresented and/or failed to disclose the true facts about the absence of dysprosium and terbium at Mountain Pass by virtue of his position as a Director of Molycorp. In particular, Defendant Henry signed the following false and materially misleading public filings: (i) the February 2011 Registration Statements; (ii) the 2010 Form 10-K; and (iii) the June 2011 Registration Statement. Throughout the Class Period, Defendant Henry also had the opportunity to correct misstatements and omissions by and on behalf of Molycorp, but failed to do so. During the Class Period, Defendant Henry reported direct sales of 69,000 shares of Molycorp common stock for proceeds of $3.5 million and profits of more than $3.3 million. These insider sales amounted to 51.3% of Defendant Henry's total Class Period holdings of Molycorp common stock. According to the Company's SEC filings, Defendant Henry's "strong background in management . . . brings significant organizational acumen to [Molycorp's] Board of Directors." Defendant Henry has not sold a single share of Molycorp common stock since June 2011.

39. Defendant Jack E. Thompson ("Thompson") was, at all relevant times, a Director of Molycorp. During the Class Period, Defendant Thompson participated in the issuance of false and/or materially misleading statements and omissions that misrepresented and/or failed to disclose the true facts about the absence of dysprosium and terbium at Mountain Pass by virtue of his position as a Director of Molycorp. In particular, Defendant Thompson signed the following false and materially misleading public filings: (i) the February 2011 Registration Statements; (ii) the 2010

Form 10-K; and (iii) the June 2011 Registration Statement.  Throughout the Class Period, Defendant

Thompson also had the opportunity to correct misstatements and omissions by and on behalf of

Molycorp, but failed to do so.  During the Class Period, Defendant Thompson reported direct sales

of 63,706 shares of Molycorp common stock for proceeds of $3.2 million and profits of more than

$3 million.  These insider sales amounted to 47.9% of Defendant Thompson's total Class Period

holdings of Molycorp common stock.  According to the Company's SEC filings, Defendant

Thompson served on the board of directors for a number of other mining companies and "brings

extensive knowledge of the mining industry and broad management experience to [the Company's]

Board of Directors."  Defendant Thompson has not sold a single share of Molycorp common stock

since June 2011.

40.     Defendants Molycorp, Smith, Allen, Ashburn, Bhappu, Cogut, Dolan, RCF, Burba,

Pegasus, Kristoff, T-II Holdings, Henry, and Thompson are referred to herein collectively as the

"1934 Act Defendants."  In addition, Defendants Smith, Ashburn, Bhappu, Cogut, Dolan, RCF,

Burba, Pegasus, Kristoff, T-II Holdings, Henry, and Thompson are referred to herein collectively as

the "Insider Defendants."  Moreover, Defendants Smith, Allen, Ashburn, Bhappu, Dolan, Burba,

Kristoff, Henry, and Thompson are referred to collectively herein as the "Individual Defendants."

Finally, Defendants Pegasus, RCF, and T-II Holdings are referred to collectively herein as the

"Shareholder Entity Defendants."

## C.     The 1933 Act Defendants

41.     On or about February 10, 2011, Molycorp conducted an IPO of 2.07 million shares of

preferred stock to trade under the symbol "MCP-PA" and a secondary offering of 15,025,00 shares

of common stock (the "February 2011 Offering").  The February 2011 Offering of common and

preferred stock was made pursuant to the Company's February 2011 Registration Statements and prospectuses on Form 424B4, dated February 10, 2011 and filed with the SEC on February 14, 2011 (the "February 2011 Prospectuses") (collectively, the "February 2011 Offering Documents"). Molycorp is statutorily liable under §11 of the 1933 Act for the materially untrue statements incorporated and contained in the February 2011 Offering Documents. In addition, on or about June 15, 2011 Molycorp completed a secondary offering of another 11.5 million shares of common stock (the "June 2011 Offering"). The June 2011 Offering was made pursuant to the Company's June 2011 Registration Statement and prospectus on Form 424B4, filed with the SEC on June 10, 2011 (the "June 2011 Prospectus") (collectively, the "June 2011 Offering Documents"). Molycorp is also liable under §11 of the 1933 Act for the issuance of the materially untrue statements incorporated in June 2011 Offering Documents.

42.     As alleged above, Defendant Smith was, at all relevant times, CEO, President, and a Director of Molycorp. Defendant Smith signed the Company's February 2011 Registration Statements in connection with the February 2011 Offering and the June 2011 Registration Statement in connection with the June 2011 Offering. The February and June 2011 Registration Statements were then incorporated into the February and June 2011 Prospectuses, respectively. Defendant Smith is statutorily liable under §§11 and 15 of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents. Defendant Smith failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts. Specifically, Defendant Smith disregarded years of ore

testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

43.     As alleged above, Defendant Allen was, at all relevant times, CFO and Treasurer of Molycorp.  Defendant Allen signed the Company's February 2011 Registration Statements in connection with the February 2011 Offering and the June 2011 Registration Statement in connection with the June 2011 Offering.  The February and June 2011 Registration Statements were then incorporated into the February and June 2011 Prospectuses, respectively.  Defendant Allen is statutorily liable under §§11 and 15 of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  Defendant Allen failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, Defendant Allen disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

44.     As alleged above, Defendant Ashburn was, at all relevant times, Executive Vice President and General Counsel of Molycorp.  Defendant Ashburn exercised control over the Company by virtue of his positions as Vice President and General Counsel of Molycorp.  In particular, Defendant Ashburn participated in the preparation and dissemination of the Company's February 2011 Registration Statements in connection with the February 2011 Offering and June 2011 Registration Statement in connection with the June 2011 Offering.  The February and June 2011 Registration Statements were then incorporated into the February and June 2011 Prospectuses, respectively.  Defendant Ashburn is statutorily liable under §15 of the 1933 Act because he was able

- 21 -

to, and did, control the contents of the February and June 2011 Offering Documents, which contained materially untrue statements and omissions of material fact.

45.     Defendant Russell D. Ball ("Ball") was, at all relevant times, a Director of Molycorp. According to the Company's SEC filings, Defendant "Ball brings a unique and important understanding of finance and accounting in the international mining industry to our Board of Directors."  Defendant Ball signed the Company's February 2011 Registration Statements in connection with the February 2011 Offering and June 2011 Registration Statement in connection with the June 2011 Offering.  The February and June 2011 Registration Statements were then incorporated into the February and June 2011 Prospectuses, respectively.  Defendant Ball is statutorily liable under §§11 and 15 of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  Defendant Ball failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, Defendant Ball disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

46.     As alleged above, Defendant Bhappu was, at all relevant times, the Chairman of the Board of Molycorp.  Defendant Bhappu signed the Company's February 2011 Registration Statements in connection with the February 2011 Offering and June 2011 Registration Statement in connection with the June 2011 Offering.  The February and June 2011 Registration Statements were then incorporated into the February and June 2011 Prospectuses, respectively.  Defendant Bhappu is statutorily liable under §§11 and 15 of the 1933 Act for the materially untrue statements incorporated

and/or contained in the February and June 2011 Offering Documents.  Defendant Bhappu failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, Defendant Bhappu disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

47.     As alleged above, Defendant Burba was, at all relevant times, Executive Vice President and CTO of Molycorp.  Defendant Burba exercised control over the Company by virtue of his positions as Vice President and CTO of Molycorp.  In particular, Defendant Burba participated in the preparation and dissemination of the Company's February 2011 Registration Statements in connection with the February 2011 Offering and June 2011 Registration Statement in connection with the June 2011 Offering.  The February and June 2011 Registration Statements were then incorporated into the February and June 2011 Prospectuses, respectively.  Defendant Burba is statutorily liable under §15 of the 1933 Act because he was able to, and did, control the contents of the February and June 2011 Offering Documents, which contained materially untrue statements and omissions of material fact.

48.     As alleged above, Defendant Dolan was, at all relevant times, a Director of Molycorp. Defendant Dolan signed the Company's February 2011 Registration Statements in connection with the February 2011 Offering and June 2011 Registration Statement in connection with the June 2011 Offering.  The February and June 2011 Registration Statements were then incorporated into the February and June 2011 Prospectuses, respectively. Defendant Dolan is statutorily liable under §§11 and 15 of the 1933 Act for the materially untrue statements incorporated and/or contained in the

- 23 -

February and June 2011 Offering Documents.  Defendant Dolan failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, Defendant Dolan disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

49.     As alleged above, Defendant Kristoff was, at all relevant times, a Director of Molycorp.  Defendant Kristoff signed the Company's February 2011 Registration Statements in connection with the February 2011 Offering and June 2011 Registration Statement in connection with the June 2011 Offering.  The February and June 2011 Registration Statements were then incorporated into the February and June 2011 Prospectuses, respectively.  Defendant Kristoff is statutorily liable under §§11 and 15 of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  Defendant Kristoff failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, Defendant Kristoff disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

50.     Defendant Alec Machiels ("Machiels") was, at all relevant times, a Director of Molycorp.  According to the Company's SEC filings, Defendant Machiels' "strong background in financial management and investment in commodity-related businesses provides [the Company's] Board of Directors with a valuable perspective on strategic, financial and capital raising matters."

- 24 -

Defendant Machiels signed the Company's February 2011 Registration Statements in connection with the February 2011 Offering and June 2011 Registration Statement in connection with the June 2011 Offering.  The February and June 2011 Registration Statements were then incorporated into the February and June 2011 Prospectuses, respectively.  Defendant Machiels is statutorily liable under §§11 and 15 of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  Defendant Machiels failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, Defendant Machiels disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

51.     As alleged above, Defendant Henry was, at all relevant times, a Director of Molycorp. Defendant Henry signed the Company's February 2011 Registration Statements in connection with the February 2011 Offering and June 2011 Registration Statement in connection with the June 2011 Offering.  The February and June 2011 Registration Statements were then incorporated into the February and June 2011 Prospectuses, respectively.  Defendant Henry is statutorily liable under §§11 and 15 of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  Defendant Henry failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, Defendant Henry disregarded years of ore testing maintained in the

Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

52.     As alleged above, Defendant Thompson was, at all relevant times, a Director of Molycorp.  Defendant Thompson signed the Company's February 2011 Registration Statements in connection with the February 2011 Offering and June 2011 Registration Statement in connection with the June 2011 Offering.   The February and June 2011 Registration Statements were then incorporated into the February and June 2011 Prospectuses, respectively.  Defendant Thompson is statutorily liable under §§11 and 15 of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  Defendant Thompson failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, Defendant Thompson disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

53.     Defendant Morgan Stanley & Co. Incorporated acted as a lead underwriter of the February 2011 Offering.  Morgan Stanley & Co. LLC acted as a lead underwriter of the June 2011 Offering.  Defendants Morgan Stanley & Co. Incorporated and Morgan Stanley & Co. LLC are collectively referred to herein as "Morgan Stanley."  Morgan Stanley is statutorily liable under §§11 and 12(a)(2) of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  Morgan Stanley failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit

- 26 -

material facts.  Specifically, Morgan Stanley disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

54.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") acted as a lead underwriter of the February 2011 Offering.  J.P. Morgan also acted as a lead underwriter of the June 2011 Offering. J.P. Morgan is statutorily liable under §§11 and 12(a)(2) of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  J.P. Morgan failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, J.P. Morgan disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

55.     Defendant Knight Capital Americas, L.P. ("Knight") acted as an additional underwriter of the February and June 2011 Offerings.  Knight is statutorily liable under §§11 and 12(a)(2) of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  Knight failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent and/or omit any material facts.  Specifically, Knight disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

56.     Defendant Dahlman Rose & Company, LLC ("Dahlman") acted as an additional underwriter in the February and June 2011 Offerings.  Dahlman is statutorily liable under §§11 and 12(a)(2) of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  Dahlman failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, Dahlman disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

57.     Defendant Stifel, Nicolaus & Company Incorporated ("Stifel") acted as an additional underwriter in the February and June 2011 Offerings.  Stifel is statutorily liable under §§11 and 12(a)(2) of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  Stifel failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, Stifel disregarded years of ore testing maintained in the Company's LIMS system establishing that  Mountain Pass lacked the HREEs dysprosium and terbium.

58.     Defendant BNP Paribas Securities Corp. ("BNP") acted as an additional underwriter in the February and June 2011 Offerings.  BNP is statutorily liable under §§11 and 12(a)(2) of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  BNP failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.

- 28 -

Specifically, BNP disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

59.     Defendant CIBC World Markets Corp. ("CIBC") acted as an additional underwriter in the February and  June 2011 Offerings.  CIBC is statutorily liable under §§11 and 12(a)(2) of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  CIBC failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts. Specifically, CIBC disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

60.     Defendant Piper Jaffray & Co. ("Piper Jaffray") acted as an additional underwriter of the secondary offering of 11.5 million shares of Molycorp common stock in the February and June 2011 Offerings.  Piper Jaffray is statutorily liable under §§11 and 12(a)(2) of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June 2011 Offering Documents.  Piper Jaffray failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, Piper Jaffray disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

61.     Defendant RBS Securities Inc. ("RBS") acted as an additional underwriter in the February and June 2011 Offerings.  RBS is statutorily liable under §§11 and 12(a)(2) of the 1933 Act for the materially untrue statements incorporated and/or contained in the February and June

2011 Offering Documents.  RBS failed to perform adequate due diligence and/or did not possess reasonable grounds for the belief that the statements contained and/or incorporated in the February and June 2011 Offering Documents did not misrepresent or omit any material facts.  Specifically, RBS disregarded years of ore testing maintained in the Company's LIMS system establishing that Mountain Pass lacked the HREEs dysprosium and terbium.

62.     Defendants Morgan Stanley, J.P. Morgan, Knight, Dahlman, Stifel, BNP, CIBC, Piper Jaffray, and RBS are collectively referred to herein as the "Underwriter Defendants."  The Underwriter Defendants shared $5.9 million and $20.4 million in underwriting fees in connection with the February and June 2011 Offerings, respectively.

63.     Defendants Molycorp, Smith, Allen, Ashburn, Ball, Bhappu, Burba, Dolan, Kristoff, Machiels, Henry, Thompson, Morgan Stanley, J.P. Morgan, Knight, Dahlman, Stifel, BNP, CIBC, Piper Jaffray, and RBS are collectively referred to herein as the "1933 Act Defendants."

D.     **Control Person/Group Published Information Allegations**

64.     It is appropriate to treat all of the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and public statements, as alleged herein, was the result of the collective actions of the Individual Defendants identified above.  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

- 30 -

65.     The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of securities laws.

66.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the 1934 Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

67.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of Molycorp, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. As such, the Individual Defendants were controlling persons of Molycorp within the meaning of §20(a) of the 1934 Act. Further, the Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the

ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

68.    In 1949, REEs were discovered at the Mountain Pass mine, which is located just north of the unincorporated community of Mountain Pass, California. Molybdenum Corporation of America acquired the mining claims at Mountain Pass the next year and began producing certain REEs in 1952.

69.    During the 1960s and through the 1980s, Mountain Pass was the world's dominant source of REOs, driven by low production costs and the rapid growth in demand for light rare earth elements ("LREEs"), particularly europium for use in television and computer monitors and cerium for glass polishing. By 2000, however, virtually all such LREEs were imported from China. Due to the huge supply of LREEs in China and a series of environmental accidents, Mountain Pass ceased production of REEs in 2002.

70.    At that time, Unocal owned Mountain Pass, which it then sold to Chevron in 2005. In June 2008, Molycorp Minerals was formed to purchase Mountain Pass from Chevron. Thereafter, under the direction of Defendants Smith, Allen, Ashburn and Burba, Molycorp Minerals embarked on a campaign to return Mountain Pass to the position of a dominant global player in the REE market. In March 2010, Molycorp was formed for the purpose of effectively converting Molycorp Minerals into a publicly-traded company. Molycorp Minerals is now a subsidiary of Molycorp.

- 32 -

71.     On July 29, 2010, Molycorp became a publicly traded firm through the IPO of 28.1 million shares of common stock priced at $14.00 per share.  The Company's common stock trades under the ticker symbol "MCP" on the NYSE.

### B.     Defendants' Unlawful Scheme

72.     Just like the "gold-rush" days of the 19th century, Defendants assured investors that the development of Mountain Pass through Molycorp's modernization and expansion plan known as "Project Phoenix" was a sure-bet to meet growing global demand for REEs, as well as to address global scarcity of the same.  With respect to highly valued HREEs, such as dysprosium and terbium, Defendants misleadingly informed investors that dysprosium and terbium were "principal products" and were present in the ore deposit at Mountain Pass.

73.     Defendants' false and misleading Class Period statements and omissions were material to investors and their investment decisions.  For example, in a report entitled "*Critical Materials Strategy*," the U.S. Department of Energy ("DOE") concluded that dysprosium and terbium would be crucial to a number of applications, including, among others, clean energy technologies and military defense applications, and that the global supply of these elements would be critically deficient for the foreseeable future, observing in pertinent part:

**Executive Summary**

This report examines the role of rare earth metals and other materials in the clean energy economy.  It was prepared by the U.S. Department of Energy (DOE) based on data collected and research performed during 2010.  Its main conclusions include:

- Several clean energy technologies – including wind turbines, electric vehicles, photovoltaic cells and fluorescent lighting – use materials at risk of supply disruptions in the short term.

- 33 -

- Clean energy technologies currently constitute about 20 percent of global consumption of critical materials. As clean energy technologies are deployed more widely in the decades ahead, their share of global consumption of critical materials will likely grow.

- *Of the materials analyzed, five rare earth metals (dysprosium, neodymium, terbium, europium and yttrium), as well as indium, are assessed as most critical in the short term. For this purpose, "critically" is a measure that combines importance to the clean energy economy and risk of supply disruption*.

- Sound policies and strategic investments can reduce the risk of supply disruptions, especially in the medium and long term.

- Data with respect to many of the issues considered in this report are sparse.

In the report, DOE describes plans to (i) develop its first integrated research agenda addressing critical materials, building on three technical workshops convened by the Department during November and December 2010; (ii) strengthen its capacity for information-gathering on this topic; and (iii) work closely with international partners, including Japan and Europe, to reduce vulnerability to supply disruptions and address critical material needs. DOE will work with other stakeholders – including interagency colleagues, Congress and the public – to shape policy tools that strengthen the United States' strategic capabilities. DOE also announces its plan to develop an updated critical materials strategy, based upon additional events and information, by the end of 2011.

DOE's strategy with respect to critical materials rests on three pillars. First, diversified global supply chains are essential. To manage supply risk, multiple sources of materials are required. This means taking steps to facilitate extraction, processing and manufacturing here in the United States, as well as encouraging other nations to expedite alternative supplies. In all cases, extraction and processing should be done in an environmentally sound manner. Second, substitutes must be developed. Research leading to material and technology substitutes will improve flexibility and help meet the material needs of the clean energy economy. Third, recycling, reuse and more efficient use could significantly lower world demand for newly extracted materials. Research into recycling processes coupled with well-designed policies will help make recycling economically viable over time.

74.     Consistent with the DOE's December 2010 conclusion that HREEs were critical to

the clean energy economy, Defendants emphasized in the Company's February and June 2011

Offering Documents that *dysprosium and terbium* "are critical to clean energy technologies in the

- 34 -

short term and medium term due to . . . [the] risk of supply disruption" and "**_heavy REEs, such as_**

**_dysprosium_**, which provide much of the heat-resistant qualities of permanent magnets used in many

industr[ies] and defense applications, **_are considered to be important_**."

75.    In complete contradiction to Defendants' materially false and misleading Class Period

statements that the Company's principal products included dysprosium and terbium and that these

elements existed in the ore deposit at Mountain Pass, the Mountain Pass ore body did not (and never

would) contain virtually any HREEs.  With knowledge and/or reckless disregard of these materially

adverse non-public facts, during the Class Period, the Insider Defendants unloaded 31,419,972

shares of their personal holdings of Molycorp common stock, generating over **_$1.5 billion_** in

unlawful insider trading proceeds and, based on their cost basis per share, over **_$1.4 billion_** in trading

profits.  This amounted to the sale of between 21% and 52% of the Insider Defendants' total

holdings of Molycorp stock.

> **C.    Defendants' Knowledge and/or Reckless Disregard of Materially
> Adverse Non-Public Facts**

76.    The allegations of falsity and scienter in this case are corroborated and supported by

the first-hand knowledge of confidential witnesses ("CWs") (herein after referred to as "CW1" and

"CW2").  Each of the CWs is a former employee of both Molycorp Minerals and Molycorp.  As

detailed below, based upon the CWs' respective positions at Molycorp Minerals and Molycorp, they

each possessed personal knowledge of the facts relevant to Defendants' fraud alleged herein.

77.    CW1 is a former analytical chemist at Molycorp Minerals and Molycorp.  CW1 was

employed by Molycorp Minerals between 2008 and 2010 and by Molycorp between 2010 and 2012.

Between 2008 and 2012, CW1 was involved in the daily analysis of 20 to 30 samples of Mountain

Pass ore, including from Mountain Pass stockpiles.  According to CW1, over the course of these four

- 35 -

years, each of the 20 to 30 daily samples of Mountain Pass ore revealed that there were no HREEs –

including dysprosium and terbium – at Mountain Pass.  The daily ore tests were being conducted to

measure the amounts of REEs at the Mountain Pass ore body, including HREEs.  CW1 added that

through "float tests" of the Mountain Pass ore body conducted during CW1's employment between

2008 and 2012, the Company repeatedly confirmed the virtual absence of HREEs at Mountain Pass.[2]

78.    CW1 stated that the data output of the daily testing of 20 to 30 samples of Mountain

Pass ore between 2008 and 2012 was recorded in notebooks and entered into the computerized LIMS

system operated by Molycorp Minerals and Molycorp.

79.    LIMS systems are ubiquitous in the mining industry.[3]  LIMS systems are specifically

designed to communicate data regarding ore testing between the laboratory and key business

decision makers, such as Defendants Smith, Burba, Ashburn, and Allen in this case.[4]  The daily

testing of Mountain Pass ore, moreover, was directly connected to the operations of Mountain Pass

during the Class Period.  Indeed, it is implausible that Defendants Smith, Burba, Ashburn, and Allen,

given their self-proclaimed long histories of working for the businesses that formerly operated

---

[2]    Float testing (or "sink-floats") is a separation procedure that relies on an element or mineral's gravimetric and/or magnetic characteristics.  During the process, lighter elements float to the top of the medium (usually a specific liquid chemical with a specific density characteristic) and heavy elements sink to the bottom of the medium.

[3]    *See, e.g.*, http://www.thermoscientific.com/en/product/lims-solution-metals-mining-1.html.

[4]    *See id.* ("With an enterprise LIMS, companies can spot trends and monitor product quality more quickly and easily, dramatically improving their overall quality control process . . . . SampleManager LIMS helps ensure accurate data flow between the lab and the rest of the organization.  Having that data available to managers and decision-makers organization-wide leads to faster, data-driven business decision-making."); *see also* http://www.labware.com /en/p/Industries/Mining-and-Metals (listing Molycorp as a customer and noting that its LIMS software designed for mining and metals laboratory management enables "[r]eal time decision making supported by continuous access to timely and reliable information").

Mountain Pass, did not understand that the LIMS data to which they had access indicated that there were virtually no HREEs – particularly dysprosium and terbium – within the Mountain Pass ore deposit.

80.     CW2 is a former operator at Molycorp Minerals and Molycorp.  CW2 was employed by Molycorp Minerals between 2008 and 2010 and by Molycorp between 2010 and 2012 and worked at Mountain Pass.  CW2's responsibilities included operating machinery that produced REE products from the ore retrieved from Mountain Pass between 2008 and 2012.  As a result of CW2's work between 2008 and 2012, CW2 learned that Mountain Pass had been unable to produce HREEs for decades.  Throughout the entirety of CW2's employment with Molycorp Minerals and Molycorp, Mountain Pass never produced HREEs, let alone dysprosium or terbium.  CW2 stated that because Mountain Pass had not and could not generate HREEs for decades prior to 2008, Mountain Pass would likely never generate HREEs.  CW2's knowledge of facts regarding HREEs corroborates the statements of CW1, who had been conducting 20 to 30 Mountain Pass ore tests each day between 2008 and 2012, with not a single one of those tests showing that Mountain Pass was capable of producing HREEs, including dysprosium and terbium.

81.     In addition to the information that CW1 and CW2 provided, other facts establish that Defendants either knew of or recklessly disregarded that the Mountain Pass deposit contained virtually no HREEs, including the critical HREEs dysprosium and terbium.   For example, Defendants Smith and Allen held themselves out to investors and the market as the persons most knowledgeable about Mountain Pass's capabilities, including the ability to extract critical HREEs, such as the purportedly "principal products" dysprosium and terbium, from the deposit.  On March 9, 2011, Defendants Smith and Allen participated in the Company's conference call to discuss its

- 37 -

earnings results for the fourth quarter ended December 31, 2010.  During the call, a Jacobs Securities analyst asked Defendants Smith and Allen whether Molycorp would be obtaining its dysprosium and terbium from a source other than the Mountain Pass deposit.  Defendant Smith unequivocally responded:  "*No.  That's all from the Mountain Pass rare earth ore body*."  Moreover, Defendant Allen did not correct Defendant Smith's materially misleading statement.  On August 11, 2011, Defendants Smith and Allen participated in the Company's conference call to discuss its earnings for 2Q11.  During the call, a Gilmore and Company analyst informed Defendants that "my concern is, as a shareholder, is a perceived lack of the heavies, particularly dysprosium [and] terbium" and asked them what their plan was to secure supply.  Again, Defendant Smith unequivocally responded: "*First of all, let me reiterate from prior calls that Molycorp will be producing 10 rare earth elements [from Mountain Pass] and we will be producing heavy rare earth metals . . . .*" Defendant Smith added "*[t]he dysprosium issue, which is linked to terbium as well, is really related to the rare earth magnet business, because without dysprosium, of course, these neodymium iron boron magnets will not be able to operate at the higher temperature capacities without that dysprosium.  So, in order to address that, our first approach is, we will be producing [dysprosium] from both Mountain Pass and Molycorp Silmat*."  And again, Defendant Allen said nothing to correct Defendant Smith's false assertion.  Finally, on November 13, 2011, two days after the end of the Class Period, Defendant Smith admitted on the Company's website that he had direct knowledge of the HREE capabilities at Mountain Pass:  "*It is not clear how this whole issue became such an important matter and I certainly apologize for any confusion people in our company may have caused who stated things they were not in a position to talk about, due to the lack of knowledge. . . . It is unclear to me why the commentators who wrote on this subject did not simply call me . . . .*"

- 38 -

82.     At no time during their Class Period communications with investors did any Defendant assert that they were not knowledgeable about the HREE capabilities at Mountain Pass. Rather, the Company touted Defendant Smith's over 24 years of experience in operating and developing the Mountain Pass mine and his "deep understanding" of its capabilities.  Further, Defendants held key executive positions at Molycorp Minerals and Molycorp between 2008 and throughout the Class Period.  It is implausible, therefore, that Defendants did not have direct knowledge of the lack of HREEs at Mountain Pass, as established by years of ore testing, the results of which were recorded and reported in the Company's LIMS system.  As such, Defendants' repeated assurances to investors during the Class Period that dysprosium and terbium were the Company's "***principal products***" and that these critical HREEs existed at the Mountain Pass deposit despite years of contemporaneous ore testing establishing just the opposite, were at a minimum made recklessly.

83.     Given that Defendants Smith, Allen, Ashburn, and Burba were key executives of Molycorp Minerals and Molycorp between 2008 and 2010, when there were no more than 133 employees working at Mountain Pass, these Defendants would be the first to know that the daily ore tests, as well as float tests designed to identify the presence of HREES, established and confirmed that the Mountain Pass deposit had virtually no dysprosium and terbium.  These tests were part of the Company's operations and were conducted for the purpose of determining whether HREEs existed at Mountain Pass and could be produced through mining.  In addition, Molycorp itself acknowledged to investors in its August 2010 IPO documents that Defendant Burba, who holds a Ph.D. in physical chemistry, was responsible for identifying and developing technologies concerning rare earth deposits at Mountain Pass since at least 2008.  As such, it is doubtful that Defendants did

- 39 -

not know of the daily tests conducted for years prior to and throughout the Class Period showing that no HREEs existed at Mountain Pass at the time they made the false and misleading Class Period statements.

**D.    Defendants' Motivation to Commit Securities Fraud: Insider Trading**

84.    During the Class Period, the Insider Defendants reported selling the following Molycorp common stock either directly ("D") or indirectly ("I") through the entities that they controlled:

| Name | Date | Shares | Price | Proceeds | D/I | Entity |
|------|------|--------|-------|----------|-----|--------|
| Smith | 2/16/11 | 72,749 | $50.00 | $3,637,450 | I | KMSMITH |
|  | 3/16/11 | 11,596 | $50.00 | $579,800 | I | KMSMITH |
|  | 6/15/11 | 63,956 | $51.00 | $3,261,756 | I | KMSMITH |
|  |  | 110,959 | $51.00 | $5,658,909 | D |  |
|  |  | **259,260** |  | **$13,137,915** |  |  |
| Ashburn | 2/16/11 | 26,580 | $50.00 | $1,329,000 | D |  |
|  | 6/15/11 | 68,604 | $51.00 | $3,498,804 | D |  |
|  |  | **95,184** |  | **$4,827,804** |  |  |
| Bhappu/ | 2/16/11 | 6,976,383 | $50.00 | $348,819,150 | I | RCF |
| Dolan | 3/16/11 | 1,045,053 | $50.00 | $52,252,650 | I | RCF |
|  | 6/15/11 | 5,747,833 | $51.00 | $293,139,483 | I | RCF |
|  |  | **13,769,269** |  | **$694,211,283** |  |  |
| Burba | 2/16/11 | 33,225 | $50.00 | $1,661,250 | D |  |
|  | 6/15/11 | 85,757 | $51.00 | $4,373,607 | D |  |
|  |  | **118,982** |  | **$6,034,857** |  |  |
| T-II | 2/16/11 | 6,113,616 | $50 | $305,680,800 | I | Pegasus |
| Holdings/ | 3/16/11 | 929,847 | $50.00 | $46,492,350 | I | Pegasus |
| Pegasus/ | 6/15/11 | 5,226,610 | $51.00 | $266,557,110 | I | Pegasus |
| Cogut |  | **12,270,073** |  | **$618,730,260** |  |  |

| Name | Date | Shares | Price | Proceeds | D/I | Entity |
|------|------|--------|-------|----------|-----|--------|
| Kristoff | 2/16/11 | 120,782 | $50.00 | $6,039,100 | D | |
| | 2/16/11 | 2,339,028 | $50.00 | $116,951,400 | I | T-II Holdings |
| | 3/16/11 | 19,252 | $50.00 | $962,600 | D | |
| | 3/16/11 | 328,198 | $50.00 | $16,409,900 | I | T-II Holdings |
| | 6/15/11 | 49,704 | $51.00 | $2,534,904 | D | |
| | 6/15/11 | 1,917,484 | $51.00 | $97,791,684 | I | T-II Holdings |
| | | **4,774,448** | | **$240,689,588** | | |
| Henry | 6/15/11 | **69,000** | $51.00 | **$3,519,000** | D | |
| Thompson | 2/16/11 | 35,883 | $50.00 | $1,794,150 | D | |
| | 6/15/11 | 27,823 | $51.00 | $1,418,973 | D | |
| | | **63,706** | | **$3,213,123** | | |
| **TOTALS:** | | **31,419,922** | | **$1,584,363,830** | | |

85.     The highly suspicious amount and timing of this insider trading supports a strong inference that the Insider Defendants timed their respective trading with knowledge of the alleged fraud and sought to capture the stock's inflated value before the market could absorb the true information regarding the lack of HREEs at Mountain Pass.

86.     The amounts of Molycorp stock that each of the Insider Defendants sold as a percentage of their total holdings during the Class Period further support a strong inference of scienter.  Specifically:

| INSIDER | PERCENTAGE OF HOLDINGS SOLD |
|---------|------------------------------|
| Smith | 21% |
| Ashburn | 34% |
| RCF/Bhappu/Dolan | 49.8% |
| Burba | 34.7% |

| T-II Holdings Pegasus/Cogut | 50.1% |
|---|---|
| Kristoff | 52% |
| Henry | 51.3% |
| Thompson | 47.9% |

87.     The amounts of Molycorp stock that each of the Insider Defendants sold following the Class Period – *i.e.*, a period co-extensive with the length of the Class Period – are dramatically out of line with their Class Period insider sales and, thus, support a strong inference of scienter.  In this regard, Defendant Smith did not sell a single share of Molycorp common stock between the end of the Class Period and the termination of his employment in December 2012.  Likewise, Defendants Ashburn and Burba did not sell a single share of Molycorp common stock between the end of the Class Period and the terminations of their employment in March 2013.  Moreover, Defendants Bhappu, Dolan, Kristoff, Henry, and Thompson did not sell a single share of Molycorp common stock since June 2011.

88.     The fact that all of the Insider Defendants' common stock sales ceased completely after June 2011, a few months before the Company's stock price dropped below $30.00 per share, further establishes that the Class Period insider sales were unusual in timing and amounts, and not the norm.

89.     The Insider Defendants had plenty of opportunity to sell their stock during the Company's 2010 IPO, but they chose not to do so.  For example, Defendant Bhappu stated to *Forbes* in January 2011 that Molycorp insiders agreed not to sell their shares in connection with the 2010 IPO and further confirmed that "'***if an opportunity arises we look to monetize some of the position,***

*but we don't want to disrupt the company and the incredible run it has been on. . . .  If we do sell any shares it would be a relatively small stake*.'"  Contrary to Defendant Bhappu's January 2011 assurance to the public that Molycorp insiders would sell "a relatively small stake" of their investments, Defendants Bhappu, Kristoff, Henry, and Thompson, in fact, sold between 47.9% and 52% of their total holdings.  Accordingly, the timing of these Insider Defendants' sales is highly suspicious and further bolsters a strong inference of fraudulent intent.

90.     The Insider Defendants also recognized astronomical profits of over ***$1.4 billion*** from their illicit sales of Molycorp common stock.  While neither Molycorp nor the Insider Defendants disclosed the cost basis for the shares they sold between February and June 2011, a simple mathematical calculation ($117 million paid in capital divided by 53 million common shares) yields a $2.21 cost per share basis.  Based on this calculation, and in combination with information gleaned from the Insider Defendants' Forms 4 and the Company's Form S-1/A for the August 2010 IPO filed with the SEC, the Insider Defendants' profits on the shares sold during the Class Period were as follows:

| INSIDER | SHARES SOLD/PROCEEDS | COST BASIS | PROFITS |
|---|---|---|---|
| Smith | 100 @ $50 (IPO shares) | $12.90 | $3,710 |
| | 84,245 @ $50 | $2.21 | $4,026,069 |
| | 87,757 @ $51 | $2.21 | $4,281,664 |
| Ashburn | 10,100 @ $50 (IPO shares) | $14.00 | $363,600 |
| | 16,480 @ $50 | $2.21 | $787,579 |
| | 68,604 @ $51 | $2.21 | $3,347,189 |
| RCF/Bhappu/ Dolan | 1,500,000 @ $50 (IPO shares) | $14.00 | $5,400,000 |
| | 6,521,436 @ $50 | $2.21 | $311,659,426 |
| | 5,747,833 @ $51 | $2.21 | $280,436,772 |
| Burba | 6,600 @ $50 (IPO shares) | $14.00 | $237,600 |
| | 26,625 @ $50 | $2.21 | $1,272,409 |
| | 87,757 @ $51 | $2.21 | $4,281,176 |

| T-II Holdings/ Pegasus/ Cogut | 7,000,000 @ $50 5,200,000 @ $51 | $2.21 $2.21 | $334,530,000 $253,708,000 |
|---|---|---|---|
| Kristoff | 1,000,000 @ $50 (IPO shares) 1,800,000 @ $50 1,900,000 @ $51 | $14.00 $2.21 $2.21 | $36,000,000 $86,022,000 $92,701,000 |
| Henry | 1,500 @ $51 (IPO shares) 67,500 @ $51 | $14.00 $2.21 | $55,500 $3,293,325 |
| Thompson | 35,883 @ $50 27,823 @ $51 | $2.21 $2.21 | $1,712,459 $1,357,484 |
| | | **TOTAL:** | **$1,425,476,962** |

91.     In sum, the timing (all insider sales occurred from February to June 2011 with no sales coming after the Class Period), amount of stock sold (over $1.5 billion) and profits realized from these sales (over $1.4 billion) clearly establishes scienter on the part of the Insider Defendants.

## V.   MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

92.     All statements made by Defendants and alleged by Plaintiffs and the putative Class to be materially false and misleading are identified at ¶¶93, 95-96, 99, 102, 104, 107 in **bold and italics**.

93.     On February 7, 2011, Molycorp filed the February 2011 Form S-1/A with the SEC in connection with the February 2011 Offering of preferred and common stock.  The February 2011 Form S-1/A contained the following statements regarding HREEs:  (i) "***heavy REEs are contained in . . . our deposit at Mountain Pass"***; and (ii) ***"[o]ur principal products[] includ[e] . . . dysprosium[] and terbium***."  Defendants Smith, Allen, Ball, Bhappu, Dolan, Kristoff, Machiels, Henry, and Thompson signed the February 2011 Form S-1/A.

94.     Defendants emphasized the materiality of the purported statements of fact regarding HREEs – particularly with regard to dysprosium and terbium – in the February 2011 Form S-1/A.  Specifically, Defendants highlighted that "to produce and sell . . . terbium oxides for phosphors, and

- 44 -

dysprosium and terbium for magnets" would bring a "dramatic change to our business and results of operations."

95.     On February 11, 2011, Molycorp filed the February 2011 Form S-1MEF with the SEC for the purpose of adding shares of preferred stock to the February 2011 Offering indicated in the February 2011 Form S-1/A.  The February 2011 Form S-1MEF incorporated by reference all statements contained in the Company's February 2011 Form S-1/A.  Defendants Smith, Allen, Ball, Bhappu, Dolan, Kristoff, Machiels, Henry, and Thompson signed the February 2011 Form S-1MEF.

96.     On February 14, 2011, Molycorp filed the February 2011 Prospectuses with the SEC in connection with the February 2011 Offering.  The February 2011 Prospectuses contained the same alleged false and misleading statements as those described in ¶93.

97.     As a result of the Defendants' false and misleading statements made on February 7 and 11, 2011, the prices of Molycorp securities traded at artificially inflated levels.

98.     On February 16, 2011, the Insider Defendants sold over 16.7 million shares of their Molycorp common stock for proceeds of $785,912,300.  These Defendants failed in their duty imposed by §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder, either to disclose the material adverse facts stated in ¶¶77-78, 80, 109(a)-(b) before selling their stock, or to abstain from trading.

99.     On March 9, 2011, Molycorp filed the 2010 Form 10-K with the SEC.  Defendants Smith, Allen, Bhappu, Ball, Dolan, Henry, Kristoff, Machiels, and Thompson signed the 2010 Form 10-K.  The 2010 Form 10-K included the identical alleged false and misleading statements as those described in ¶93.

100.     As a result of Defendants' March 9, 2011 misleading statements, the price of Molycorp's securities continued to trade at artificially inflated levels.

101.     On March 16, 2011, the Insider Defendants sold over 4.6 million additional shares of their Molycorp common stock for proceeds of $233,648,700.  These Defendants failed in their duty imposed by §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder, either to disclose the material adverse facts stated in ¶¶77-78, 80, 109(a)-(b) before selling their stock, or to abstain from trading.

102.     On May 10, 2011, Molycorp filed with the SEC its 1Q11 Form 10-Q.  Defendants Smith and Allen signed the 1Q11 Form 10-Q.  The 1Q11 Form 10-Q stated:  "*Our principal products[] includ[e] . . . dysprosium[] and terbium* . . . . "

103.     As a result of Defendants May 10, 2011 misleading statements, the price of Molycorp's securities continued to trade at artificially inflated levels.

104.     On June 7, 2011 and June 10, 2011, Molycorp filed with the SEC the June 2011 Registration Statement and the June 2011 Prospectus, respectively, in connection with the June 2011 Offering of 11.5 million shares of common stock.  Defendants Smith, Allen, Ball, Bhappu, Dolan, Kristoff, Machiels, Henry, and Thompson signed the June 2011 Registration Statement.  The June 2011 Offering Documents contained the same alleged false and misleading statements as those described in ¶93.

105.     As a result of Defendants' June 10, 2011 misleading statements, the price of Molycorp's securities continued to trade at artificially inflated levels.

106.     On June 15, 2011, the Insider Defendants sold over 13.3 million shares of their Molycorp common stock pursuant to the secondary offering for proceeds of $681,756,780.  These

Defendants failed in their duty imposed by §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder, either to disclose the material adverse facts stated in ¶¶77-78, 80, 109(a)-(b) before selling their stock, or to abstain from trading.

107.    On August 11, 2011, Molycorp filed with the SEC its 2Q11 Form 10-Q.  Defendants Smith and Allen signed the 2Q11 Form 10-Q.  The 2Q11 Form 10-Q contained the same alleged false and misleading statement as that described in ¶102.

108.    As a result of Defendants' August 11, 2011 misleading statements, the price of Molycorp's common stock continued to trade at artificially inflated levels.

109.    Defendants' above statements in the February 2011 Offering Documents, the 2010 Form 10-K, the 1Q11 Form 10-Q, the June 2011 Offering Documents, and the 2Q11 Form 10-Q that (i) ***"heavy REEs are contained in . . . our deposit at Mountain Pass"*** and (ii) ***"[o]ur principal products[] include[e] . . . dysprosium[] and terbium"*** were materially false and misleading when made because Defendants failed to disclose that dysprosium and terbium did not exist at Mountain Pass and thus were not Molycorp's "principal products," as confirmed by the following CW information:

(a)    According to CW1, between 2008 and throughout 2011, Molycorp Minerals and Molycorp conducted daily tests of 20 to 30 samples of Mountain Pass ore body for the purpose of determining whether dysprosium and terbium existed at the mine.  The results of each of these analyses, kept in the LIMS system maintained by Molycorp Minerals and Molycorp between 2008 and throughout 2011, confirmed that there were no HREEs in the Mountain Pass deposit.  Moreover, according to CW1, "float tests" conducted during the same period failed to identify any significant quantities of HREEs at Mountain Pass (*see* ¶¶77-78, *supra*); and

(b)     According to CW2, who was responsible for operating machinery that extracted REE product from Mountain Pass as a former employee of both Molycorp Minerals and Molycorp between 2008 and throughout 2011, during this time period, Mountain Pass never produced any HREEs.  Moreover, because Mountain Pass had been unable to produce HREEs, including dysprosium and terbium, for decades prior to CW2's employment with Molycorp Minerals and Molycorp between 2008 and throughout 2011, CW2 explained that Mountain Pass would never be able to produce these elements (*see* ¶80, *supra*).

## VI.     LOSS CAUSATION/ECONOMIC LOSS

110.     Between November 8 and November 10, 2011, news began entering the market revealing in direct contradiction to Defendants' Class Period statements, that Molycorp had not determined whether any quantities of HREEs existed at the Mountain Pass mine, particularly dysprosium and terbium.  Specifically, during an November 8-10, 2011 Motor & Motion Association Technical Conference, a Molycorp senior executive informed participants at the conference that the Company had not found any quantities of HREEs in the Mountain Pass ore body.

111.     On November 10, 2011, Molycorp released its financial results for the third quarter ended September 30, 2011 ("3Q11"), announcing "record sales," record "gross margin," and "record operating income."  But during the Company's 3Q11 earnings conference call that same day, Defendant Smith stated that the furthest the Company had come toward actually identifying HREEs at Mountain Pass was its mere construction of a "cracking facility" (in order to separate HREEs), which investors had long understood to be far from completion, uneconomical, and inefficient.

112.     In reaction to the revelation of this news, and notwithstanding the announcement of "record" 3Q11 revenues and earnings, the Company's common stock price dropped from a

- 48 -

November 8, 2011 closing price of $42.29 per share to close at $33.45 on November 11, 2011.  The

Company's preferred stock also dropped from a November 8, 2011 closing price of $80.04 per share

to close at $69.92 on November 11, 2011.

113.    Market participants similarly reacted negatively to Defendants' apparent deception

concerning whether HREEs even existed at Mountain Pass.  For example, on November 11, 2011,

*Technology Metals Research* reported in an article entitled "What Molycorp Has NOT Said About

Its Future Rare Earth Production (Until Now)":

> Yesterday I listened to a conference call hosted by Molycorp Inc. . . . to discuss the company's Q3 2011 financial performance. . . . No surprises there; Mark Smith, the company's CEO, pointed out the record revenues that the company earned in this period, which of course is great news for Molycorp shareholders.
>
> As the call proceeded, Mr. Smith started to review what he called the company's "multi-pronged heavy rare-earth strategy" for the mid- and long term. My ears pricked up at this point . . . .
>
> *                 *                 *
>
> I've wondered for a long time now, just how Molycorp intended to produce these [heavy] REEs in "commercially significant quantities," given the small quantities present in the ore body.  Surely it wouldn't make sense, I thought, to build HREE separation circuits, given the significant costs associated with such a capability, for such a small quantity.  I know others have wondered the same thing, how such capabilities could be accounted for in the $781 million budget for Project Phoenix.

114.    On November 13, 2011, Defendant Smith acknowledged in the "Elementally Green

Blog" on Molycorp's website that, despite announcing record 3Q11 financial results, "*our stock*

*price went down*" when "*commentators . . . suggested recently we are not being as forthright as we*

*should be about the ability to produce heavies at Mountain Pass.*"  In the same November 13, 2011

blog entry, Defendant Smith added:  "*It is not clear how this whole issue became such an*

*important matter and I certainly apologize for any confusion people in our company may have*

- 49 -

*caused who stated things they were not in a position to talk about, due to the lack of knowledge. . .*

*. It is unclear to me why the commentators who wrote on this subject did not simply call me* . . . ."

115.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated and maintained Molycorp's stock price and operated as a fraud or deceit on Class Period purchasers of the Company's publicly-traded securities by misrepresenting and omitting material information about the operational capabilities of Mountain Pass.   When Defendants' Class Period statements that Molycorp's "principal products" included dysprosium and terbium and that these elements existed in the deposit at Mountain Pass were revealed to be false and misleading, Molycorp's securities prices fell precipitously.   As a result of their Class Period purchases of Molycorp stock, including the Company's preferred stock, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

116.    Defendants' false statements and omissions, identified herein at ¶¶92, 95-96, 99, 102, 104, 107, had the intended effect and caused the Company's stock to trade at artificially inflated levels up to and above $70 per share during the Class Period.

117.    As a direct result of the disclosures between November 8 and November 10, 2011, the Company's securities prices suffered an abnormal decline in value as the prior inflation in the prices of those securities dissipated.   By November 10, 2011, after information had entered the market revealing that HREEs did not exist at Mountain Pass, the Company's stock price dropped $6.18 per share, or 22.0%, on high trading volume.   This drop removed the inflation from Molycorp's securities prices, causing real economic loss to investors who had purchased the securities during the Class Period.

118.    The decline in the Company's securities prices at the end of the Class Period was a direct result of the nature and extent of Defendants' prior false statements and omissions being revealed to investors and the market.  The timing and magnitude of Molycorp's securities price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's securities prices and/or maintain such prices at artificially inflated levels and the subsequent significant decline in the value of Molycorp's securities prices when Defendants' prior misrepresentations and omissions were revealed.

## VII.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

119.    Plaintiffs and the Class are entitled to a presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, the material misstatements and omission alleged herein would induce a reasonable investor to misjudge the value of Molycorp's securities and, without knowledge of the misrepresented or omitted material facts, Plaintiffs and other members of the Class purchased or acquired Molycorp securities between the time Defendants misrepresented and failed to disclose material facts and the time the true facts were revealed.  Accordingly, Plaintiffs and other members of the Class relied, and are therefore entitled to have relied, upon the integrity of the market prices of Molycorp's securities, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

- 51 -

120.   At all relevant times, the market for Molycorp common and preferred stock before, during, and after the Class Period was efficient for the following reasons, among others:

(a)   Molycorp securities were listed and or actively traded on an efficient and automated trading market, the NYSE;

(b)   Molycorp filed periodic public reports with the SEC;

(c)   Molycorp regularly communicated with investors in the U.S., through established market communications mechanisms, including through regular dissemination of press releases on U.S. national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other reporting services and via the Internet;

(d)   Molycorp was followed by numerous major securities and industry analysts and brokerage firms throughout the Class Period who regularly issued reports that were distributed to investors.  Each of these reports were publicly available and entered the public marketplace;

(e)   Molycorp had a large market capitalization in excess of $1 billion throughout the Class Period; and

(f)   During the Class Period, on August 5, 2011, Molycorp filed a Form S-3ASR with the SEC, which may only be filed by well-known seasoned issuers.

121.   As a result of the foregoing, the market for Molycorp's securities promptly digested current, public information regarding Molycorp from publicly available sources and reflected such information in the price of the Company's securities.  Accordingly, all purchasers or acquirers of Molycorp securities during the Class Period suffered similar injury through their purchase or acquisition of Molycorp securities at artificially inflated prices.

122.    Plaintiffs and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## VIII.   NO SAFE HARBOR

123.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded herein.   Particularly, Defendants' statements concerning the existence of HREEs at Mountain Pass cannot be forward-looking statements subject to the PSLRA's safe-harbor provision because dysprosium and terbium never could be extracted from the Mountain Pass ore body.

124.    Many of the specific statements pleaded herein, moreover, were not identified as "forward-looking statements" when made.  To the extent any of the statements pleaded herein could be construed as forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Molycorp who knew that those statements were false when made.

125.    Defendants failed to provide any meaningful discussion of the risks which, throughout the Class Period, were materially and adversely impacting the Company's operations.

- 53 -

IX.     **CLASS ACTION ALLEGATIONS**

126.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the Class.  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

127.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and will preserve scarce Court resources.  Molycorp has millions of securities trading in the U.S., owned by hundreds, if not thousands, of institutional and retail investors.  Record owners and other members of the Class may be determined by Molycorp, its transfer agent, and depository institutions and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

128.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     Whether the 1933 Act and 1934 Act were violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     With respect to Plaintiffs' 1934 Act claims, whether Defendants knew or deliberately disregarded that their statements were false and misleading; and

(e)     The extent of damages sustained by Class members and the appropriate measure of damages.

129.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

130.    Plaintiffs will adequately protect the interests of the Class and have retained counsel with experience in class action securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

131.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for members of the Class to individually redress wrongs perpetrated by Defendants.  There will be no difficulty in the management of this case as a class action.

## FIRST CLAIM FOR RELIEF

### For Violations of §10(b) of the 1934 Act and Rule 10b-5
### Against Defendants Molycorp, Smith, Allen, Ashburn, Bhappu, Burba,
### Cogut, Pegasus, Dolan, RCF, Kristoff, T-II Holdings, Henry, and Thompson

132.    Plaintiffs repeat and reallege each and every allegation contained above (other than the disclaimers of fraud claims) as if fully set forth herein.  The First Claim is brought pursuant to §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, on behalf of all Class members against Defendants Molycorp, Smith, Allen, Ashburn, Bhappu, Burba, Cogut, Pegasus, Dolan, RCF, Kristoff, T-II Holdings, Henry, and Thompson (the "10(b) Defendants").

- 55 -

133.     During the Class Period, each of the 10(b) Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Molycorp securities; and (iii) cause Plaintiffs and other members of the Class to purchase Molycorp securities at artificially inflated prices and, as a result, suffer economic losses when the truth about Defendants' fraud was revealed.  In furtherance of this unlawful scheme, plan, and course of conduct, the 10(b) Defendants, and each of them, took the actions set forth herein.

134.     During the Class Period, the 10(b) Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Molycorp securities in violation of §10(b) of the 1934 Act and Rule 10b-5.

135.     The 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Molycorp as specified herein.

136.     During the Class Period, the 10(b) Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Molycorp's value and performance and continued substantial growth, which included: (i) the making

of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein; and (ii) engaging in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Molycorp securities.

137.     The 10(b) Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the 10(b) Defendants were high-level executives and directors at the Company during the Class Period; (ii) the 10(b) Defendants were privy to and participated in the creation, development, and reporting of the Company's Mountain Pass mining capabilities; and (iii) the 10(b) Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

138.     The 10(b) Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  The 10(b) Defendants' material misrepresentations and omissions were made knowingly or recklessly and for the purpose and effect of concealing Molycorp's operating condition and business prospects from the investing public and supporting the artificially inflated prices of the Company's securities.  As demonstrated by the alleged misstatements and omissions regarding the Company's operations throughout the Class Period, the 10(b) Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

1019208_1

139.    As a direct and proximate result of the 10(b) Defendants' dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Molycorp securities was artificially inflated during the Class Period.   In ignorance of the fact that market prices of Molycorp publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Molycorp securities during the Class Period at artificially inflated prices and were damaged thereby.

140.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.   Had Plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of Molycorp, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Molycorp securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

141.    By virtue of the foregoing, the 10(b) Defendants have violated §10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

142.    As a direct and proximate result of the 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM FOR RELIEF**

**For Violations of §20(a) of the 1934 Act**
**Against Defendants Smith, Allen, Ashburn, Bhappu,**
**Burba, Cogut, Dolan, Kristoff, Henry, and Thompson**

143.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  The Second Claim is brought pursuant to §20(a) of the 1934 Act, 15 U.S.C. §78t(a), on behalf of all Class members against Defendants Smith, Allen, Ashburn, Bhappu, Burba, Cogut, Dolan, Kristoff, Henry, and Thompson (the "20(a) Defendants").

144.    The 20(a) Defendants acted as controlling persons of Molycorp and/or the Shareholder Entity Defendants within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their high-level positions, ownership, and contractual rights, participation in and awareness of the Company's operations and/or intimate knowledge of the statements disseminated to the investing public, the 20(a) Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading statements alleged herein, and/or the Shareholder Entity Defendants, including the insider selling transactions alleged herein.  The 20(a) Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, and public filings containing the false and misleading statements alleged herein prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of these statements or cause these statements to be corrected and/or directed the Shareholder Entity Defendants to sell shares of Molycorp common stock while failing to disclose all material, adverse, non-public information.

145.    In particular, the 20(a) Defendants had direct and supervisory involvement in the day-to-day operations of the Company and/or Shareholder Entity Defendants and, therefore, are

- 59 -

presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

146. As set forth above, the 20(a) Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions. By virtue of their positions as controlling persons, the 20(a) Defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of the 20(a) Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## X.    ALLEGATIONS SPECIFIC TO PLAINTIFFS' CLAIMS PURSUANT TO THE 1933 ACT

147. Plaintiffs incorporate by reference each non-fraud based allegation regarding the false and misleading statements set forth at ¶¶93, 95-96, 104, 109, *supra*. With respect to the 1933 Act claims, Plaintiffs do not allege that the 1933 Act Defendants committed fraud or acted with the intent to deceive. Rather, the 1933 Act Defendants' violations of §§11, 12(a)(2), and 15 of the 1933 Act are the result of negligent conduct triggering the strict liability provisions of the 1933 Act.

148. In the context of their claims for violations of §§11, 12(a)(2), and 15 of the 1933 Act, Plaintiffs specifically do not allege that any of the 1933 Act Defendants are liable for fraudulent or intentional conduct. Furthermore, Plaintiffs do not identify or name the Underwriter Defendants as parties to Plaintiffs' 1934 Act claims.

149. In connection with the 1933 Act claims, Plaintiffs allege that the February and June 2011 Offering Documents contained material misstatements and omitted material information that was required to be disclosed pursuant to SEC Regulations, including Item 303 of Regulation S-K, 17 C.F.R. §229.303. The material misrepresentations in the February and June 2011 Offering

Documents relate to, *inter alia*: (i) dysprosium and terbium being Molycorp's "principal products";

and (ii) the existence of HREEs, including dysprosium and terbium at Mountain Pass.

150.    The 1933 Act Defendants each owed to the purchasers of Molycorp's preferred and

common stock in the February and June 2011 Offerings the duty to make a reasonable and diligent

investigation into the accuracy of the statements contained in the February and June 2011 Offering

Documents at the time they became effective.   This duty included performing an appropriate

investigation to ensure that the statements contained in the offering documents were true and that

there were no omissions of material fact required to be stated in order to make the statements

contained in the February and June 2011 Offering Documents not materially misleading.   Each of

the 1933 Act Defendants failed to fulfill these duties.   Specifically, the 1933 Act Defendants

disregarded years of ore testing maintained in the Company's LIMS system establishing that

dysprosium and terbium did not exist at Mountain Pass.

## XI.    MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE OFFERING DOCUMENTS

### A.    The February 2011 Offering

151.    On or about February 10, 2011, Molycorp conducted the February 2011 Offering of

preferred and common stock.   In connection with the February 2011 Offering, Molycorp filed with

the SEC the February 2011 Registration Statements, pursuant to which the Company issued 13.5

million shares of common stock, while granting the Underwriter Defendants the option to purchase

an additional 2,025,000 common shares, which they subsequently exercised, and 1.8 million shares

of preferred stock, while granting Defendants Morgan Stanley and J.P. Morgan the option to

purchase an additional 270,000 preferred shares, which they subsequently exercised.   The February

2011 Registration Statements were signed by Defendants Smith, Allen, Ball, Bhappu, Dolan,

- 61 -

Kristoff, Machiels, Henry, and Thompson.  Thereafter, on February 14, 2011, Molycorp filed the February 2011 Prospectuses, valuing the 15,025,000 registered shares of common stock at $50 per share and the 1.8 million registered shares of preferred stock at $100 per share.

152.    As set forth above at ¶¶53-62, the Underwriter Defendants acted as the underwriters of the February 2011 Offering, with Defendants Morgan Stanley and J.P. Morgan serving as their representatives.  Pursuant to the underwriting agreement entered into on February 10, 2011 in connection with the February 2011 Offering, Morgan Stanley and J.P. Morgan each sold 5,328,950 shares of common stock and 900,000 shares of preferred stock, CIBC sold 454,734 shares of common stock, Dahlman sold 483,152 shares of common stock, BMO and Stifel each sold 397,899 shares of common stock, Knight sold 426,316 shares of common stock, and Piper Jaffray and RBS each sold 341,050 shares of common stock.  Plaintiffs and other Class members purchased from the Underwriter Defendants shares of Molycorp preferred and common stock in connection with the February 2011 Offering pursuant to the February 2011 Prospectuses.

### B.    The June 2011 Offering

153.    On June 7, 2011, Molycorp conducted the June 2011 Offering.  In connection with the June 2011 Offering, Molycorp filed with the SEC the June 2011 Registration Statement, pursuant to which the Company issued 10 million shares of common stock, while granting the Underwriter Defendants the option to purchase an additional 1.5 million common shares, which they subsequently exercised.  The June 2011 Registration Statement was signed by Defendants Smith, Allen, Ball, Bhappu, Dolan, Kristoff, Machiels, Henry, and Thompson.  Thereafter, on June 10, 2011, Molycorp filed the June 2011 Prospectus, valuing the 11.5 million registered shares of common stock at $51 per share.

1019208_1

154.    As set forth above at ¶¶53-62, the Underwriter Defendants acted as the underwriters of the June 2011 Offering, with Defendants Morgan Stanley and J.P. Morgan serving as their representatives.  Pursuant to the underwriting agreement entered into on June 9, 2011 in connection with the June 2011 Offering, Morgan Stanley and J.P. Morgan each sold 4,000,000 shares of common stock, Knight sold 475,000 shares of common stock, Dahlman sold 400,000 shares of common stock, Stifel sold 275,000 shares of common stock, BNP sold 250,000 shares of common stock, and CIBC, Piper Jaffray, and RBS each sold 200,000 shares of common stock.  Plaintiffs and other Class members purchased from the Underwriter Defendants shares of Molycorp common stock in connection with the June 2011 Offering pursuant to the June 2011 Prospectus.

155.    As alleged above at ¶¶93, 95-96, 104, the February and June 2011 Offering Documents each contained the following statements regarding HREEs:  (i) "*heavy REEs are contained in . . . our deposit at Mountain Pass*"; and (ii) "*[o]ur principal products[] includ[e] . . . dysprosium[] and terbium*."  These statements were materially false and misleading when made because the 1933 Act Defendants failed to disclose that dysprosium and terbium did not exist at Mountain Pass and thus were not Molycorp's "principal products," as confirmed by the following CW information:

(a)    According to CW1, between 2008 and throughout 2011, Molycorp Minerals and Molycorp conducted daily tests of 20 to 30 samples of Mountain Pass ore body for the purpose of determining whether dysprosium and terbium existed at the mine.  The results of each of these analyses, kept in the LIMS system maintained by Molycorp Minerals and Molycorp between 2008 and throughout 2011, confirmed that there were no HREEs in the Mountain Pass deposit.  Moreover,

- 63 -

according to CW1, "float tests" conducted during the same period failed to identify any significant quantities of HREEs at Mountain Pass (*see* ¶¶77-78, *supra*); and

(b)     According to CW2, who was responsible for operating machinery that extracted REE product from Mountain Pass as a former employee of both Molycorp Minerals and Molycorp between 2008 and throughout 2011, during this time period, Mountain Pass never produced any HREEs.  Moreover, because Mountain Pass had been unable to produce HREEs, including dysprosium and terbium, for decades prior to CW2's employment with Molycorp Minerals and Molycorp between 2008 and throughout 2011, CW2 explained that Mountain Pass would never be able to produce these elements (*see* ¶80, *supra*).

156.     The 1933 Act Defendants failed in their duty to perform reasonable due diligence that would have alerted them to the materially false and/or misleading statements and omissions contained in the February and June 2011 Offering Documents.  Specifically, the 1933 Act Defendants disregarded, and otherwise failed to disclose to investors years of ore testing conducted between 2008 and throughout 2011 maintained in the Company's LIMS system establishing that dysprosium and terbium did not exist at Mountain Pass.

157.     As alleged herein, the lack of any HREEs at Mountain Pass was not previously disclosed and was material to investors because HREEs were highly valued and a potential source of quality revenue and earnings to the Company.  Further, the 1933 Act Defendants were under a legally imposed duty to disclose this information in the February and June 2011 Offering Documents pursuant to Item 303 of Regulation S-K, because the lack of HREEs at Mountain Pass clearly represented a "known trend[] or uncertaint[y]" concerning Molycorp that would "have had . . . a material . . . unfavorable impact on [the Company's] net sales or revenues or income from [its]

continuing operations." Further, the 1933 Act Defendants were under a duty to disclose these facts when they asserted that dysprosium and terbium were principal products contained in the Mountain Pass deposit in order to make these statements, in light of the circumstances under which they were made, not misleading.

158.    The allegations at ¶¶77-78, 80, 93, 95-96, 104, 109 form the sole basis of Plaintiffs' 1933 Act claims against the 1933 Act Defendants.

## FIRST CLAIM FOR RELIEF UNDER THE 1933 ACT

### For Violations of §11 of the 1933 Act in Connection with the Offering of Securities Against Defendants Molycorp, Smith, Allen, Ball, Bhappu, Dolan, Kristoff, Machiels, Henry, Thompson, and the Underwriter Defendants

159.    The First Claim under the 1933 Act is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of all persons who purchased shares of Molycorp preferred or common stock issued pursuant or traceable to the February and June 2011 Registration Statements in connection with the February and June 2011 Offerings, respectively.  Plaintiffs Iron Workers and Salmon repeat and reallege the allegations in ¶¶147-158, as if fully set forth herein.  This First Claim is not based on any allegations of knowing or reckless misconduct and Plaintiffs disclaim any and all allegations of fraud for purposes of this 1933 Act claim.  Plaintiffs Iron Workers and Salmon assert this First Claim against Defendants Molycorp, Smith, Allen, Ball, Bhappu, Dolan, Kristoff, Machiels, Henry, Thompson, and the Underwriter Defendants (collectively, the "§11 Defendants").

160.    The February and June 2011 Registration Statements were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein, as set forth more fully above in ¶¶77-78, 93, 95-96, 104, 109, 155.

- 65 -

161.    Molycorp was the issuer of preferred and common stock pursuant to the February and June 2011 Registration Statements.  As the issuer of this preferred and common stock, Molycorp is strictly liable to members of the Class who purchased Molycorp preferred and common stock pursuant or traceable to the February and/or June 2011 Registration Statements, which contained the untrue statements and omissions of material fact alleged herein

162.    Defendants Smith, Allen, Ball, Bhappu, Dolan, Kristoff, Machiels, Henry, and Thompson signed the February and June 2011 Registration Statements.  These Defendants acted negligently and are therefore liable to Plaintiffs and other members of the Class who purchased shares of Molycorp preferred or common stock pursuant or traceable to the February and/or June 2011 Registration Statements.

163.    The Underwriter Defendants were the underwriters of the February and June 2011 Offerings.  The Underwriter Defendants acted negligently and are therefore liable to Plaintiffs and other members of the Class who purchased shares of Molycorp preferred or common stock pursuant or traceable to the February and/or June 2011 Registration Statements.

164.    Plaintiffs and other members of the Class purchased Molycorp preferred and common stock issued pursuant or traceable to the February and/or June 2011 Registration Statements, and did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements and omissions of material fact contained therein.

165.    None of the §11 Defendants conducted a reasonable investigation into or possessed reasonable grounds for the belief that the statements contained in the February and June 2011 Registration Statements were true and without omissions of any material facts and were not misleading.

- 66 -

166.    By reason of the conduct herein alleged, each of the Defendants in this First Claim violated, and/or controlled a person who violated, §11 of the 1933 Act.

167.    Plaintiffs and other members of the Class who purchased shares of Molycorp preferred or common stock pursuant or traceable to the February and/or June 2011 Registration Statements have sustained damages as a result of the untrue statements of omissions of material fact contained therein.  The value of Molycorp common and preferred stock has declined substantially subsequent to and due to the §11 Defendants' violations of the 1933 Act.

168.    At the time Plaintiffs and other members of the Class purchased shares of Molycorp preferred or common stock pursuant to the February and June 2011 Registration Statements, they were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to November 8, 2011.  This First Claim is brought within the applicable statute of limitations because less than one year has elapsed from the time Plaintiffs discovered or reasonably would have discovered the facts upon which it is based to the time that Plaintiffs initiated this action.  This First Claim is also brought within the applicable statute of repose because less than three years have elapsed between the time that the securities upon which this First Claim is brought were offered to the public and the time Plaintiffs initiated this action.

## SECOND CLAIM FOR RELIEF

### For Violations of §12(a)(2) of the 1933 Act
### Against the Underwriter Defendants

169.    The Second Claim under the 1933 Act is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77l, on behalf of Plaintiffs Iron Workers and Salmon and all other members of the Class who purchased Molycorp preferred or common stock in the February and/or June 2011 Offerings pursuant to the February and/or June 2011 Prospectuses, respectively.  Plaintiffs Iron

- 67 -

Workers and Salmon repeat and reallege the allegations in ¶¶147-168, as if fully set forth herein. This Claim is not based on any allegations of knowing or reckless misconduct and Plaintiffs disclaim any and all allegations of fraud for purposes of this claim.  Plaintiffs Iron Workers and Salmon assert this Claim against the Underwriter Defendants.

170.     The Underwriter Defendants were sellers, offerors and/or solicitors of sales of the common and preferred stock offered in connection with the February and June 2011 Offerings pursuant to the February and June 2011 Prospectuses, which contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein, as set forth more fully above in ¶¶77-78, 93, 95-96, 104, 109, 155.

171.     Plaintiffs and other members of the Class purchased shares of Molycorp common and preferred stock in the February and June 2011 Offerings pursuant to the February and June 2011 Prospectuses, and did not know, or in the exercise of reasonable care could not have known, of the untrue statements and omissions of material fact contained therein.

172.     Plaintiffs and members of the Class who purchased shares of Molycorp common and preferred stock in the February and June 2011 Offerings pursuant to the February and June 2011 Prospectuses are entitled to rescissory damages on any shares so purchased, but no longer held. Plaintiffs and members of the Class purchased shares of Molycorp common and preferred stock in the February and June 2011 Offerings pursuant to the February and June 2011 Prospectuses, for which Plaintiffs, individually and representatively, hereby elect to rescind and tender all such shares of Molycorp common and preferred stock to the Underwriter Defendants in return for the

consideration paid for those shares, together with interest thereon pursuant to §12(a)(2) of the 1933 Act.

173.     The Underwriter Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

174.     At the time Plaintiffs and other members of the Class purchased Molycorp securities, they were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to November 8, 2011.  This Second Claim is brought within the applicable statute of limitations because less than one year has elapsed from the time Plaintiffs discovered or reasonably would have discovered the facts upon which it is based to the time that Plaintiffs initiated this action.  This Second Claim is also brought within the applicable statute of repose because less than three years have elapsed between the time that the securities upon which this Second Claim is brought and were offered to the public and the time Plaintiffs initiated this action.

175.     By virtue of the foregoing, the Underwriter Defendants violated §12(a)(2) of the 1933 Act.

### THIRD CLAIM FOR RELIEF

**For Violations of §15 of the 1933 Act
Against Defendants Smith, Allen, Ashburn, Ball, Bhappu,
Burba, Dolan, Kristoff, Machiels, Henry, and Thompson**

176.     The Third Claim is brought pursuant to §15 of the 1933 Act, 15 U.S.C. §77o, on behalf of Plaintiffs Iron Workers and Salmon and all other members of the Class who purchased Molycorp preferred or common stock in the February and June 2011 Offerings pursuant to the

- 69 -

February and June 2011 Registration Statements, and this Third Claim is premised upon Molycorp's primary violation of §11 of the 1933 Act alleged above in the First Claim.  Plaintiffs Iron Workers and Salmon repeat and reallege the allegations in ¶¶147-175, as if fully set forth herein.  This 1933 Act Claim is not based on any allegations of knowing or reckless misconduct and Plaintiffs disclaim any and all allegations of fraud for purposes of this claim.  Plaintiffs assert this Third Claim against Defendants Smith, Allen, Ashburn, Bhappu, Burba, Dolan, Kristoff, Machiels, Henry, and Thompson (the "§15 Defendants").

177.   At all relevant times, each of the §15 Defendants was a control person of Molycorp by virtue of his position as a director and/or senior officer of Molycorp.  Each of the §15 Defendants had a series of direct and/or indirect business and/or personal relationships with the other directors and/or officers and/or major shareholders of Molycorp.

178.   Each of the §15 Defendants was a culpable participant in the violation of §11 of the 1933 Act alleged in the First Claim above, based on their having signed the February and June 2011 Registration Statements in connection with the February and June 2011 Offerings and/or having otherwise participated in the processes necessary to conduct the February and June 2011 Offerings.

179.   By reason of the foregoing, the §15 Defendants are liable under §15 of the 1933 Act jointly and severally with and to the same extent as Molycorp is liable under §11 of the 1933 Act, to Plaintiffs and other members of the Class who purchased Molycorp common or preferred stock in the February and June 2011 Offerings pursuant or traceable to the February or June 2011 Registration Statements.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

(a)    Declaring this action to be a Plaintiff class action properly maintained pursuant to Fed. R. Civ. P. 23(a) and (b)(3);

(b)    Awarding compensatory damages in favor of Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements;

(d)    Awarding extraordinary, equitable and/or injunctive relief (including, but not limited to, rescission); and

(e)    Awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## XIII.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial on all issues triable by a jury.

DATED:  May 29, 2015                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        JONAH H. GOLDSTEIN
                                        TRIG R. SMITH
                                        REGIS C. WORLEY, JR.


                                             s/ TRIG R. SMITH
                                            TRIG R. SMITH

                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        KESSLER TOPAZ MELTZER
                                          & CHECK, LLP
                                        MICHAEL YARNOFF
                                        MATTHEW MUSTOKOFF
                                        MEREDITH L. LAMBERT
                                        JOSHUA A. MATERESE
                                        280 King of Prussia Road
                                        Radnor, PA  19087
                                        Telephone:  610/667-7706
                                        610/667-7056 (fax)

                                        Co-Lead Counsel for Plaintiffs

                                        DYER & BERENS LLP
                                        ROBERT J. DYER III
                                        JEFFREY A. BERENS
                                        303 East 17th Avenue, Suite 810
                                        Denver, CO  80203
                                        Telephone:  303/861-1764
                                        303/395-0393 (fax)
                                        bob@dyerberens.com
                                        jeff@dyerberens.com

                                        Liaison Counsel for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2015, I authorized the electronic filing of the foregoing with

the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-

mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused

to be mailed the foregoing document or paper via the United States Postal Service to the non-

CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on May 29, 2015.

s/ TRIG R. SMITH
TRIG R. SMITH

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:trigs@rgrdlaw.com

# Mailing Information for a Case 1:12-cv-00292-RM-KMT Molycorp Shareholder Group et al v. Molycorp, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Stephen M. Baldini**
  sbaldini@akingump.com,nymco@akingump.com

- **Jeffrey Allen Berens**
  jeff@dyerberens.com,jeffreyberens@comcast.net

- **David Adam Berger**
  dberger@abv.com

- **Travis Shenandoah Biffar**
  tbiffar@jonesday.com,kamarkwick@jonesday.com

- **Brian Thomas Carney**
  bcarney@akingump.com

- **Jonah H. Goldstein**
  jonahg@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **John Jay Gross**
  jgross@ktmc.com,ahankins@ktmc.com

- **Stephen Kirk Ingebretsen**
  kingebretsen@shb.com,pheeren@shb.com,ssumpter@shb.com

- **Gregory J. Kerwin**
  gkerwin@gibsondunn.com,Denver_USDC@gibsondunn.com,AKostecka@gibsondunn.com,lhoward@gibsondunn.com

- **Peter George Koclanes**
  pkoclanes@shermanhoward.com,lcrisswell@shermanhoward.com,efiling@sah.com

- **Allison Kaye Kostecka**
  akostecka@gibsondunn.com,lapodaca@gibsondunn.com

- **Meredith Leigh Lambert**
  mlambert@ktmc.com

- **Eric Neil Landau**
  elandau@jonesday.com,kamarkwick@jonesday.com

- **Charles Walter Lilley**
  clilley@lilleylaw.com

- **Kevin Hugh Logan**
  klogan@jonesday.com

- **Joshua Angelo Materese**
  jmaterese@ktmc.com,ahankins@ktmc.com

- **Kim Elaine Miller**
  kim.miller@ksfcounsel.com,tamar.pacht@ksfcounsel.com,dawn.hartman@ksfcounsel.com

- **Jeffrey S. Nobel**
  jnobel@izardnobel.com,nkulesa@izardnobel.com

- **Nicole Susan Schram**
  nikki@jmvpclaw.com,monica@jmvpclaw.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,e_file_sd@rgrdlaw.com,asharbutt@rgrdlaw.com

- **Benjamin James Sweet**
  bsweet@carlsonlynch.com

- **The Allen Group**
  fmcconville@faruqilaw.com

- **Jeffrey Mark Villanueva**
  jeff@jmvpclaw.com,melissa@jmvpclaw.com,monica@jmvpclaw.com

- **Daniel F. Wake**
  dwake@shb.com,hhiatt@shb.com,pheeren@shb.com,ssumpter@shb.com,mwarnecker@shb.com

- **Regis C. Worley , Jr**
  rworley@rgrdlaw.com

- **Michael Keith Yarnoff**
  myarnoff@ktmc.com,namjed@ktmc.com,ahankins@ktmc.com

- **Jonathan D.K. Youngwood**
  jyoungwood@stblaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`